UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

K.S. on Behalf of Herself and Her Minor Child, D.S.,

Plaintiffs,

--against-

THE CITY OF NEW YORK, ST. VINCENT'S SERVICES, INC., HEARTSHARE HUMAN SERVICES OF NEW YORK, HEARTSHARE ST. VINCENT'S SERVICES, THE ADMINISTRATION FOR CHILDREN'S SERVICES, COMMISSIONER DAVID HANSELL, In His Official Capacity, JOHN OLUFEMI, ST. VINCENT'S ROSALYN CHERNOFSKY,  LYDIA KING,  DAWN SAFFAYEH, NEW YORK CITY DEPARTMENT OF EDUCATION, NEW YORK CITY BOARD OF EDUCATION, CHANCELLOR MEISHA PORTER, In her Official Capacity, TYANDA SMITH, PAUL FRANKEL, VIOLA WRIGHT, ELISSA GROSSINGER, BLANCA CORREA, DIANA JEFFREY, JOHN OLUFMI, LYSCHEL WILKERSON, HILDA ST. CATHERINE, HOWARD BISHOP, KENDRA MULZAC, MELODY CENTENO, KATELYN CHAPPELL, ANIKA TILLERY, AMANDA RILEY, NICHOLE EDWARDS, KEISHA WALKER, and TANISHA TABB,

Defendants.

Civ. No. 21-cv- 4649

SECOND AMENDED COMPLAINT

DEMAND FOR JURY TRIAL

## PRELIMINARY STATEMENT

1.      This is an action on behalf of K.S. and D.S. for the egregious neglect, failure to supervise, and numerous omissions by the Defendants while D.S. was in foster care from April 2009, when he was two years old, through May 2018, at the age of eleven years old, when he was adopted by his mother K.S.

2.      D.S. is a fifteen-year-old boy with multiple and severe psychological, psychiatric, and physical disabilities.

1

3.      K.S. on behalf of herself and D.S., ("Plaintiffs") bring this action against, *inter alia*, New York City, the Administration for Children's services ("ACS"), the ACS Commissioner in his official capacity, the foster care agencies responsible for D.S., their officials, and employees, as well as the New York City Department of Education, the New York City Board of Education, and the Chancellor of the City's schools.

4.      Plaintiffs raise individual and systemic causes of action under multiple federal and state laws.

5.      Upon information and belief, D.S. was abused in foster care, both physically and sexually.

6.      Among other things, certain Defendants failed to screen D.S.'s long-term foster parents (L.M. and O.M.) and inappropriately placed D.S. into their foster home, and maintained the inappropriate placement with L.M. and O.M. for six years despite repeated knowledge of medical, psychological and educational abuse and neglect by L.M. and O.M.

7.      Defendants placed D.S. with L.M. and O.M. as a "kinship" foster home, but which was, in fact, not.  Rather, L.M. and O.M. were not legal relatives of D.S. or his parent.

8.      Further, O.M. had disqualifying convictions and a history of incarceration for serious felonies and was also re-arrested for domestic violence while D.S. lived here.

9.      Further, ACS and Foster Care Defendants ignored indicated and multiple reports of abuse and neglect, and left D.S. and his siblings in the home and provided no assistance or services to remediate or negate the abuse and neglect.

10.     While in foster care, D.S. suffered, among other things, physical and sexual abuse (by one of his foster brothers), and D.S. also suffered gross neglect of his medical, psychological, psychiatric, mental health and educational needs, in gross disregard of his rights.

11.    Subsequently he was moved to at least four foster homes.

12.    Defendants negligently failed to supervise the foster homes in which D.S. was placed.

13.    Upon information and belief, D.S. has a history of seizures and Periventricular Leukomalacia, as well as other health conditions which were concealed from Plaintiff K.S. and not treated or addressed appropriately by Defendants while D.S. was in care.

14.    Further, certain Defendants denied D.S. necessary services, medical care, psychological care, appropriate special education services and placements, and psychological and psychiatric assessment and treatment while in foster care, as well as treatment for physical and sexual abuse.

15.    In addition, due to certain Defendants' actions, inactions, policies, procedures and practices, D.S.'s social, emotional, psychological, and educational needs were left unaddressed for many years.

16.    Defendants failed to ensure visitation with D.S.'s numerous siblings and interfered with the relationship between D.S. and his siblings. *See* 18 N.Y.C.R.R. § 431.10.

17.    Upon information and belief, there were no less than twelve HSVS case planners, seven HSVS supervisors, and five ACS case planners assigned to D.S.'s case during the time he was in foster care.  This resulted in a lack of continuity, information sharing, and rapport with the children.

18.    Moreover, foster care agency staff responsible for D.S. in 2017 and representatives of ACS intentionally misrepresented and intentionally concealed D.S.'s medical and psychiatric history, his history of sexual abuse, the level of care that D.S. required, his bizarre and sexualized behavior, such as defecating and urinating on the floor and in cups, and sexualized behavior toward

other children,  as well as his multiple hospitalizations, fraudulently inducing K.S. to agree to be D.S.'s pre-adoptive foster parent.

19.    The record reveals that there was no continuity of care, follow up to ensure appropriate care and education was being delivered, and that D.S. obtained a range of various diagnoses and was prescribed a host of multiple medications, that do not appear to have been properly managed and supervised, to determine whether and to what extent they were appropriate.

20.    Further, the ACS and the Foster Care Defendants never enrolled D.S. in therapy with an experienced, expert in trauma and sexual abuse, despite the severity of his issues, even once it was confirmed that he was anally raped in foster care by his foster brother.

21.    Further, certain Defendants were aware of a history of brain injury and seizures and actively, intentionally, and fraudulently concealed these issues from K.S. and refused to turn over medical records.

22.    Upon information and belief, Defendants had determined that D.S. required a therapeutic foster home prior to the time they placed D.S. with K.S. and concealed this fact from her.  Further, Defendants did not train or prepare K.S. for handling D.S.'s underlying severe behaviors and psychiatric conditions.

23.    Upon information and belief, Defendants had determined that D.S. required a residential placement when he was in elementary school, but Defendants never acted on this determination and withheld this information from K.S. as well as D.S.'s other foster parents.

24.    Further, Defendants did not train or prepare K.S. and D.S.'s other foster parents to handle or address D.S.'s underlying severe behaviors and psychiatric conditions.

25.    Once K.S. became his foster and pre-adoptive parent, various Defendants and individual employees of defendants withheld D.S.'s records – and continue to withhold some of

them to this day – despite a Family Court order and administrative subpoenas, and their agreement to turn over records, further hindering D.S.'s treatment and educational progress.

26.    It was the intention of the Defendants responsible for D.S.'s care to entice K.S. to adopt D.S. so as to relieve themselves of responsibility for D.S.

27.    It was gross misconduct for Defendants to have deliberately concealed and misrepresented D.S.'s medical, psychiatric and behavioral conditions to K.S., causing K.S. to agree to foster and then adopt K.S. when she did not have the resources to support and assist him.

28.    As a result, K.S. will need to incur significant expenses over the course of D.S.'s life - that she cannot afford – to try to provide care for D.S.

29.    K.S. has experienced and will continue to experience significant stress, anxiety, and emotional distress for the rest of her life in her effort to care for and help D.S., whose behavior, condition, and psychological issues are worsening.

30.    Defendants' concealment of these underlying medical and psychiatric conditions until recently has further injured D.S. and K.S. In particular, the fact that he has a history of seizures, and a brain injury was information that K.S. should have immediately had access to in order to try to obtain the appropriate medical care and follow-up testing.

31.    In addition, despite his significant needs, and life-long involvement in the special education system, Defendant DOE failed to assign a surrogate parent to act on his behalf and also failed to allow his foster parents to do so, even after his biological parents' rights were terminated.

32.    Even after the initial complaint was filed, and K.S. expressed to Defendants the urgent need for a full set of records for D.S.'s treatment,  that information was not timely provided and critical information about his sexual abuse in care was withheld and is continuing to be

withheld, despite the fact that it is necessary for his care and treatment to have a full history of his experiences before he was placed with K.S.

33.    The municipal Defendants – the City, ACS, and DOE Defendants – have a duty and obligation to ensure that policies, procedures and practices are in place to implement the requirement in the Individuals with Disabilities Education Act ("IDEA") that ensures that each foster child has an adult who has access to records and is provided information necessary to understand the special education process and can act on the child's behalf.

34.    They have utterly failed to do so and have failed to require and ensure that the foster care agencies in New York City, including the ones responsible for D.S., understand and implement the federal and state special education laws.

35.    Rather than receive the help he needed, D.S. was moved from educational setting to setting, without appropriate interventions to address his severe trauma and abuse, Post Traumatic Stress Disorder ("PTSD") and underlying medical conditions.

JURISDICTION

36.    Jurisdiction is conferred on this Court by 28 U.S.C. § 1343, which provides for original jurisdiction over all actions brought pursuant to 42 U.S.C. §1983, by 28 U.S.C. §1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States, and by 28 U.S.C. §1332.

37.    This Court also has jurisdiction over certain defendants and certain New York State law claims pursuant to 28 U.S.C. §1367.

38.    This Court also has jurisdiction over certain defendants and certain claims pursuant to 20 U.S.C. §1415 and 29 U.S.C. § 794.

PARTIES

39.     Plaintiff, K.S. and her son, D.S., are legal residents of Brooklyn, New York.

40.     D.S. is a "child with a disability" under the IDEA and an individual with a disability under Section 504 of the Rehabilitation Act.

41.     D.S. is currently in Massachusetts at the time this amended complaint is being filed. He had been attending a school there but was remanded to pretrial detention in family court.

42.     K.S., D.S., D.S.'s siblings, and D.S.'s foster parents are identified by their initials throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information, including under the IDEA, 20 U.S.C. § 1417(c), and the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g(b).  Minor D.S. is identified by his initials in accordance with Federal Rule of Civil Procedure 5.2(a).

43.     Defendant City of New York ("City") is a municipal corporation, incorporated pursuant to New York State law.

44.     Between April 2009 and May 2018, D.S. was in foster care.

45.     On May 22, 2018, K.S. adopted D.S. in New York.

46.     Under State and federal law, the government (City, County or State) has legal custody of every child who is in foster care in the United States.  *See* N.Y. Soc. Serv. L. §§ 378, 395; 42 U.S.C. § 672(a)(2)(B)(i); 42 U.S.C. § 672(a)(2)(B)(ii).

47.     Defendant City of New York has legal custody of each New York City child in foster care, including plaintiff, D.S., when he was in care.

48.     ACS is an agency of the City of New York that is authorized by New York State law to care for children in foster care.

49.     ACS is responsible for protecting children from child abuse, maltreatment, and neglect.

50.     Children in foster care are in the legal custody of the Commissioner of ACS.

51.     Jess Dannhauser is the Commissioner of ACS.  He was appointed on January 4, 2022. He is the successor-in-interest to former Commissioner David Hansell who was appointed in 2017.  Previously, Gladys Carrión served as ACS Commissioner between 2014 and 2016.  New York City Civil Court Judge Ronald Richter was ACS Commissioner between 2011 and 2013. John Mattingly served as ACS Commissioner from 2004 to 2011.

52.     Prior to joining ACS, Judge Richter was a New York City Family Court judge, and he presided over D.S.'s initial removal from his biological parent.

53.     Throughout this complaint, when the terms "the City" or "Defendant City" are used, those terms refer, individually and collectively, to ACS, the ASC Commissioner, the ACS Employees, and the City as a municipal corporation.

54.     When children are removed from the homes of their natural parents, the City contracts with private childcare organizations ("contract agency" or "foster care agency") for the provision of foster care services.

55.     Upon information and belief, the City of New York contracts with private not-for-profit foster care agencies to provide day-to-day care for most, but not all, of the City's foster children, including Plaintiff, D.S.

56.     Defendant City contracted with St. Vincent's Services, Inc., Heartshare Human Services of New York, and HeartShare St. Vincent's Services ("HSVS") to provide foster care to children, including D.S., and, in so doing, defendant City outsourced some of its statutory and constitutional obligations to those agencies and affiliated agencies.

57.     Upon information and belief, defendant St. Vincent's Services, Inc. ("St. Vincent's") is a not-for-profit corporation organized under the laws of the State of New York and

was during all relevant time periods and is an "authorized agency" as defined in New York Social Services Law § 371 and a "contract agency" as well as a "foster care agency."

58.    Upon information and belief defendant HeartShare Human Services of New York ("Heartshare") is a not-for-profit corporation organized under the laws of the State of New York and was during all relevant time periods and is an "authorized agency" as defined in New York Social Services Law § 371 and a "contract agency" as well as a "foster care agency."

59.    Upon information and belief, in 2014, Defendant HeartShare and St. Vincent's entered into an affiliation.

60.    Following that affiliation, St. Vincent's became known as HeartShare St. Vincent's Services ("HSVS").

61.    According to the press release issued by Heartshare, "HSVS will provide all foster care, adoption, prevention, youth programs, HIV/AIDS residential and Article 31 Clinic services. HeartShare will provide all developmental disabilities services, including those currently operated by St. Vincent's."[1]

62.    Any time HSVS is referenced in the instant complaint, that term refers to HSVS, as well as St. Vincent's and Heartshare, collectively and individually.

63.    Upon information and belief, HeartShare, St. Vincent's and HSVS (collectively "the Foster Care Agencies" and the "Foster Care Agency Defendants") are all in the business of providing foster care, under contract with defendant City, to children who have been placed in foster care, in the custody of the City of New York.

---

[1] HeartShare Human Services and St. Vincent's Services Announce Affiliation, March 3, 2014 https://hsvsnyc.org/heartshare-human-services-and-st-vincents-services-announce-affiliation/ (Last visited January 9, 2023).

64.     Upon information and belief, each of the Foster Care Agencies was during relevant time periods and is an "authorized agency" as defined in New York Social Services Law § 371, as well as a "contract agency" and a "foster care agency."

65.     All actions taken by the Foster Care Agencies to maintain and protect the children in their care are actions taken under color of state law, which subject the Foster Care Agency Defendants and their respective staff to liability under the provisions of 42 U.S.C. §1983, because said Defendants acted jointly with Defendant City, performed a government function, and were entwined with the City in the provision of foster care services to children.

66.     The Foster Care Agency Defendants were and are recipients of federal funding.

67.     Upon information and belief, the Commissioners of ACS, their agents, supervisees, and assigns, had the responsibility for assuring that the Foster Care Agency Defendants and their agents and employees complied with their obligations under the Constitution, federal law, and state law.

68.     Upon information and belief, Defendants Tyanda Smith and Paul Frankel were employed by Defendant City and assigned to work as the ACS case manager on D.S.'s case, a supervisory and/or managerial role, during a part of D.S.'s time in foster care and were responsible for tasks including the approval of Family Assessment and Service Plans ("FASPs").

69.     Defendants Tyanda Smith and Paul Frankel are referred to herein collectively and individually as "ACS Employees."

70.     Upon information and belief, as of 2014, Dawn Saffayeh was, during all applicable time periods, the Executive Director of HSVS, and she is a successor in interest to the Executive Director of St. Vincent's Inc.

71.     Upon information and belief, Dawn Saffayeh was responsible for making, implementing, and supervising the foster care policies and practices of HSVS, ensuring that the staff and agents of HSVS were qualified and trained, and understood their obligations under the various laws pursuant to which they operated.

72.     Upon information and belief, Defendant Lydia King was employed by HSVS as a clinical social worker and held the title of Director of Family Foster Care, Brooklyn, as of 2017, with a previous title of case work supervisor.

73.     Upon information and belief, HSVS assigned Defendant King to supervise the foster care placement of D.S. and to supervise the caseworkers who were assigned to D.S.'s foster care case.

74.     Upon information and belief, Defendant Rosalyn Chernofsky was employed by HSVS as Director of Special Medical and Foster Care Programs.

75.     Upon information and belief, the Foster Care Agency Defendants assigned Rosalyn Chernofsky to provide services and oversight on D.S.'s case.

76.     Upon information and belief, Defendant Viola Wright was employed by Foster Care Agency Defendants as Home Finding and Intake Coordinator and/or Supervisor during the time period relevant to this complaint and was involved in placing children, including D.S., in foster homes and recertifying foster parents/homes for the continued placement of foster children.

77.     Upon information and belief, Defendant Elissa Grossinger was employed by Foster Care Agency Defendants as Adoption Coordinator at the time of D.S.'s placement in foster care and thereafter and was involved in making recommendations regarding the appropriateness of HSVS foster care parents to become adoptive parents for children in their care.

78.    Upon information and belief, Defendant Blanca Correa was employed by Foster Care Agency Defendants as Intake Supervisor at the time of D.S.'s placement in foster care and was involved in placing D.S. in the home of L.M. and O.M.

79.    Upon information and belief, Defendants Diana Jeffrey, John Olufmi (*a/k/a* John Olufemi), Lyschel Wilkerson, Hilda St. Catherine, Howard Bishop, and Kendra Mulzac were employed by Foster Care Agency Defendants and assigned to work in a supervisory capacity on D.S.'s case during a part of D.S.'s time in foster care.

80.    Upon information and belief, Defendants Melody Centeno, Katelyn Chappell, Anika Tillery, Amanda Riley, Nichole Edwards, Keisha Walker, and Tanisha Tabb were employed by Foster Care Agency Defendants and assigned to serve as the case planner and/or case worker on D.S.'s case during a part of D.S.'s time in foster care.

81.    Defendants Dawn Saffayeh, Lydia King, Rosalyn Chernofsky, Viola Wright, Blanca Correa, Elissa Grossinger, Diana Jeffrey, John Olufmi, Lyschel Wilkerson, Hilda St. Catherine, Howard Bishop, Kendra Mulzac, Melody Centeno, Katelyn Chappell, Anika Tillery, Amanda Riley, Nichole Edwards, Keisha Walker, and Tanisha Tabb are referred to individually and collectively as "Foster Care Agency Employees."

82.    Throughout this complaint, when the terms "Foster Care Defendants" is used, that terms refers, individually and collectively, to Defendant City, Foster Care Agency Defendants, and Foster Care Agency Employees.

83.    Throughout this complaint, when the terms "Foster Care Defendants" is used, that terms refers, individually and collectively, to Defendant City, Foster Care Agency Defendants, and Foster Care Agency Employees.

84.     David Banks is the current Chancellor of the New York City School District ("the Chancellor") who was appointed in 2022 and, as such, is entrusted with the specific powers and duties set forth in N.Y. Educ. L. § 2590-h.  During the tenure of the years at issue, there were a number of predecessors-in-interest to Chancellor Banks, including former Chancellors Meisha Porter, Richard Carranza, Carmen Farina, Dennis Walcott, Kathy Black, and Joel Klein.

85.     The New York City Board Of Education (or the "Board Of Education of the City School District of the City of New York" or "Board") was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York.  It is a recipient of federal financial assistance.

86.     Upon information and belief, The The New York City Department Of Education (the "Department"), claims to be and appears to have been delegated the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  It is not clear that the Department is a legally formed independent entity, although it appears in lawsuits and claims to be a "municipal" corporation. It is a recipient of federal financial assistance.

87.     Collectively, the Chancellor, Board, and Department are being referred to as the "DOE Defendants" or the "DOE."

88.     Under the IDEA, the Local Educational Agency ("LEA") is responsible for providing a Free Appropriate Public Education ("FAPE") to students with disabilities.

89.     DOE Defendants individually and/or collectively form the LEA.

90.     The City, DOE Defendants and ACS are required to adopt and implement effective policies, procedures, and practices relative to special education services to children in foster care

so as to ensure they are not denied general and special education services to which they are entitled under state and federal law, as a result of their placement in foster care.

SYSTEMIC FACTS

91.    Upon information and belief, prior to December 15, 2008, ACS's Office of Contract Agency Case Management ("OCACM") oversaw and monitored contract agencies through review of mandatory paperwork such as Family Assessment Service Plans ("FASP").

92.    Upon information and belief, prior to the implementation of an initiative called Improved Outcomes for Children ("IOC") (announced in March 2007), ACS employees in OCACM, Adoption Case Management ("ACM"), and Agency Program Assistance monitored and supervised contract agencies.

93.    Upon information and belief, in or around 2008, slightly more than one hundred and fifty ACS workers were cut due to ACS's IOC plan, pursuant to which the OCACM was closed.  Under this plan, the agencies were left to monitor themselves.

94.    Upon information and belief, Agency Program Assistance ("APA") is an office within ACS responsible for working with each contract agency to monitor and improve contract agency casework practices on a broad level.

95.    Upon information and belief, APA is required to monitor and meet with contract agencies regularly to discuss and work to improve performance issues.

96.     Upon information and belief, APA monitors and tracks the ability of agencies to assess the safety of foster homes and considers the number and type of indicated cases an agency has had in a given year when monitoring overall agency performance.

97.    Upon information and belief, APA staff members review certifications of indicated cases of abuse or neglect, which are an agency's written explanation of its responses to indicated

cases, to determine whether the actions taken by an agency in response to an indicated case were prudent, meaning that the actions were responsive to the safety issues raised in the substantiated case.

98.    Upon information and belief, if the APA staffer reviewing the certification deemed that the agency's action was not prudent, APA would contact the agency to inquire about additional follow-up actions and reassess whether those follow-up actions were prudent.

99.    Upon information and belief, APA assisted with the pre-IOC monitoring and supervision of contract agency performance by conducting performance evaluations known as EQUIP.

100.    Upon information and belief, IOC replaced the functions of OCACM, and the latter ceased to exist in 2008.

101.    Upon information and belief, in approximately 2007, ACS transitioned from using agency evaluations called "EQUIP evaluations" to annual evaluations known as Scorecards.

102.    Upon information and belief, Scorecards evaluate the overall performance of contract agencies by measuring factors related to safety, permanency, well-being, and foster parent support.

103.    Upon information and belief, Scorecards give letter grades (A through F) to agencies on various aspects of each agency's performance, including protecting foster children from abuse.

104.    Upon information and belief, the Scorecard process involves a review of a sample of each contract agency's case records by an ACS Provider Agency Measurement System ("PAMS") unit for the purpose of evaluating the casework of contract agency staff.

105.    Upon information and belief, if a PAMS reviewer notices anything during a case record review that raises a concern or a safety risk with respect to a particular child, the reviewer should issue a safety alert.  The safety alert is sent to both the APA monitor and the contract agency itself, and the agency must address the situation within 48 hours.

106.    Upon information and belief, unsatisfactory performance on a Scorecard could result in placement of a contract agency on one of several heightened monitoring statuses or the closing of intake at the contract agency, which would mean that no additional foster children could be placed there.

107.    "[F]or fiscal years 2008, 2010, and 2011, ACS gave Heartshare a Scorecard rating of zero on a scale of zero to one hundred (with zero being the worst possible rating) for 'frequency of OSI indicated cases.'"  *Jewels v. Lewis*, No. 15-CV-5760 (KAM) (ST), 2019 WL 5896224, at *14 (E.D.N.Y. Nov. 12, 2019).

108.    Upon information and belief, a contract agency's failure to improve its performance over time could result in the contract with the City being terminated or reduced.

109.    Upon information and belief, during Commissioner Hansell's tenure, ACS asserted that it had implemented a "Foster Care Strategic Blueprint."  The Foster Care Strategic Blueprint recognized that there were ongoing problems in the foster care system in the above areas.

110.    ACS's Foster Care Strategic Blueprint:

[o]utlines [ACS's] key priorities and strategies for *improving* case practice and safety, permanency and well-being outcomes for children and families in the foster care system. Our work includes the implementation of evidence-based models to address trauma, mental health and other challenges faced by children and families; strategies to improve reunification, adoption and kinship guardianship outcomes; cutting-edge training and professional development for the child welfare workforce; and rigorous foster care agency monitoring and continuous quality improvement systems.[2]

---

[2] NYC Children, *Foster Care Strategic Blueprint:  Three-Year Progress Report FY 2017 - FY 2019,* at 5, *available at*  https://www.nyc.gov/assets/acs/pdf/about/2020/threeyearprogressreport.pdf (last visited Jan. 9, 2023).

111.    Defendant City has the authority to commence and maintain child protective proceedings, which remove children from their families, place the children in government custody, and determine the conditions of that custody. *See* N.Y. Fam. Ct. Act §1032(a).

112.    All foster care placements in New York State are made by court order, under Articles 3, 7, and 10 of the New York Family Court Act and under New York Social Services Law §358-a(3)(a).

113.    Defendant City, not the foster care agencies, also has the authority to accept a child into City foster care as a voluntarily placed child, N.Y. Soc. Serv. L. §384-a, which then must be approved by the Family Court under New York Social Services Law § 358-a(3)(a).

114.    In the event that the Family Court terminates the parental rights of the biological parent of a foster child, the court will name the City and the foster care agency as joint legal guardians of the foster child.

115.    Upon information and belief, when a child comes into foster care, the City may decide whether to establish direct care for that foster child in its public agency, or to select a foster care agency, such as the Foster Care Agencies, to care for the child.

116.    Upon information and belief, when the City chooses a foster care agency to provide care for a foster child, the foster care agency cannot reject the child, as long as the agency has a foster home available to care for the child.

117.    Upon information and belief, when the City chooses a foster care agency to provide care for a child, the child cannot reject the foster care agency and insist upon being cared for by a public agency.

118.    Upon information and belief, the contracts between the City and all agencies that provide foster care contain substantially identical provisions, except for the number of children to

be placed with each agency, the types of foster care placements that will be provided and the funds allocated to each agency.

119.    Upon information and belief, contracts with foster care agencies, including the Foster Care Agencies, are based on a model contract issued by the Office of Children and Family Services ("OCFS").

120.    Upon information and belief, according to the language of the foster care contract itself, the fundamental purpose of the contract between each foster care agency and the City of New York is to provide the best available services to children whom the City entrusts to the contract agency/foster care agency and to ensure that the health, welfare, and fundamental rights of the children in foster care shall be the guiding principle for all decisions which affect the foster children's lives.

121.    Upon information and belief, pursuant to the contact, the foster care agency agrees to take all necessary steps to ensure the provision of services, care, treatment, and support to the foster children in its care.

122.    Upon information and belief, pursuant to the contact, the City retains ultimate responsibility for the protection and preservation of the welfare of each child in the care of the contract foster care agencies, including the Foster Care Agencies.

123.    Upon information and belief, pursuant to the contract, the City has final administrative authority over all placement decisions regarding each child.

124.    Upon information and belief, pursuant to the contract, the City has the ultimate authority for making all decisions relative to the welfare of such child.

125.    Upon information and belief, under a provision of the contract that the City has with the Foster Care Agencies, the City has final decision-making authority over the following

issues regarding each foster child: risk assessment and service plans, trial and final discharge, transfer of children to a higher level of care or another agency, preventive services, homemaker services, day care services, rates of foster parent compensation and placement of siblings of a foster child.

126.    New York law provides detailed rules and regulations for the not-for-profit foster care agencies to follow in caring for foster children, while the City provides additional detailed rules for the not-for-profit foster care agencies to follow for foster children, like D.S., in their care.

127.    Foster care agency staff and administrators work closely with City staff and administrators, on a day-to-day basis, in caring for foster children such as D.S.

128.    Upon information and belief, in caring for foster children, foster care agencies use the City's tools and would emulate exactly what the City does.

129.    Upon information and belief, City standards for licensing foster care agency foster homes are comprehensive.

130.    Upon information and belief, the City's rules require a foster care agency to assign a caseworker for each foster child, who is responsible for overseeing all aspects of the care of the foster child.

131.    Upon information and belief, the City and the State of New York establish maximum caseloads for foster care agency caseworkers in order to ensure proper supervision of the foster children.

132.    The City also assigns a City case manager to each foster child, including each foster child who is in the care of one of the foster care agencies.

133.    Upon information and belief, the foster care agency caseworker is required to document all of her activities regarding each foster child on her caseload.    Documentation is

supposed to be entered and maintained digitally, including all visits with the child in the foster home or the foster care agency office, all telephone calls with the child, all visits to the foster parents, all visits with the birth parents, all visits to the child's schools, all other visits and personal contacts concerning the child, all telephone calls with or about the child, all records concerning medical treatment and education for the child, and all other significant information about the child.

134.    Upon information and belief, the City Defendants' case manager assigned to the foster child reads all entries made by the agency caseworker and has the right to request more information about the entries and to direct the agency caseworker to investigate any concerns raised by the City case manager.

135.    Upon information and belief, there are regular meetings concerning each foster child that include, among other people, the City and agency case workers, where birth and foster parents are invited.  At these meetings, topics include future planning for the child, as well as the child's safety.

136.    All foster children must have their cases reviewed periodically in a permanency hearing in the Family Court. *See* N.Y. Fam. Ct. Act § 1089.

137.    The Petition for permanency hearings must be verified by the City or the foster care agency, served by ACS, and must be served upon "the agency supervising the care of the child on behalf of the social services district with whom the child was placed."  N.Y. Fam. Ct. Act §1089(b)(1).

138.    Foster care agency staff are mandated reporters of abuse and neglect. Agency staff themselves are not permitted to investigate the reports and must defer to the City to do so.

139.    The City also has the authority to craft Corrective Action Plans for the foster children and compel the foster care agency to comply with those Corrective Action Plans, including moving a child to a new foster home.

140.    Upon information and belief, the City was required to provide a written evaluation of the performance of each foster care agency on an annual basis, known as a Scorecard, which gives letter grades to the foster care agency on aspects of the foster care agency's performance, including protecting foster children from abuse.

141.    Upon information and belief, each time a foster care agency confirms a case of abuse, neglect, or endangerment of a child in foster care, accident, illness or death, the agency must submit to the City a written summary of the circumstances and description of actions that the agency took in response, following which the City determines the appropriateness of the agency response.

142.    Upon information and belief, the City must weigh factors including response to cases of abuse, neglect, or endangerment of a child in care, in relation to whether or not it renews an agency contract and also has the authority to place an agency under increased monitoring.

143.    The City has the right to move a foster child from the care of one of the foster care agencies to the care of another agency, and the foster care agency has no right to challenge the removal.

144.    Foster care agencies, including the Foster Care Agencies, are generally responsible for selecting, screening, and training foster parents and must conduct intensive background checks and interviews of those parents, including kinship foster parents. The foster care agency is supposed to collect a range of information about the foster parents' income, assets, expenses, jobs, and licenses; medical evaluations of the foster parents; letters of recommendation for the foster

parents; information concerning all adults who reside in the foster home; criminal background checks of the foster parents; State Central Register ("SCR") background checks of the foster parents, and other personal information; and whether kinship foster parents satisfy the standards for kinship care.

145.    Upon information and belief, the City maintains authority to review the file of the foster parents selected by the foster care agencies, and City employees have the authority to visit foster homes and question foster parents about the foster children.

146.    The City and the foster care agencies share the responsibility for training foster care agency employees, with the foster care agencies providing some of the training to their employees and the City providing the remainder of the training.

147.    The City, ACS and DOE Defendants systemically deny foster children with severe, chronic psychological and psychiatric conditions access to a FAPE.

148.    Despite the fact that many foster children are diagnosed with numerous psychological and/or psychiatric disorders, including PTSD, that arise from and/or are exacerbated by the abuse and/or neglect and trauma that they suffered, Defendants do not generally offer the evidence-based and appropriate therapeutic and academic services that are required under the IDEA, such as evidence-based interventions, access to tutoring, and/or appropriate day and residential settings.

149.    Further, DOE Defendants are required to provide instruction "in the home," in residential settings and in hospitals. 20 U.S.C. §1401(29).

150.    Although the IDEA mandates that Defendants provide a FAPE to children with Individualized Education Programs ("IEPs") who require instruction in their homes, Defendants do not have adequate policies, procedures, resources and/or services to develop legally sufficient

IEPs and placements for foster children who have severe psychological and/or psychiatric disorders, including PTSD, who require intensive behavioral and psychological interventions.

151.    Defendant DOE does not have programs or services for children like D.S., with psychiatric and/or psychological conditions and exposure to abuse and trauma that prevent them from engaging in educational activities and/or cooperating with education.

152.    Defendants do not operate programs for children like D.S. who were sexually abused and/or exposed to sexual abuse.

153.    DOE Defendants do not conduct medical evaluations that they require under the IDEA.

154.    Defendants do not have policies, procedures, guidance, and practices that would facilitate the appropriate placement of a child, like D.S., in the intensive treatment that he required at an early age to address the impact of his abuse and neglect and trauma.

155.    Further, once Defendants determined that D.S. required a residential setting, they had no services and/or supports to offer parents like K.S.  It is unsafe for D.S. to return home, but all Defendants have to offer is limited home instruction by a teacher (who may not be special education certified), or referral to D.S. to District 75-day program, where he could not engage for even one day.

156.    The City, ACS, and DOE Defendants do not effectively collaborate and/or coordinate to ensure a FAPE for children in foster care.

157.    Thus, students like D.S., with severe psychiatric disabilities, school refusal, and PTSD are simply left to languish.

158.    Defendants do not offer any of the following services on an IEP: cognitive behavioral therapy ("CBT"), dialectical behavior therapy ("DBT"), evidence-based trauma interventions, behavior therapy, family counseling, social work services, or tutoring.

159.    Defendants the City, ACS, and Foster Care Agencies and Foster Care Employees do not ensure that they, their staff, and agents are sufficiently familiar with special education laws and rights to ensure the provision of a FAPE for foster children.

160.    DOE Defendants have failed to ensure that during the timeframe that D.S. attended the New York City Children's Center ("NYCCC"), that NYCC offered appropriate treatment, psychological, psychiatric, and mental health services and offers a FAPE to students. Further, NYCCC did not offer comparable services and resources that typically developing students receive, is not adequately funded, does not employ and/or assign adequately trained staff, did not ensure an appropriate, violence-free environment, and grouped children inappropriately, allowing children who were younger and exposed to trauma access to older children whose emotional, behavioral, and psychiatric issues prevented them from being an appropriate peer.

## OVERVIEW OF INDIVIDUAL FACTS

161.    All allegations are based on upon information and belief, pieced together from the documentation that K.S. has been provided prior to the filing of the initial complaint and supplemented by records received since that was filed ("Defendants' records").

162.    While K.S. was D.S.'s foster parent, she was denied access to the records and information that she needed in order to develop a fully accurate picture of D.S.'s history and to ensure she obtained appropriate treatment and education.

163.    Since adopting D.S., K.S. was also denied access to records, until this action was filed, and the Defendants slowly started to turn them over.

164.    It is painfully clear from the records that despite a considerable number of evaluations and testing by DOE and Foster Care Defendants, as well as involvement of multiple staff members from Defendants' various agencies, that Defendants failed to ensure the appropriate medical, psychiatric, psychological, and mental health care of D.S. and failed to ensure D.S.'s safety, health and welfare from the time he was born.

165.    Shockingly, records turned over since this case was filed show that D.S. has been diagnosed with, *inter alia*: neonatal hypoglycemia, necrotizing enterocolitis (NEC), and periventricular leukomalacia, seizures, asthma, pervasive developmental delay (now considered to be part of the Autism Spectrum), hearing impairment, gross and fine motor delays, speech and language impairments, disruptive behavior disorder, conduct disorder, disruptive mood dysregulation disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), PTSD, borderline intellectual functioning (inaccurate), Enuresis Encopresis, myopia and a strabismus.  Further, there is possible evidence of a genetic abnormality and a history of possible *in utero* exposure to drugs or alcohol.  Moreover, more than one professional has suggested that D.S. was abused and/or inappropriately exposed to sexual abuse, as he engages in significant sexual acting out behavior, inappropriate urination and defecation, and violent, aggressive, and maladaptive behaviors.

166.    There were numerous rotating agency staff throughout the case, a lack of coordination and communication, misinformation, and a failure to follow up on gravely serious conditions and behavior, failure to coordinate between agencies, share information and ensure that D.S. was cared for, and his needs went completely unaddressed.

167.    While D.S. was in care via preventive services, the records show clear signs that his parent was unable to appropriately care for the children; ultimately, his brothers had confirmed

sexual abuse at the hands of their uncle. As D.S. was only two years old at the time, it was not clear what had occurred with him.

168.    Further, the records indicate that D.S. was abused by another child in a foster home.

169.    Throughout the records there are indications of recommendations for treatment (which were not consistently followed up on), counseling to investigate and address obvious signs of sexual abuse and/or exposure, placement in a residential setting, trauma counseling, and a therapeutic foster boarding home. None of these recommendations, treatments or placements were appropriately followed up on.

170.    D.S. was, however, placed on a merry-go-round of various medications, none of which assisted him with his underlying issues.

171.    A current and appropriate diagnostic picture and treatment plan has been hampered by the failure to disclose and share historical records.  Further, the records themselves show that none of the persons charged with D.S.'s care were provided a clear, historical picture of his needs and disabilities, were not trained and/or afforded authority to make appropriate health, psychological and/or psychiatric care decisions regarding D.S. and/or failed to follow up to ensure that care was provided.  In fact, Defendants never appointed anyone to act in D.S.'s behavior in the special education system, despite the fact that these services should have been critical to D.S.'s programming and coordinated with any additional treatment.

172.    Instead, D.S. languished with a patchwork and inconsistent medical and mental health treatment. In fact, Foster Care Defendants claim they cannot locate any of the allegedly mental health treatment records for any therapy provided to D.S. while he was in care. Yet, Defendants were required to maintain those records.

173.    Moreover, the records show that the long-term foster home that Defendants placed D.S. in until 2015 was not, as represented, a kinship placement.   Records show that D.S.'s mother confessed in 2011 and 2012 that she and the foster mother had lied.   Yet, the City and the Foster Care Defendants allowed D.S. and his siblings to remain and for the family to remove D.S. to Pennsylvania.   Further, Defendants allowed the alleged kinship mother to leave the children unaccompanied for weeks and months with her husband, who had multiple arrests, for violent felonies, a history of incarceration, domestic violence charges and drug use.   The records also show that the Defendants stood by while the foster mother left D.S. with her mother, who due to her history of abuse and neglect cases, was not permitted to be alone with children. D.S. has asserted he suffered physical and sexual abuse by his foster parents.

174.    These records were not given to K.S. despite the fact that they were critically important to D.S.'s care. Even now, as this second amended complaint is being filed, it is not clear that Plaintiffs have access to all of the information, as we have identified relevant records that have not been turned over.

INDIVIDUAL FACTS

175.    D.S. was born in 2007 and is currently fifteen years old.

176.    D.S.'s biological mother is L.S. ("Ms. S.").

177.    Ms. S. had six children before D.S.  One of the children lived with a relative, and the remaining five children lived with Ms. S. at the time of D.S.'s birth.

178.    ACS put in place preventative services for the family based on concerns about Ms. S.'s drug use and supervision and care for the children.

179.    Defendants' records indicate that Ms. S. tested positive for marijuana during her early pregnancy with D.S., and D.S.'s medical records indicate a concern that he could have been exposed to alcohol in utero.  Ms. S. was also an insulin-dependent diabetic.

180.    D.S. was born at 34 weeks of gestation and experienced respiratory distress at birth, as well as neonatal hypoglycemia, anemia, and necrotizing enterocolitis.

181.    Necrotizing enterocolitis is "a serious gastrointestinal problem that mostly affects premature babies" and "inflames intestinal tissue, causing it to die."  Cleveland Clinic, *Necrotizing Enterocolitis (NEC)*, *at* https://my.clevelandclinic.org/health/diseases/10026-necrotizing-enterocolitis#:~:text=Necrotizing%20enterocolitis%20(NEC)%20is%20a,or%20bloodstream%20through%20the%20hole (last visited January 9, 2023).

182.    D.S. was reported to experience a distended abdomen with his bowel in his stomach and a bowel infection.

183.    D.S. was placed in the Neonatal Intensive Care Unit ("NICU") and remained in the hospital for 42 days following his birth.

184.    At approximately age 40 days, D.S. underwent a head ultrasound, which revealed periventricular leukomalacia and a grade 1 germinal matrix bleed.

185.    Periventricular leukomalacia is a "type of brain injury most common in very premature babies" that can cause "damage to the nerve pathways that control motor movements" and can result in "trouble with vision and with eye movements," "trouble with movement, and tight muscles," and "developmental delay that is increasingly apparent over time."  Boston Children's Hospital, *What is periventricular leukomalacia (PVL)? at* Periventricular Leukomalacia | Boston Children's Hospital (childrenshospital.org).  Children with periventricular leukomalacia also may exhibit "learning difficulties and other developmental problems." *Id.*

186.    In early May 2007, D.S. was hospitalized to address limited weight gain and a bowel obstruction, and he remained hospitalized for more than a month.  Upon information and belief, D.S. underwent surgery on his intestines at this time.

187.    D.S. was repeatedly treated in the hospital as a young child, including in November 2007 and June 2008 for seizures, in January 2008 for pneumonia and asthma, and in August 2008 for coxsackie virus.  It was later reported that D.S. had seizures until 2009.

188.    Ms. S. struggled to keep Public Assistance and Medicaid benefits in place for the family, and the lack of consistent medical coverage impeded D.S.'s receipt of timely and appropriate medical care.

189.    In June 2007, a report was made to ACS concerning marijuana use and inadequate guardianship by Ms. S.  Ms. S. tested positive for marijuana, and ACS found the report substantiated for inadequate guardianship and parent's drug/alcohol use.

190.    Later, in 2008, ACS found that reports were indicated against Ms. S. for educational neglect after her four school-age children were excessively absent from school.

191.    During her pregnancy with D.S. and after he was born, Ms. S. moved in and out of homeless shelters with her children because of concerns that her apartment was not safe.  In April 2008, Ms. S. and her children moved from a shelter to an apartment in Queens.

192.    In the spring of 2008, Ms. S. tested positive for marijuana while pregnant with D.S.'s brother Z.

193.    On May 22, 2008, ACS Supervisor Michael Chukwu stated that there were concerns about the case, and it was "questionable" that Ms. S. was meeting the children's needs.

194.    In or around August 2008, Ms. S. began receiving services with ACS agency provider Safe Space and case planner Joy Okoro ("Case Planner Okoro").

195.    In June 2008, when he was almost two years old, D.S. was referred for Early Intervention evaluations to address concerns that he was not walking or speaking at an age-appropriate level.  The evaluations were conducted by On Our Way Learning Center in December 2008 and recommended speech and physical therapy.

196.    Case Planner Okoro referred Ms. S. for mental health services, but Ms. S. did not follow through on attending treatment.  Ms. S. also did not follow through on attending drug treatment and missed many appointments with Case Planner Okoro.

197.    Ms. S. had positive toxicology results for marijuana from November 2008 through March 2009.

198.    On April 21, 2009, ACS was informed of a report of sexual abuse concerning Ms. S.'s sons D. and A. with an uncle who previously had inappropriate sexual contact with Ms. S.'s daughters.  The incident involving D. reportedly occurred on April 19, 2009.

199.    Ms. S. was not in the house with her children at the time of the reported incident on April 19, 2009.  Ms. S. left the children in the house with her uncle even though she was aware of the prior incident of sexual abuse involving her daughters.

200.    D.S. was two years old at the time of the reported April 19, 2009, incident, and it is unclear from Defendants' records where D.S. was at the time.

201.    Upon information and belief, Defendant City and ACS Employees, and later Foster Care Agency Defendants Foster Carey Agency Employees, failed to take adequate steps to assess D.S. and to determine if he had been sexually abused by his uncle or had witnessed the uncle abusing his siblings.

202.    Upon information and belief, ACS caseworker Annette Rochester ("ACS Caseworker Rochester") was assigned to investigate the incident involving the uncle and take

appropriate steps to ensure the safety of Ms. S.'s children, with supervisory/managerial responsibility regarding the case assigned to Supervisor Natalie Arthur ("ACS Supervisor Arthur") and Child Protective Manager Dorett Graham ("ACS Manager Graham").

203.    ACS ultimately found reports indicated against Ms. S. for drug misuse and inadequate guardianship.  ACS also substantiated allegations of sexual abuse by the uncle.

204.    ACS Manager Graham concluded that the support provided to Ms. S.'s family was "not very useful to prevent the neglect of the children," stating: "The family's history with the agency and the current report of sexual abuse are evidence to the fact that safety and risk factors that place the children in danger exist within the home."

205.    Following the April 19, 2009, incident, Ms. S. sought to place her children in kinship foster care so she could have time to get herself together.

206.    Ms. S. initially stated that her mother would care for D.S. and Z., and other relatives would care for the remaining children. However, ACS Caseworker Rochester discovered through a clearance that Ms. S.'s mother had a drug-related arrest.

207.    As an alternative, Ms. S. proposed S.B., identified as the godmother of two of her children.  Ms. S. stated that S.B. could take D.S. and his three brothers T., D., and Z.

208.    On April 24, 2009, ACS Caseworker Rochester spoke to S.B., who stated that she had been a foster parent with HSVS, but she was investigated by ACS and the agency closed her home.

209.    ACS Caseworker Rochester ran a clearance for S.B., which showed that S.B. was investigated by ACS in March 2006 on allegations of inadequate guardianship and parents' drug and alcohol misuse and had a positive toxicology for cocaine.

210.    On April 23, 2009, ACS referred a case against Ms. S. to Queens County Family Court on allegations of sexual abuse and inadequate guardianship.

211.    On April 24, 2009, Judge Richter of Queens County Family Court issued an Order directing D.S.'s temporary removal and placing him in the custody of the Commissioner of ACS on the grounds that Ms. S. misused marijuana, was not engaged in a drug treatment program, was not engaged in mental health services, and put D.S. at risk based on her misuse of drugs and non-compliance with mental health services.

212.    Through the Queens County Family Court proceedings, children A. and M. were paroled to their father, and D. was paroled to her father.

213.    At the Queens County Family Court, ACS Caseworker Rochester met L.M., who identified herself as Z.'s godmother and a certified foster parent through HSVS. L.M. stated that she would like to care for Ms. S.'s children. L.M. stated that she lived with her husband O.M. and their three children A.H., B.M., and D.M.

214.    L.M. was the daughter of S.B., whose request to care for the children had been denied based on her indicated ACS history.

**D.S.'s Placement in the L.M. and O.M. Foster Home**

215.    On April 24, 2009, Defendant City and Foster Care Agency Defendants placed D.S., who was 2 years old at the time, and his three brothers T., D., and Z. in the care of L.M.

216.    D.S. continued to be placed with L.M. and O.M. until April 2015, when he was removed from the home and the home was involuntarily closed by HSVS.

217.    HSVS had placed foster children in the home of L.M. and O.M. ("the M. home") for several years before D.S.'s placement there and had been informed by OCFS that O.M. had a criminal history including convictions for robbery and the sale of drugs, as well as multiple arrests,

and that L.M. had an arrest for aggravated harassment.  OCFS informed HSVS no later than May 2009 of an additional conviction for O.M. in 2008 for driving while his ability was impaired by alcohol.

218.    Foster Care Defendants knew or should have known of O.M.'s criminal history at all times relevant to this complaint.

219.    On April 28, 2009 – days after D.S. was placed with L.M. and O.M. – O.M. was arrested for driving while intoxicated.

220.    OCFS informed HSVS of O.M.'s arrest by letter dated May 5, 2009, addressed to HSVS Home Finding and Intake Coordinator Viola Wright ("HSVS Coordinator Wright").  OCFS directed HSVS to conduct an updated safety assessment and take all appropriate steps to protect the children in the home.

221.    During the time period when D.S. was placed in the M. home, Foster Care Defendants knew or should have known that O.M. drove with D.S. and/or his brothers in the car.

222.    In addition, OCFS informed HSVS prior to D.S.'s placement in the M. home that O.M.'s robbery conviction was a presumptive disqualification conviction for a foster parent.

223.    By letter dated May 14, 2009, to HSVS Coordinator Wright, OCFS stated that O.M.'s application to be a foster parent "MUST BE DENIED" pursuant to Section 378-a(2)(e)(1) of the New York Social Services Law because the robbery conviction was for a crime involving violence.  The letter stated that HSVS was required to conduct a safety assessment for any children placed in the home and take all appropriate steps to protect the children, including removing them from the home and closing the foster home, subject to applicable due process procedures.

224.    Despite repeated notices from OCFS about the criminal history and continued arrests of L.M. and O.M., Foster Care Agency Defendants, and Defendant Wright in particular, continued to reauthorize placement of D.S. and his siblings in the foster home of L.M. and O.M.

**False Designation of the Home of L.M. and O.M. as a "Kinship" Foster Home for D.S.**

225.    In addition to placing D.S. in a home with O.M., an individual with a criminal history of violence and driving while intoxicated, Foster Care Defendants falsely designated the M. home as a "kinship" foster home for D.S.

226.    Neither L.M. nor O.M. was a legal relative of Ms. S., D.S., or D.S.'s siblings at any time while D.S. was placed in the M. home.

227.    Foster Care Defendants knew or should have known that the M. home was not a "kinship" foster home for D.S. and failed to take appropriate steps to assess the purported "kinship" foster parent status of L.M.

228.    Defendants' records do not document any investigation conducted before or after D.S. was placed in the M. home to verify that L.M. was in fact a legal relative of Ms. S., D.S., and/or his siblings.

229.    Foster Care Defendants also falsely continued to designate the M. home as a "kinship" foster home for D.S. even after it was explicitly revealed that L.M. was not a legal relative.

230.    Upon information and belief, the false designation of the M. home as a "kinship" foster home for D.S. adversely influenced the decision-making of Foster Care Defendants regarding D.S.'s safety in the M. home and the appropriateness of his placement there.

231.    As of April 24, 2009, when D.S. was placed in the "kinship" foster home of L.M. and O.M., Foster Care Defendants knew that L.M.'s relationship to Ms. S. and her children was that of Z.'s godmother and a family friend, and not a legal relative of Ms. S., D.S., or his siblings.

232.    HSVS documents contained conflicting information that was not investigated and/or clarified to or by staff of HSVS and ACS.

233.    As of May 2009 and continuing thereafter until 2015 when D.S. was removed from the M. home, Foster Care Agency Defendants and Foster Care Agency Employees began representing to outside entities, including medical and educational providers, the DOE, ACS and the Queens County Family Court, that D.S.'s placement was in a kinship home and/or that L.M. was D.S.'s maternal aunt, despite knowledge to the contrary.

234.    City Defendants and ACS employees appear to have accepted the false representation of Foster Care Agency Defendants and Foster Care Agency Employees that D.S. was placed in a kinship foster home with D.S., notwithstanding information available to Defendants and ACS employees to the contrary.

235.    There was such a revolving door of HSVS staff, they also believed that D.S. was in a kinship home.  For example, on or about February 17, 2012, HSVS Adoption Coordinator Elissa Grossinger ("HSVS Coordinator Grossinger") noted that she asked Ms. S. if L.M. "was actually her sister and she stated 'no.'"

236.    Yet, again, HSVS Defendants took no action to conduct an appropriate investigation of the D.S.'s life with L.M. and O.M.

**D.S.'s Life in the Foster Home of L.M. and O.M.**

237.    On or about May 6, 2009, HSVS case planner Latoya Thomas ("HSVS Case Planner Thomas") visited the M. home and observed that the children did not have an adequate

amount of clothes and space to store their personal possessions.  L.M. complained that she had not received an emergency check from HSVS and stated that she would return the children to the agency if they were not related to her.

238.    Throughout the time that D.S. was in the M. home, Defendants failed to conduct timely home visits of D.S. The negligent supervision of D.S. in foster care led to physical, sexual, and emotional abuse and neglect of his medical, psychological, and educational needs.

239.    For the six years D.S. was in L.M.'s care, L.M. repeatedly failed to comply with regulations and directives of HSVS.

240.    D.S. had not received Early Intervention services following his previous evaluations in December 2008, so HSVS re-referred him in May 2009. D.S. underwent a second round of evaluations at On Our Way Learning Center in July 2019.

241.    Defendants' records indicate that no visits to the M. home were made for D.S. between May 6, 2009, and July 22, 2009.  ACS Arthur repeatedly pointed to the lack of updated home visits in her July 2009 notes.

242.    On July 22, 2009, HSVS Case Planner Melody Centeno ("SVS Case Planner Centeno") conducted a visit to the M. home.  L.M. stated that O.M. was staying home with the children at that time and inquired about the possibility of using S.B. as a babysitter.

243.    S.B. subsequently failed to provide the required background check information to HSVS Case Planner Centeno in a timely fashion.

244.    SVS Case Planner Centeno appears to have briefly interviewed D.S. during her July 22, 2009, home visit, but repeatedly declined to interview D.S. during subsequent home visits through June 2010 on the ground that he was "too young."

245.     In August 2009,2009 and an Early Intervention Individualized Family Service Plan ("IFSP") was created in August, 20009 for D.S. that recommended center-based special instruction, speech-language therapy, physical therapy, and family training.  Upon information and belief, D.S. was placed at On Our Way Learning Center for three hours per day beginning in September 2009 pursuant to the IFSP.

246.     In October 2009, L.M. sought to become an adoptive resource for the children in the event they did not return to Ms. S.

247.     In October 2009, D.S. was referred for a neurology evaluation to address his seizures and D.S.'s siblings were referred for sexual abuse and/or mental health evaluations in light of their uncle's abuse. D.S. was deemed too young to be evaluated for sexual abuse, or mental health issues in connection with witnessing sexual abuse.

248.     However, in November 2009, HSVS referred D.S. for HIV testing and circled as a risk factor on the consent form that D.S. was "sexually abused."  D.S. tested negative.

249.     In a supervisory note dated November 12, 2009, ACS Child Protective Specialist Helene Cook reported the indicated finding of abuse by the children's uncle and mandated steps to be taken going forward, including:  (a) all children must be observed and interviewed separate from the parents or caretakers; (b) two home visits must be conducted per month, with one visit in the home to include a safety assessment; (c) the assigned worker must contact the children's school, speak with the child's teachers, and obtain information on the child's academic performance, attendance, behavior in school, and appearance; and (d) the assigned worker must contact the children's pediatrician and obtain an updated medical report.

250.     Upon information and belief, Foster Care Defendants materially failed to ensure that these steps were completed.

251.    On February 8, 2010, HSVS Case Planner Centeno conducted a visit to the M. home.  Despite the requirement for two monthly home visits, Defendants' records show that HSVS Case Planner Centeno had not visited since September 2009.

252.    On or about March 1, 2010, Leslie Gulick, M.D. of HSVS sent a letter to HSVS Case Planner Centeno and her supervisor, Diana Jeffrey ("HSVS Supervisor Jeffrey") stating that she had not received a "CAC" report for D.S.'s brother D., which it was necessary for her to review "to know if he needs any other testing or if the siblings require any further evaluations."

253.    Upon information and belief, "CAC" as referenced in Dr. Gulick's March 1, 2010, letter stands for "Child Advocacy Center."

254.    "Children's advocacy centers (CACs) are community-based, child-friendly, and trauma-informed organizations that coordinate a multidisciplinary response to child maltreatment allegations. CACs deliver a best practice model that bring together, often in one location, child protective services investigators, law enforcement, forensic interviewers, prosecutors, family advocates, and medical and mental health professionals to provide a coordinated, comprehensive response to victims and their caregivers."[3]

255.    On March 24, 2010, SVS Case Planner Centeno conducted a visit to the M. home. Based on Defendants' records, this visit was more than one and a half months after the last visit on February 8, 2010.

256.    On April 6, 2010, D.S. was seen by ophthalmologist Dr. Storm.  Dr. Storm diagnosed D.S. with intermittent exotropia.[4]

---

[3] U.S. Dep't of Health and Human Servs., *et al.*, *Children's Advocacy Centers*, *at* https://www.childwelfare.gov/topics/responding/iia/investigation/advocacy/

[4] "Exotropia is a form of strabismus (eye misalignment) in which one or both of the eyes turn outward." American Ass'n for Pediatric Ophthalmology and Strabismus, *Exotropia*, *at* Exotropia - American Association for Pediatric Ophthalmology and Strabismus (aapos.org).

257.    Prior to this visit with Dr. Storm, HSVS had sent L.M. notices of three missed vision appointments for D.S. dating back to at least January 2010.

258.    An April 2010 FASP reported that Ms. S. provided HSVS with a notarized letter stating that she no longer wanted to plan for D.S. and his three brothers and sought to turn decision-making authority for them over to L.M. and O.M.

259.    On May 17, 2010, SVS Case Planner Centeno visited the M. home. Based on Defendants' records, this visit was more than a month after her last visit on April 13, 2010.

260.    During the May 17, 2010, visit, L.M. complained about not receiving a higher foster care payment rate for D.S., the special rate for children with significant disabilities who require a high degree of supervision.  *See* 18 N.Y.C.R.R. § 427.6(c)(4).

261.    On May 26, 2010, D.S. underwent an Audiology Evaluation at Long Island College Hospital ("LICH") and was diagnosed with at least a mild hearing loss in his composite better ear.

262.    The LICH evaluation was delayed by L.M.'s failure to keep medical appointments for D.S.  An audiology evaluation initially was scheduled for D.S. in July 2009, and HSVS had sent notices to L.M. of three missed audiology appointments since January 2010.

263.    In a foster home reauthorization report dated July 13, 2010, HSVS reported that the M. home "was not visited due to what is deemed as non-cooperation by [L.M.] and her unavailability for a recertification home visit."  The report documented multiple communications with L.M. between June 4, 2010, and July 13, 2010, regarding the need for a home visit and the need for compliance with the recertification requirements.  The report contained no information other than a description of these communications, a list of the foster children placed in the home, and the following statement:

> Recommend home at this time and if possible continue to remain open in order not
> to disrupt the care of the foster children currently residing in the home.  It is,

however, highly recommended that her [*sic*] be closed once the children leave the home and/or are adopted, or [L.M.] continues not to comply with state regulations and agency policy.

264.    The required home visit was not conducted until August 18, 2010.  The resulting Home Study Addendum report was signed by HSVS Home Finding Caseworker Candice Hall and HSVS Coordinator Wright.  The report noted that L.M. and O.M. had moved to a new house with their five foster children (including another child in addition to D.S. and his brothers) and were seeking to take on one more.  The report noted that L.M. had recently started a new job, while O.M. was unemployed, and recommended that before another child was placed in the home, the agency should assess whether L.M. and O.M. "can handle the additional responsibility."

265.    On August 26, 2010, D.S. underwent a LICH Child Neurology Evaluation conducted by Samuel Apeatu, M.D. Dr. Apeatu's recommendations included continuation of D.S.'s current therapies and services, a 12-month educational program to prevent regression, genetic testing, and ophthalmologic and hearing evaluations.  Dr. Apeatu further stated that parent supportive counseling with a focus on behavior management was "essential."

266.    Foster Care Defendants knew that D.S. required a neurology evaluation to address the root cause of his seizures since approximately October 2009, if not before, but failed to ensure that D.S. timely received the evaluation.  A neurology evaluation was previously scheduled for D.S., but L.M. did not keep the appointment.

267.    D.S. underwent genetic testing with Signature Genomics, resulting in a Microarray Report dated September 3, 2010.  The Mircroarray Report stated that there were no detected abnormalities in D.S.'s DNA.

268.    However, of potential concern, the genetic testing revealed a 1q44 microdeletion. A 1q44 microdeletion syndrome had since been identified as a genetic disease characterized by seizures and developmental delay.[5]

269.    On October 7, 2010, HSVS Case Planner Centeno visited the M. home. Defendants' records indicate that this was the first completed visit for D.S. since July 6, 2010.  An unannounced visit was attempted, but not successful, on August 20, 2010.

270.    An October 18, 2010, FASP reported that Ms. S. signed a conditional surrender application for the children in May 2010, and L.M. and O.M. were willing to adopt them.

271.    On November 19, 2010, HSVS Case Planner Centeno visited the M. home.  She reported that she could not engage D.S.

272.    On January 31, 2011, HSVS Case Planner Centeno conducted an unannounced visit to the M. home.  L.M. complained about HSVS and requested an agency transfer, stating that HSVS removed a prior foster child from her home, and she believed HSVS was seeking to do it again. L.M. referred in this discussion to the multiple medical appointments she had missed for D.S. and his brothers.

273.    HSVS Case Planner Centeno visited the M. home again on February 2, 2011.  L.M. reported that the principal of the children's school gave her letters for HSVS regarding concerns about the physical appearance of the children and that the children were not dressed appropriately for school.

274.    These letters were part of a pattern evident in Defendants' records of school officials expressing concerns to Foster Care Defendants about the appearance and cleanliness of the children in the care of L.M. and O.M. and the adequacy of the clothing/footwear they were

---

[5] Elena-Silvia Shelby, et al., lq44 Microdeletion Syndrome:  A New Case with Potential Additional Features, available at  https://rjmp.com.ro/articles/2021.1/RJMP_2021_1_Art-16.pdf (last visited Jan. 9, 2023).

provided. As set forth herein, school officials later also made multiple reports to Foster Care Defendants expressing concerns about the adequacy of the food given to the children, their supervision, and concerns about physical abuse.

275.    Foster Care Defendants failed to act appropriately and adequately on these reports and failed to take necessary and appropriate action in response to the reports to protect D.S. from neglect and abuse at the hands of L.M and O.M.

276.    Foster Care Defendants also failed to adequately, and with sufficient frequency, engage in communications with school officials and/or conduct visits to the children's schools to assess whether the children were being adequately cared for, or whether they are being neglected and/or abused.

277.    During a March 17, 2011, visit to the M. home, L.M. again requested an agency transfer from HSVS Case Planner Centeno, expressing concern that someone at HSVS would seek to stop her from adopting D.S. and his siblings.

278.    During Family Team Conference ("FTC") held on April 5, 2011, for the purpose of changing D.S.'s goal change to adoption, but conflict between L.M. and HSVS prevented the conference from being completed.  HSVS Case Planner Centeno was leaving the agency shortly, and L.M. expressed concern about who would handle the case, thereafter, exhibiting anxiety that the agency was out to get her.  L.M. stated that she would have switched agencies but was told that she could not take the children with her.

279.    An April 2011 FASP reported that Ms. S. gave birth to another baby, who was born with a positive toxicology and paroled to his birth father, and that Ms. S. had not complied with any of her service plan.  The new baby was D.S.'s eighth sibling.

280.    Throughout his time in foster care, Foster Care Defendants failed to ensure that D.S. had visits with his siblings placed outside of the M. home.

281.    An April 2011 FASP documented concerns expressed by D.S.'s school that his behavior had changed drastically in the past few months, and they wanted to know if there were any changes made in the home.  The FASP stated that D.S. would be referred for therapy due to his behavior in school.

282.    On April 15, 2011, HSVS Supervisor Jeffrey conducted an unannounced visit to the M. home to assess and speak with the children about an incident that occurred at D.S.'s school, On Our Way Learning Center.  L.M. had been asked to bring the children to the agency the prior day to be interviewed but stated that she was unable to do so.

283.    When HSVS Supervisor Jeffrey arrived at the house on April 15, 2011, L.M. and the children were not home.  She called L.M., who asked her to wait an hour until she returned with the children.  When L.M. arrived, her mother (S.B.) was in the home with a baby and stated that she babysits, despite the fact that she had indicated abuse reports and was not supposed to have the children.

284.    On Our Way Learning Center reported that D.S. took down another child's pants and put his mouth on the child's penis.

285.    L.M. responded to the report of the incident by saying that she wanted to change D.S.'s school.  SVS Supervisor Jeffrey observed that L.M. was "very annoyed" over the incident and thought the school was making a big deal out of nothing.

286.    SVS Supervisor Jeffrey interviewed D.S. about the incident.  D.S. initially said that nothing happened, but eventually admitted that he pulled his friend's pants down, then denied it

again and said that nothing happened.  SVS Supervisor Jeffrey stated that D.S. would be referred for play therapy.

287.    Defendants' records indicate that L.M. was permitted to place D.S. and his brothers in the home of S.B. while L.M. traveled from approximately May 26 to June 1, 2011, notwithstanding S.B.'s ACS history.

288.    On July 21, 2011, SVS Coordinator Wright signed as supervisor the annual report for the reauthorization of the M. foster home.  HSVS recommended that the foster home remain open so L.M. could continue caring for the children currently placed there.

289.    In August 2011, L.M. stated to SVS Supervisor Jeffrey that she did not intend to send D.S. back to On Our Way Learning Center and claimed that the school said he no longer needed his services.

290.    L.M.'s removal of D.S. from On Our Way Learning Center was part of a pattern, evident in Defendants' records, of L.M. seeking to move D.S. and his brothers around after concerns were expressed about them.  After HSVS expressed concern about the children's many missed medical appointments, L.M. sought (unsuccessfully) to move the children to another foster care agency.  After On Our Way Learning Center reported a sexual incident involving D.S. and raised concerns about what was occurring at home, L.S. removed him from the school.  As set forth below, L.S. would later move D.S. to Pennsylvania following multiple additional school reports raising concerns about the children, then back from Pennsylvania after concerns were raised about her lack of a permanent address.  L.M. also would later transfer D.S. and his brother Z. from one school to another mid-year after the first school expressed concerns about the children's appearance and cleanliness and possible physical abuse in the home.

291.    On August 22, 2011, Ms. S. expressed concern to HSVS Supervisor Jeffrey that L.M. did not provide adequate clothing for her children, that O.M. hit the children, and that L.M. and O.M. were using alcohol and drugs and allowing it to be available to the children. A report raising these concerns also was made to ACS the same day.

292.    The August 22, 2011, report was investigated by ACS Worker Dorys Lara ("ACS Worker Lara"). ACS ultimately deemed the report unfounded. There is no indication in Defendants' records that the investigation included communication with, or a visit to, the children's schools.

293.    On August 31, 2011, D.S. underwent an HSVS Psychiatric Mental Status Exam conducted by Pierre R. Arty, M.D. Dr. Arty stated that the reason for referral was the April 2011 incident in which D.S. took down another child's pants and placed his mouth at the other child's penis. Dr. Arty noted the incident in which D.S.'s brother D. was sexually abused by his uncle and stated: "[i]t is unknown how long this abuse was taking place before it was discovered and who else among the brothers might have been victim to the abuse."

294.    Dr. Arty stated that D.S.'s visits with his biological mother should be supervised.

295.    Dr. Arty diagnosed D.S. with Disruptive Behavior Disorder Not Otherwise Specified ("NOS"), Rule Out ADHD, Combined Type, and Rule Out PDD.

296.    Dr. Arty recommended that D.S. receive 1:1 therapy including play therapy, continuous psychiatric evaluation to further evaluate for ADHD, a repeat neurological evaluation as needed, and collateral parent counseling with the foster parents. Dr. Arty stated that D.S. should resume treatment for developmental delays "ASAP."

297.    Dr. Arty further stated: "If not already performed, [D.S.] should have an evaluation with a specialist in the area of pediatric sexual abuse."

298.    Foster Care Defendants failed to ensure that Dr. Arty's recommendations were implemented, and that D.S. received the therapy that he required.  On October 11, 2011, note from HSVS indicates that only weeks after Dr. Arty's evaluation, D.S. stopped attending therapy because it was too far away.

299.    On September 29, 2011, HSVS Case Planner Anita Rae ("HSVS Case Planner Rae") visited the M. home.  HSVS Case Planner Rae found that L.M. was very rude, hostile, and uncooperative, reporting that L.M. would not allow access to the entire house and appeared reluctant to provide information about the children.

300.    During a September 29, 2011, home visit, both D. and T. reported to HSVS Case Planner Anita Rae ("HSVS Case Planner Rae") that they were sometimes punished by being required to stand in the same position for long periods of time.

301.    Between October 7 and 9, 2011, D.S. and his three brothers had an overnight visit with Ms. S.  D.S. came home with scratches on his chest and back.  Ms. S. asserted that D.S. obtained scratches while playing with his siblings.

302.    On October 13, 2011, HSVS Case Planner Katelyn Chappell ("HSVS Case Planner Chappell") visited the M. home and observed the scratches on D.S.  She described seeing three close scratches about two inches long on each side of D.S.'s chest and some on his back, with the scratch on D.S.'s back the deepest.  D.S. also had a scab on his elbow.  L.M. reported an account by D.S. that Ms. S. beat him after he fought with another child.  D.S. denied that Ms. S. scratched him, but admitted that he got in trouble for beating up another child and stated that he did not like visiting Ms. S.

303.    Despite the clear recommendation from Dr. Arty and Ms. S.'s known history of failing to appropriately care for her children, Foster Care Defendants failed to adequately supervise D.S.'s visits with Ms. S. and to protect D.S. from abuse during those visits.

304.    During the October 13, 2011, home visit, L.M. informed HSVS Case Planner Chappell that D.S.'s brother, D. wrote a letter at school stating that he and his brothers were not being given adequate food. HSVS Case Planner Chappell interviewed D., who said he wrote the letter at the direction of T. and Ms. S., but it was true because L.M. and O.M. would not give T. lunch money and T. did not eat anything all day. D. further stated that L.M. and O.M. punished the children for every little thing and made them stand against the wall with their arms raised up in front of them for hours. D. stated that he wanted to move.

305.    HSVS Case Planner Chappell responded to D.'s report by telling him to call her if there were problems in the home instead of writing letters to the school.

306.    An October 2011 FASP reported that D.S. and his three brothers saw their other siblings only on occasion. The FASP did not set forth any plan for regular sibling visits.

307.    During an October 2011 permanency hearing, HSVS was directed to get counseling for D.S. SVS Case Worker Chappell failed to secure counseling for D.S.

308.    On November 3, 2011, HSVS Case Planner Chappell received a call from Jeanette Nau, a nurse in the HSVS medical department. Nurse Nau reported information she received from D.S.'s school stating that D.S.'s behavior was out of control, and L.M. did not come to the school to get him when he wet himself or send clothes when he needed to be changed.

309.    There is no indication in Defendants' records that Foster Care Defendants spoke with D.S.'s school or visited the school in response to this report.

310. On November 10, 2011, SVS Case Planner Chappell visited the M. home. D.S. informed Case Planner Chappell that he did not want to visit Ms. S. anymore. D.S. stated that Ms. S. put him on top of a car, and he was afraid. L.M. later informed HSVS Case Planner Chappell that D.S.'s visit with Ms. S., D.S. was tied to the top of a car, and the car was driven with him attached.

311. Again, Foster Care Defendants failed to adequately supervise D.S.'s visits with Ms. S. It was only after this November 2010 incident that HSVS began having D.S.'s visits with Ms. S. supervised at the agency.

312. L.M. informed HSVS Case Planner Chappell on November 15, 2011, that D.S. and his brother D. never had CAC evaluations. HSVS Case Planner Chappell stated that she would refer them for CAC evaluations at Bellevue Hospital.

313. In late November 2011, a report was filed to the State Central Registry indicating that D.S.'s brother, T., was primarily caring for his younger brothers and was made to stand with his arms outstretched for an extended period of time, and there was too little food in the home.

314. On December 1, 2011, HSVS Case Planner Chappell visited the M. home. HSVS Case Planner Chappell noted the report that was called in against L.M. earlier in the week. L.M. stated that she was looking to move with the children to Pennsylvania.

315. On December 15, 2011, SVS Case Planner Chappell conducted an unannounced visit to the M. to address the report called in against L.M. T. denied being left alone with the children. HSVS Case Planner Chappell provided L.M. with an adoption application.

316. On December 22, 2011, the ACS Office of Special Investigations ("OSI") called the HSVS emergency supervisor and reported on an incident of suspected drug use by L.M. A

nurse observed that L.M. smelled of marijuana when she brought her son for medical care, and when confronted, L.M. left the hospital quickly.

317.    On December 23, 2011, another report was made against L.M. and O.M. stating that T. was being left to care for the children on a regular basis.  The report further stated that L.M. was under the influence of marijuana while caring for the children.

318.    A December 30, 2011, Safety Assessment produced in response to the December 23, 2011, report stated: "The family had a prior history with similar safety concerns of parent's drug/alcohol misuse and lack of supervision, relating to the present safety concern.  It appears as though the children are left at home unsupervised."

319.    ACS determined that the allegations of inadequate guardianship and lack of supervision against O.M. and L.M. were substantiated, while the allegations of parent's drug use were unsubstantiated.  L.M. and O.M. were advised against allowing foster children to care for the other children.

320.    On January 19, 2012, SVS Medical Coordinator Gail Williams, R.N., MSW reported that D.S. had behavioral problems at school, including physical altercations with the teacher and bus matron.  The FASP she made a CAC evaluation referral to Bellevue Hospital for D.S.

321.    In March 2012 L.M. reported that D.S. allegedly was supposed to have been referred for individual counseling services through HSVS, but because the family was planning to move to Pennsylvania, services would not be arranged in New York.

322.    The April 2012 FASP reported that there was no visiting plan in place for the children, and they saw their siblings only on occasion.

323.     An April 2012 social history from the DOE's records indicates that L.M. had already left to go to Pennsylvania, and D.S. was living with "an older sibling" who reported that they were planning to move to Pennsylvania to join L.M. in approximately one month.

324.     On April 26, 2012, D.S. and his brothers moved with L.M. and O.M. to Pennsylvania.  Their residence there is referred to herein as the "Pennsylvania M. home."

325.     An Interstate Compact on the Placement of Children ("ICPC") was not approved at the time that L.M. removed D.S. and his siblings to Pennsylvania.

326.     The ICPC, as codified in New York State law, provided that a foster child was not to be sent to a receiving state until the appropriate public authorities in that state notified the sending agency in writing that the proposed placement did not appear contrary to the interests of the child.  N.Y. Soc. Servs. L. 374-a, Art. III(b).

327.     An ICPC was never approved for L.M.'s removal of D.S. and his siblings from New York, and the ICPC application was eventually canceled when L.M., D.S. and his siblings returned from Pennsylvania back to New York.

328.     On May 30, 2012, HSVS Case Planner Chappell visited the Pennsylvania M. home. L.M. stated that Pennsylvania did not have the same educational systems as New York, D.S. was not enrolled in school, and he would not attend school again until September.  SVS Case Planner Chappell spoke to O.M. about a recent arrest and advised him that he needed to provide documentation of the disposition.

329.     As set forth below, Defendants' records indicate that O.M. was convicted in October 2012 on drug charges.

330.     SVS Case Planner Chappell visited the Pennsylvania M. home again on June 28, 2012.  L.M. reported that D.S. was having behavior problems, had flooded all the bathrooms in

the house, became violent and did not listen when in the park, and snuck out of bed and stole food from the kitchen. SVS Case Planner Chappell advised L.M. about concerns raised by the Law Guardian regarding sibling visits for the children. L.M. stated that she would like a different Law Guardian.

331.    By July 27, 2012, Findings of Fact, Conclusions of Law, and Final Order of Disposition, the Queens County Family Court transferred custody and guardianship of D.S. to the Commissioner of Social Services of the City of New York and St. Vincent's Services. with full power and authority to place D.S. for legal adoption and consent to the adoption.

332.    On July 31, 2012, SVS Case Planner Chappell reported that the ICPC still had not been approved.

333.    HSVS Supervisor Jeffrey visited the Pennsylvania M. home on August 30, 2012. L.M reported that the children needed physicals, and she had no Medicaid for them. L.M. expressed concern that D.S. would not be able to continue his services in Pennsylvania without Medicaid. L.M. raised the same concern about physicals during a September 29, 2012, visit by HSVS Supervisor Jeffrey.

334.    HSVS Case Planner Anika Tillery (HSVS Case Planner Tillery) visited the Pennsylvania M. home on November 20, 2012. L.M. expressed concern about the ICPC, stating that the children's Law Guardian told her she was not supposed to have moved with the children until the ICPC was complete.

335.    Yet, they were allowed to move with the children despite the fact that the ICPC never got approved.

336.   During a November 20, 2012, visit, HSVS Case Planner Anika Tillery (HSVS Case Planner Tillery) learned that D.S. got in trouble at school that day because another child said D.S. touched his private parts.

337.   A December 2012 FASP reported that the case had not yet been accepted by the ICPC unit, and there continued to be no visiting plan for the children to see their siblings.  A December 14, 2012, Court Action Summary entered by HSVS Case Planner Tillery indicated that HSVS was to arrange for sibling visits between the children in Pennsylvania and other children in care in New York.

338.   HSVS Case Planner Tillery visited the Pennsylvania M. home on December 20, 2012, and spoke to L.M. about bringing the foster children for sibling visits at the agency.  L.M. stated that the children had not seen their siblings in two years, indicated that the visits would be an inconvenience, and stated that she would not do them.

339.   During the December 20, 2012, visit, L.M. stated that she was planning to be in New York to do taxes for three months beginning in January 2013 and that she would be traveling back and forth between New York and Pennsylvania during that time period.  L.M. stated that while she was in New York, D.S. and his brothers T. and D. would remain in Pennsylvania with O.M., while Z. would come with her.

340.   On January 28, 2013, L.M., D.S., and his three brothers attended a meeting at HSVS with HSVS Case Planner Tillery, HSVS Supervisor Jeffrey, and HSVS Coordinator Elissa Grossinger to address a report that L.M. beat the younger children.  L.M. and O.M. denied the allegations.   Z. told HSVS Supervisor Jeffrey that L.M. gives him "pow pow," which he demonstrated by taking one hand and hitting the other hand.  D.S. and D. reportedly denied being beaten.

341.    HSVS prepared a Comprehensive Adoption Report dated February 11, 2013, authored by Adoption Specialist Laurel Charles.  The report stated that D.S. and his siblings were placed in a "kinship" home with L.M. since 2009, while simultaneously noting that L.M. did not actually believe Ms. S. was her biological sister.  The report noted O.M.'s three convictions for robbery and drug sales but failed to note his additional conviction for driving under the influence of alcohol.    The report further asserted, without noting 2011 indicated report for inadequate guardianship, that no one in the household was the subject of a child abuse case.  The report asserted, despite clear evidence to the contrary, that L.M. and O.M. "ensure that the children's physical, educational and emotional needs are met" and recommended that they be approved as the adoptive parents of D.S. and his brothers T., D., and Z.

342.    SVS Coordinator Grossinger reported that the adoption home study was approved on February 11, 2013, and L.M. and O.M. signed adoptive placement agreements on March 29, 2013.

343.    In April and May 2013.  D.S. was not home at the time of the visit, even though it was scheduled in advance and all children were expected to be present.  L.M. stated, Defendants learned that D.S. was with her mother (S.B.).

344.    During the February 26, 2013, visit, L.M. informed HSVS Case Planner Tillery about an incident that happened while she was in New York earlier that month.  L.M stated that she was arrested because she was driving a car with someone who smelled like marijuana, butcontinued to have difficulties in school, where L.M. and Defendants had been released.

345.    An April 2013 FASP reported that D.S. was not receiving any mental health services and that, while D.S. was receiving failed to arrange for special education services through his prior school in New York, in Pennsylvania he was in regular education.  Although it was a year

since L.M. moved the children to Pennsylvania, the FASP reported that L.M. was still trying to obtain D.S.'s IEP and have him reevaluated for an IEP in Pennsylvania. and related services.

346.    The April 2013 FASP acknowledged that the ICPC was not in place at the time of the move and remained in process.  The FASP further acknowledged that there continued to be no visiting plan between all siblings.

347.    HSVS Case Planner Tillery visited the Pennsylvania M. home on April 23, 2013. D.S. was home with O.M., while L.M. was on her way back from New York with Z.  O.M. reported that they would be moving to another house, and he and L.M. would take turns alternating residences in New York and Pennsylvania.

348.    On May 20, 2013, L.M. informed HSVS Case Planner Tillery that D.S. was kicked out of school for throwing a bottle in the classroom that hit a table and shattered.  L.M. stated that she was looking for a new school for D.S. for September 2013.

349.    HSVS Case Planner Tillery visited the Pennsylvania M. home again on May 30, 2013.  D.S. reported that he was back in school.  Again, O.M. was home with D.S., and L.M. was not home.

350.    HSVS Case Planner Tillery conducted a home visit on June 27, 2013, this time to the Queens home where the family previously resided.  L.M. and D.S. were there, but L.M. stated that they were returning to Pennsylvania, and D.S. would attend school in Pennsylvania in September.  SVS Case Planner Tillery reported that the ICPC had to be resubmitted.

351.    SVS Case Planner Amanda Riley ("HSVS Case Planner Riley") visited the Queens M. home on July 27, 2013, and observed that D.S. was very tense.  SVS Case Planner Riley discussed with L.M. an incident in which D.S.'s brother D. videotaped a girl his age performing oral sex on him.  L.M. responded by laughing and stating that the little girl should not have been

that stupid; that her mother should have taught her not to put things in her mouth; and that L.M. told the principal of the school that if he was approached with the offer of oral sex, she knows he would take it.

352.    SVS Case Planner Riley conducted an agency visit with L.M. and D.S. on August 20, 2013.  D.S., who was six years old at the time, was very soft spoken and not very talkative. SVS Case Planner Riley and the adoption supervisor informed L.M. that the ICPC had not been approved, and the adoption could not be completed without a permanent address for L.M. and the children.  L.M. expressed concern that Pennsylvania would not approve the ICPC because of L.M.'s and O.M.'s criminal history and stated that she would stay with the children in Queens and enroll them in school there.

353.    On September 18, 2013, HSVS Supervisor John Olufmi ("HSVS Supervisor Olufmi") signed an ICPC report stating that the children had been returned to the sending state and listing the date of termination as August 20, 2013.

354.    On September 19, 2013, D.S. underwent a Comprehensive Psychological Evaluation conducted by Eugene Plotnick, Ph.D. of the HSVS Medical Department.  Dr. Plotnick reported that D.S. had serious behavior problems at home and at school; he threw chairs and computers at teachers and assaulted other students; and recently put an eraser in his own ear which reportedly remained stuck there.

355.    Dr. Plotnick also reported that, per L.M., D.S. urinated in cups and left them around for other people to pick up; put his feces into cups and other receptacles around the house; and smeared feces on the wall.  L.M. also reported that D.S. wet the bed very frequently.

356.    Dr. Plotnick noted Dr. Arty's previous recommendation in 2011 for D.S. to receive mental health treatment but stated that it did not take place.  Dr. Plotnick reported that L.M. moved with the family to Pennsylvania, and treatment did not occur there.

357.    Dr. Plotnick observed D.S.'s eye drifting out of alignment during the evaluation, which D.S. said affects his vision.  L.M. stated that she would have it checked by an eye doctor soon.

358.    Dr. Plotnick reported that D.S., who was then six years old, began sucking his thumb halfway through the evaluation.

359.    Dr. Plotnick administered the Wechsler Intelligence Scales for Children – IV (WISC-IV) to assess D.S.'s cognitive functioning.  D.S. achieved a full-scale IQ score of 84 with index scores of 98 in verbal comprehension, 88 in perceptual reasoning, 65 in working memory, and 91 in processing speed.  On the Wide Range Achievement Test – IV (WRAT-IV), D.S., a first-grade student, scored at the K.0 level in math, K.3 level in word reading, and K.4 level in spelling.

360.    Dr. Plotnick diagnosed D.S. with ADHD, Combined Type; Conduct Disorder, Early Onset, Mild; Encopresis; Enuresis; Learning Disorder NOS, Rule Out Post Traumatic Stress Disorder ("PTSD"), and Rule Out Mood Disorder NOS.

361.    Dr. Plotnick recommended that D.S. receive outpatient mental health treatment "ASAP," as well as an eye exam and glasses.  Dr. Plotnick stated that his evaluation should be used to determine an appropriate special education placement for D.S. and that D.S. might need a more restrictive supervised setting, such as a residential treatment program, if his behavioral problems worsened.

362.    An October 2013 FASP reported that D.S. was referred to the HSVS outpatient clinic for therapy and awaiting an appointment.  The FASP acknowledged that there continued to

be no visiting plan between all siblings. The FASP stated that a Safety Assessment/Certificate of Disposition, as well as an Investigation and Report, were required for O.M.'s October 2012 arrest and conviction on drug charges.

363.     Notwithstanding D.S.'s severe behavioral difficulties exhibited at home and at school, the October 2013 FASP stated that D.S. was "undoubtedly thriving" in the home of L.M. and O.M.   Notwithstanding the extended time period during which D.S. had gone without needed mental health and special education services and his many missed medical appointments, the FASP stated that L.M. and O.M. ensured that D.S.'s medical, mental health, and educational needs were being addressed.   Despite all of the above, as well as the repeated concerns raised by school officials and others about the care of the children, the FASP recommended that HSVS continue to work to complete the children's adoption by L.M. and O.M.

364.     Upon information and belief, the individuals involved in the creation of the October 2013 FASP were SVS Case Planner Riley, SVS Supervisor Olufmi, and SVS Supervisor Howard Bishop ("SVS Supervisor Bishop"), and the individual charged with approving the FASP was ACS Case Manager Paul Frankel ("ACS Case Manager Frankel").

365.     On December 18, 2013, OCFS issued letters to HSVS stating that upon review of the State Central Register's Records, OCFS found that both L.M. and O.M. were the subject of an indicated case of child abuse and maltreatment.

366.     On December 23, 2013, HSVS Case Planner Nichole Edwards ("HSVS Case Planner Edwards") conducted a visit to the home.  L.M. reported that D.S. did not have an IEP and special education services in place because the school would not convene an IEP meeting or place D.S. in a special education class because no surrogate parent had been appointed, and the school could not reach anyone at HSVS.

367.    On January 24, 2014, SVS Case Planner Edwards visited the M. home and expressed concern that D. and T. were living with O.M. in Pennsylvania, and there was a question as to whether the children were being neglected.  O.M. asserted that T. and D. were being transported daily from New York to Pennsylvania for school and returned to New York every night.

368.    In connection with the January 24, 2014, home visit, SVS Case Planner Edwards noted that the adoption was being delayed because the initial clearance results showed an indicated case with ACS for child abuse or neglect for L.M. and O.M., and O.M. had not provided the disposition from his most recent criminal case.

369.    On March 6, 2014, OCFS sent a letter to SVS Coordinator Wright providing notice that O.M. had been arrested on February 24, 2014, for criminal obstruction of breathing or blood circulation in the jurisdiction of the Queens County Criminal Court and that the agency was required to update the safety assessment.

370.    Defendants' records indicate that this arrest involved an altercation with L.M.'s sister that led to a conviction for disorderly conduct and the issuance of an Order of Protection.

371.    In March and April 2014, L.M. reported that D.S.'s IEP was completed, and he was moved into a 12:1:1 class.

372.    Upon information and belief, D.S. had been scheduled for a speech-language evaluation on March 6, 2014, but that appointment was missed, as was a subsequent appointment on April 1, 2014.  The school agreed to schedule one final appointment on April 8, 2014, only on the condition that ACS Case Planner Edwards accompany D.S. to the evaluation.

373.    On April 3, 2014, the guidance counselor at P.S. 123 informed HSVS Case Planner Edwards that the school had great concerns for D.S.  D.S.'s teachers reported that he came to

school daily unkempt, with his clothing soiled and his face dirty. The guidance counselor reported that Z. likewise came to school with soiled clothing and his face dirty, was always hungry, and stole food from the other children in the class. L.M. failed to pick up the children's report cards or attend the parent-teacher conferences.

374.    Defendants learned of continued concerns regarding D.S.'s education and neglect, and another IEP was created in May 2014.

375.    An April 2014 FASP stated that the foster boarding home of L.M. continued to meet agency standards for safety, and there continued to be no safety concerns in the home. Upon information and belief, the individuals involved in the creation of the April 2014 FASP included HSVS Case Planner Edwards and HSVS Supervisor Olufmi, and the individual charged with approving the FASP was ACS Case Manager Frankel.

376.    During a May 9, 2014, home visit, L.M. informed SVS Case Planner Edwards that D.S. continued to smear feces on the walls and urinate in various places around the home. L.M. reported that D.S. attended weekly therapy, but she did not see any improvement.

377.    It is not clear from Defendants' records where D.S. allegedly was receiving therapy at this juncture or for how long such services were provided.

378.    D.S.'s Dibels Composite Score indicated that during a June 5, 2014, home visit, L.M. informed HSVS Case Planner Edwards that her home had mold. SVS Case Planner Edwards noted that D.S.'s medical was overdue and that it would not take place until July due to the agency's relocation.

379.    HSVS had been sending L.M. notices of missed physical exam appointments for D.S. for the last 10 months. D.S. missed at least six physical exam appointments scheduled

between July 2013 and May 2014. On July 24, 2014, D.S. belatedly underwent his physical examination with Dr. Gulick at SVS.

380.    On June 21, 2014, a report was made against L.M. stating that she left the children outside unsupervised, the children appeared malnourished and unkempt, the children's clothes and bodies were dirty, and they were hungry.  ACS Worker Cherise Liesdek ("ACS Worker Liesdek") investigated the report.  ACS ultimately determined that the allegations of lack of supervision, inadequate guardianship, and inadequate food, clothing, and shelter were unsubstantiated against O.M. and L.M.

381.    On July 16, 2014, HSVS worker Sharima Stuart ("HSVS Worker Stuart") conducted a visit to the foster home of L.M. and O.M. in connection with the recertification process.  In her report, HSVS Worker Stuart described L.M. as a "certified kinship foster parent" and the children in care as L.M.'s "nephews," even though HSVS employees working on the case knew or should have known that this was not true.  The report recommended that L.M.'s home remain open "only as a kinship placement."

382.    On July 25, 2014, HSVS Case Planner Edwards reported that D.S. had been referred to the HSVS mental health clinic for an updated evaluation and individual therapy and was awaiting an intake appointment.

383.    During a July 25, 2014, home visit, L.M. stated that she was now willing to bring D.S. for sibling visits, and D.S. stated that he would like to have them.  SVS Case Planner Edwards informed D.S. that he had a new baby brother, and D.S. said he would like to meet him.

384.    During the July 25, 2014, visit, L.M. informed SVS Case Planner Edwards about an incident that occurred between D.S.'s brother D. and her 11-year-old daughter.  L.M. reported that her daughter went to D.'s room to get something; her daughter observed that D. had an

erection; and D. started massaging himself and asked L.M.'s daughter if she wanted to touch him. L.M. opined that D.'s behavior stemmed from his sexual abuse history, which was never addressed.

385.    On July 29, 2014, SVS Case Planner Edwards provided L.M. with information about a sibling visit scheduled for August in the Bronx.  L.M. stated that she would take the children to HSVS for visits, but not to the Bronx.  L.M. did not bring D.S. for the scheduled visit.

386.    During an August 22, 2014, home visit, HSVS Case Planner Edwards again was informed that the home had mold.  HSVS Supervisor Lyschel Wilkerson ("SVS Supervisor Wilkerson") entered a note stating that the children should leave the home by September 2, 2014.

387.    L.M. proposed that the children stay with her mother, S.B., while the mold was removed.  However, clearance information received by HSVS Case Planner Edwards showed that S.B. had two indicated allegations of inadequate guardianship, one from March-May 2006 and one from September-November 2011.  The clearance also showed that the September-November 2011 allegation was indicated against S.B.'s husband J.B.

388.    SVS Case Planner Edwards informed L.M. on August 28, 2014, that S.B. was not appropriate resource for the children.

389.    An October 2014 FASP reported that D.S. would like to have sibling visits, visits were not occurring with his four siblings placed with the agency New York Foundling.  Despite the evidence to the contrary, the FASP concluded that D.S.'s educational, emotional, and medical needs were being met in the home of L.M. and O.M.

390.    Upon information and belief, the individuals involved in the creation of the October 2014 FASP included HSVS Case Planner Edwards and HSVS Supervisor Wilkerson, and the individual charged with approving the FASP was ACS Case Manager Frankel.

391.    On October 22, 2014, a report was made to ACS that on October 21, 2014, out of anger and as a form of punishment, L.M. had beaten seven-year-old D.S. over the head and back with a notebook to the point that the notebook was destroyed.  The report stated that L.M. beat D.S. because he was out of control in school and destroyed his classroom, throwing chairs and breaking objects.  The report stated that when D.S. returned to school on October 22, 2014, he attacked his gym teachers, and there were concerns for his safety if L.M. was notified of this.  The report also stated that D.S. and Z. had poor hygiene and body odor, that the boys wore dirty clothing, and that L.M. was not cooperative with the school for either boy.

392.    ACS Worker Darlene Ellison ("ACS Worker Ellison") was assigned to investigate the report, overseen by ACS Supervisor Natasha Christian ("ACS Supervisor Christian").

393.    ACS Worker Ellison interviewed both D.S. and Z. on October 22, 2014.  D.S. denied being hit by L.M., but Z. stated that L.M. hit D.S. when he was bad and also hit him.

394.    During a November 12, 2014, home visit, L.M. informed HSVS Case Planner Edwards that D.S. and Z. had been transferred to a new school, P.S. 42.

395.    On November 12, 2014, HSVS Case Planner Edwards reported that D.S. attended the final intake appointment at the HSVS mental health clinic on November 10, 2014 and was awaiting assignment to an outpatient therapist for weekly therapy.

396.    A psychiatric evaluation from HSVS dated November 10, 2014, states that D.S. was referred for evaluation due to "deteriorating behaviors impulsive, disruptiveness and fights."  D.S. had been physically aggressive toward his foster family and school staff and had even broken a staff member's glasses.  At the time, his school performance was deteriorating, and he was running out of class, hitting students and staff, and throwing items.  The report notes that D.S. had a history of exhibiting sexually inappropriate behaviors as well as putting his mouth on the penis

62

of another boy.  He experienced bed wetting.  Further, the report reiterated his "aggressive behaviors" at the time, which included urinating in cups around the house and smearing feces on the walls of his home.

397.    The November 10, 2014, report recommended individual psychotherapy, medical clearance, especially EKG and lab reports for future medication trial, family psychotherapy, educational progress reports, a neurological assessment, and the possibility of medication after establishing a psychotherapeutic relationship and psychotherapy.  Upon information and belief, most of these recommendations were not implemented by Foster Care Defendants or DOE Defendants.

398.    Upon information and belief, the Foster Care Agency Defendants did not provide the November 10, 2014, psychiatric evaluation report to the DOE Defendants.

399.    On December 5, 2014, ACS Worker Ellison visited P.S. 42, interviewed D.S. and Z., and spoke with school staff.  ACS Worker Ellison observed that both D.S. and Z. were wearing "filthy" uniform shirts inappropriate for school or anywhere else.  ACS Worker Ellison observed that Z. had a foul body odor and that his socks were mismatched, with one black and one pink.  D.S. reported going to S.B.'s house after school and staying overnight at S.B.'s home.  Z. also reported staying overnight at S.B.'s home.

400.    On the same date, the P.S. 42 guidance counselor informed ACS Worker Ellison that D.S. and Z. had appeared filthy since their first day of school and had ongoing body odor.  The guidance counselor reported that, according to D.S. and L.M., D.S. was living with S.B.  D.S.'s teacher similarly reported that he came to school daily with dirty clothing and body odor, and one day L.M. was contacted because D.S.'s body odor was consuming the classroom.

401.    On December 5, 2014, ACS Worker Ellison also spoke with the guidance counselor at P.S. 123, D.S.'s former school.  The P.S. 123 guidance counselor reported that during both the current and prior year, there was an ongoing issue with D.S.'s and Z.'s hygiene and appearance, and their clothes were dirty and their shoes too small.  The guidance counselor also recounted the report of L.M. hitting D.S. with a notebook.

402.    On December 5, 2014, HSVS Case Planner Edwards conducted an unannounced visit to the M. home.  L.M.  denied sending D.S. to school dirty.  D.S. expressed concern to Case Planner Edwards about whether L.M. knew that ACS Worker Ellison came to see him at school.

403.    On December 9, 2014, a conference was held with L.M., O.M., S.B., HSVS Case Planner Edwards, and ACS Worker Ellison.  L.M. continued to deny the allegations.  ACS Worker Ellison stated that the children are not allowed to spend the night in S.B.'s home, and S.B. is not allowed to have child-caring responsibilities for them because of S.B.'s indicated ACS history.  L.M. reported that D.S.'s first therapy appointment was that day, but she was not going to take him because of the meeting.  ACS Worker Ellison told L.M. that she had time to go to the therapy appointment because it was three hours later.

404.    D.S. missed his first therapy appointment on December 9, 2014.

405.    On December 19, 2014, ACS determined that the allegations of inadequate food, clothing, and shelter and of inadequate guardianship were substantiated for D.S. and Z.  ACS determined that the allegation of excessive corporal punishment against L.M. was unsubstantiated because L.M. and D.S. denied it and no signs of physical abuse were noted on an exam.  ACS Supervisor Christian and ACS Supervisor Marcia Florian ("ACS Supervisor Florian") determined that corrective actions would include the involuntary closure of L.M.'s foster home as soon as the foster children currently in the home achieved permanency.

406.    On December 23, 2014, ACS Supervisor Christian sent a letter to Dawn Saffayeh, Executive Director of SVS ("Executive Director Saffayeh") documenting the indicated report of suspected child abuse and maltreatment of D.S. and Z. by L.M. and the Corrective Action Plan required by the agency.  The corrective actions listed including retraining L.M., conducting unannounced home visits, and involuntarily closing L.M.'s home once the children achieved permanency.

407.    On January 23, 2015, HSVS issued a notice to L.M. and O.M. that they were overdue for the training required by the indicated OSI report.

408.    This was reflective of a pattern with L.M. and O.M.  HSVS had issued notices to L.M. and O.M. about their failure to attend required recertification trainings despite repeated notices throughout the time period of D.S.'s placement in the home.

409.    On February 5, 2015, a Placement Preservation Conference was held to address HSVS's concerns regarding the children's placement with L.M. and O.M.  The conference attendees included L.M., O.M., ACS Facilitator Clayton Townsend ("ACS Facilitator Townsend"), and the following staff from HSVS:  HSVS Case Planner Edwards, HSVS Assistant Director Lydia King ("HSVS Assistant Director King"), HSVS Assistant Director Norma Forde ("SVS Assistant Director Forde"), HSVS Deputy Director Shavon Roach, HSVS Adoption Expeditor Joy Smith, HSVS Supervisor Olufmi, and HSVS Paralegal Ushadevi Ranya.

410.    During the February 5, 2015, conference, the recent indicated OSI report was discussed.  SVS Case Planner Edwards reported that similar complaints were made by the children's prior school and noted L.M.'s decision to transfer the children to a new school.  The HSVS staff also expressed concern that L.M. and O.M. had not kept medical appointments for the children and did not take the children to their therapy sessions.

411.    During the February 5, 2015, conference, L.M. became upset and complained that HSVS had not adequately helped her obtain services for the children, noting that she had been asking for sex abuse evaluations for D.S. and his brother D., but they were not done.

412.    At the February 5, 2015, conference, HSVS Assistant Director King stated that the recommendation of ACS/OSI was for the agency to keep the children in the home and proceed with the adoption, but the foster home was to be involuntarily closed once the children were adopted.

413.    ACS Facilitator Townsend recorded in the February 5, 2015, conference notes: "The children are safe at this time.  Agency will keep the children in the home of their maternal aunt and uncle.  Agency will make unannounced visits to the foster home."  ACS Facilitator Townsend further stated: "There is no immediate danger of serious harm."  ACS Facilitator Townsend stated that HSVS would, *inter alia*, follow up about sex abuse counseling being initiated for D.S. and D.

414.    ACS Facilitator Townsend's description of L.M. and O.M. as D.S.'s maternal aunt and uncle was inaccurate and contradicted by the available information.  ACS Facilitator Townsend and the other conference attendees' conclusion that the children were safe in the home and that there was no immediate danger of serious harm was unfounded.

415.    On February 23, 2015, HSVS Assistant Director King entered a note stating that there were "concerns regarding this home in terms of safety of children in the foster home" and specifically noting a concern that the children were staying at S.B.'s home.

416.    On February 24, 2015, HSVS Assistant Director King again noted "serious concerns" regarding D.S.'s placement with L.M.  She directed the Case Planner to closely

supervise the home, make announced and unannounced home visits, and explore whether D.S. was in the right school placement.

417.    On February 26, 2015, an OSI worker contacted HSVS Case Planner Edwards and informed her that a report was called in against L.M. regarding D.S.'s brother D.  D. had gone "AWOL" from the home of L.M. on February 23, 2015.

418.    On April 16, 2015, there was an indicated abuse/neglect finding against L.M. and O.M. with an intake date of February 26, 2015.  ACS records reveal that the case was flagged as "high risk of sex abuse" with more than four prior state central registry reports.

419.    On February 27, 2015, D. returned from AWOL status and was placed outside the home of L.M.

420.    On March 11, 2015, HSVS Case Planner Edwards conducted an unannounced school visit to P.S. 42.  The school social worker reported that D.S. was often non-compliant with the school dress code and "unprepared with no book bag or school supplies."  D.S.'s teacher reported that he never did his homework and did very little work in the classroom.  D.S. reported that after school he went to S.B.'s home and was later brought to L.M.'s job by his aunt.  D.S. reported that he was absent from school the prior day because he had to stay home to clean the house.

421.    On March 25, 2015, HSVS Case Planner Edwards attempted to conduct an unannounced foster home visit, but no one was home.

422.    On March 26, 2015, HSVS Assistant Director King noted that L.M. "does not seem to be able to meet [D.S.'s] needs as there continues to be concerns regarding school attendance and performance and compliance with mental health."  She directed the Case Planner to contact

the mental health providers to ensure that D.S. was attending therapy and to put more effort into scheduling sibling visits.

423.    On March 30, 2015, HSVS Case Planner Edwards visited the M. home.  SVS Case Planner Edwards informed L.M. about her visit to D.S.'s school and stated that his attendance report showed 20 absences and 10 instances of lateness.  L.M. confirmed that D.S. and Z. were going to her mother's home after school but asserted that O.M. was at the home and supervised the children there.

424.    On March 30, 2015, HSVS Case Planner Edwards provided L.M. with a 10-day notice that the agency planned to remove D.S. and Z. from her home.

425.    An April 2015 FASP stated that L.M. and O.M. were not meeting D.S.'s medical, educational, and emotional needs and were not providing him with a safe environment.  The FASP stated that although L.M. and O.M. knew that L.M.'s parents S.B. and J.B. had indicated OSI cases for drug use and sexual abuse, they continued to leave D.S. at S.B.'s and J.B.'s home.  The April 2015 FASP further noted that "sibling visitation has been difficult to coordinate and has occurred limitedly."

426.    An April 9, 2015, HSVS form stated that that the foster home of L.M. and O.M. was being closed.  The primary worker listed on the form was SVS Supervisor Correa, and the reason listed for the closure was "Health and Safety."  The form reported that L.M. tested positive for marijuana, and "there were ongoing levels of concern about the care and safety provided for the children placed in the home."  The form stated that the home of L.M. and O.M. was "an unsafe environment to keep and place foster children in."  The form further stated that pursuant to the request of OSI, it was recommended that the home of L.M. and O.M. "not be considered to re-open."

68

427.     On April 10, 2015, D.S. and Z. were removed from the home of L.M. and O.M. and placed in the foster home of another foster parent, J.A.   D.S. was eight years old at the time of his removal from the home of L.M. and O.M.

**D.S.'s Placement in the Home of J.A.**

428.     On April 24, 2015, two weeks after D.S. came to live with J.A., J.A. took D.S. to the emergency room at Jamaica Hospital because he was cursing, exhibiting sexual behavior, physically abusing Z. and making threats towards the baby in the house.

429.     D.S. was transferred from Jamaica Hospital to Bellevue Hospital ("Bellevue").

430.     On April 28, 2015, HSVS Assistant Director King went to Bellevue and informed the staff that L.M. and O.M. should not be permitted to visit D.S. "as it is suspected that [D.S.] and his sibling were traumatized in this home."

431.     On May 6, 2015, HSVS Case Planner Keisha Walker ("HSVS Case Planner Walker") attended a conference with Dr. Brandon of Bellevue.   Dr. Brandon reported that D.S. was terrified of L.M. and traumatized, and he did not want L.M. to find him.

432.     HSVS Case Planner Walker's notes from the May 6, 2015, conference state that D.S. told J.A., his new foster parent, many disturbing things that occurred while he lived with L.M., including that he went to school one day with a patch on his eye because he had a black eye and was told not to say anything, or he would get a beating.   D.S. also told J.A. that on many occasions he and his brother were with L.M. while she stole clothing and accessories from department stores.   J.A. reported that D.S. displayed very disturbing behaviors in her home, constantly cursing and on one occasion stripping naked and making sexual gestures towards his brother and the baby in the home.

433.    On May 28, 2015, a hospital made a report that in April 2015 and before, D.S. was sexually abused by L.M. and O.M. on at least five occasions.    The report stated that D.S. was experiencing PTSD from these incidents as well as aggressive behaviors.

434.    ACS Workers Kayode Kassim ("ACS Worker Kassim") and Jessica Chavez ("ACS Worker Chavez") worked on the May 28, 2015, report in an investigative capacity.

435.    ACS Supervisor Aida Elshorbagi ("ACS Supervisor Elshorbagi") and ACS Supervisor Florian worked on the May 28, 2015, report in a supervisory capacity.

436.    On May 29, 2015, ACS Worker Chavez met with D.S. at Bellevue.  ACS Chavez reported the following:  When D.S. saw her, he immediately said he did not want to talk about it. D.S. disclosed, however, that he did not like the home of L.M. and O.M. because they always hit him.  D.S. made additional allegations regarding L.M. and O.M. and stated that he wanted to kill them.  ACS Chavez's notes indicate that she did not ask D.S. about his report of sexual abuse by L.M. and O.M.

437.    On June 2, 2015, ACS Worker Chavez spoke to Detective Phelan, who was assigned to investigate the report of sexual abuse by L.M. and O.M.  ACS Worker Chavez informed Detective Phelan that D.S. was still at Bellevue, and Bellevue would have D.S. interviewed at their CAC.  Detective Phelan stated this should not occur because once D.S. was out of the hospital, he would set up a CAC, and it was not a good idea for D.S. to be interviewed more than once.  ACS Chavez called Bellevue and conveyed what Detective Phelan said.

438.    In a note dated June 4, 2015, ACS Supervisor Elshorbagi directed ACS Worker Chavez to follow up with the CAC referral after D.S. was discharged from the hospital.  ACS Supervisor Florian likewise issued a directive for follow-up with the CAC.  ACS Supervisor

Florian confirmed in her June 4, 2015, note that D.S. "was not interviewed regarding the sex allegations as he will be interviewed at the CAC once he is discharged."

439.    Upon information and belief, Foster Care Defendants failed to ensure that D.S. had a CAC evaluation following his discharge from Bellevue.

440.    On June 5, 2015, D.S. was discharged from Bellevue and placed back in the foster home of J.A.

441.    On June 8, 2015, J.A. took D.S. to Jamaica Hospital. J.A. reported that after D.S. was released from Bellevue, he exhibited behaviors including cursing, throwing things out the window of the car, spitting, breaking things, and stripping naked.

442.    J.A. informed HSVS that she no longer felt safe for D.S. to be in her home or around other children.

443.    In a note dated June 10, 2015, HSVS Case Planner Walker reported that D.S. was discharged from Jamaica Hospital and placed in the respite foster home of T.D.

444.    On June 12, 2015, D.S. was admitted to Four Winds Hospital ("Four Winds").

445.    According to Defendants' records, D.S., who was only eight years old at the time, was hospitalized at Four Winds because he exhibited, *inter alia*, violence, aggression, threatening behavior toward others, severe acting out behaviors, and PTSD.

446.    According to a Four Winds report, D.S. had "a severe history of sexual abuse by aunt, for 5 years." D.S. reported that he had "thoughts about the bad things that she used to do but reported she use[d] to hit him a lot but did not report sexual abuse." The foster parent reported that D.S. made "sexual comments" to his foster siblings and took off his clothes at inappropriate times.

447. None of the Foster Care Defendants provided Four Winds with an accurate medical history for D.S. Further, Foster Care Defendants did not provide accurate information about the Four Winds stay to the DOE Defendants.

448. The DOE Defendants and Defendant City do not have appropriate policies, procedures, and practices to address coordination and communication for children with IEPs who enter in-patient care.

449. According to a June 15, 2015, report by ACS Worker Chavez, Chavez said he could not interview D.S. if he was in the hospital, so he would interview the alleged subjects and close the case if nothing was found.

450. On June 17, 2015, a Four Winds social worker contacted HSVS Case Planner Walker to report that D.S. was struggling with his behavior. The social worker stated that D.S. urinated on the wall in the quiet room, took off all his clothes, and was yelling and screaming.

451. While D.S. was hospitalized at Four Winds, J.A. reported that he left frightening messages for her in which he went from saying that he loved her and missed her to calling her curse words in a whisper and stating that when he came home, he would kill her.

452. On June 19, 2015, ACS Worker Chavez reported that the case remained open, but the allegation had not been addressed due to D.S.'s mental condition.

453. In a note dated July 2, 2015, ACS Worker Chavez stated: "A CAC never occurred due to the child's continued admission to the hospital for psychiatric reasons."

454. On July 6, 2015, ACS Worker Chavez reported that the allegation of sexual abuse against L.M. and O.M. was deemed unfounded/unsubstantiated. ACS Worker Chavez stated that D.S. did not disclose sex abuse to her or the HSVS case planner and due to being in and out of hospitals could not be interviewed. ACS Worker Chavez stated that the allegation therefore was

72

being unsubstantiated based on no credible evidence. The decision to find the report of sexual abuse unfounded was made and/or approved by ACS Worker Chavez and ACS Supervisor Aida Elshorbagi.

455.    ACS and HSVS failed to make further investigations into D.S.'s sexual abuse, including a failure to refer D.S. for further evaluations and/or therapy.

456.    In her July 6, 2015, note, ACS Worker Chavez stated that HSVS was to ensure that D.S. was placed in an appropriate setting once discharged and it was recommended that he be placed in a therapeutic foster home with no other children due to D.S.'s behavior.

457.    D.S. was discharged from Four Winds on July 10, 2015.  Four Winds diagnosed D.S. with PTSD and ADHD.   The Four Winds discharge plan listed D.S.'s medications as Zoloft, Prazosin, and Seroquel, while a July 10, 2015, HSVS medication list for D.S. reported that he was taking Abilify, Seroquel, and Zoloft.

**D.S.'s Placement in the Home of C.P.**

458.    Upon his discharge from Four Winds on July 10, 2015, D.S. was placed in the home of another foster parent, C.P.

459.    On July 10, 2015, HSVS Case Planner Walker visited the home of C.P.   Another child – R., age 12 – was placed in the home, despite the ACS recommendation that D.S. be the sole child in any foster home.

460.    C.P.'s home was not a therapeutic foster home, even though Foster Care Defendants knew that D.S. needed such a home.

461.    C.P.'s home was not a foster home without other children, even though Foster Care Defendants knew that D.S. needed such a home.

462.    Upon information and belief, Foster Care Defendants had sufficient information about both R. and D.S. to know that it would be unsafe for them to be placed in a home together where they would have the ability to engage in an unsupervised manner.

463.    On July 15, 2015, ACS Supervisor Elshorbagi learned from SVS Case Planner Walker that D.S. was not placed in a therapeutic foster home because HSVS did not have therapeutic foster homes, and he was not placed in a home without other children because such homes were hard to find.  SVS Case Planner Walker further reported that the prior day D.S.'s older sibling, D., had disclosed to her that D.S. was hit by L.M. and O.M. when he lived with them.  D.S. and his siblings would be hit hard, and their mouth would be bleeding.  D. observed both D.S. and Z. being hit by L.M. and O.M. on numerous and frequent occasions.

464.    In a note dated July 16, 2015, ACS Supervisor Elshorbagi reported that allegations of excessive corporal punishment against L.M. and O.M. were being added and substantiated based on sibling D.'s report. ACS Supervisor Elshorbagi stated that a corrective action was being requested for HSVS to explore a residential setting for D.S. and ensure that no New York City children were placed in the foster home of L.M. and O.M.

465.    On July 17, 2015, HSVS Supervisor Hilda St. Catherine ("HSVS Supervisor St. Catherine") directed steps to be taken to request a therapeutic home for D.S.

466.    On August 27, 2015, HSVS Assistant Director King directed the case planner to begin the process for referring D.S. to a higher level of care and explore whether D.S. was ready to have visits with his sibling Z.

467.    In an HSVS medical record dated August 27, 2015, HSVS reported that D.S. was on the psychotropic medications Sertraline, Quetiapine, and Ariprazole.

468.    In another HSVS medical record dated August 27, 2015, Dr. Gulick noted that D.S. had a history of rape per the foster mother's report of his statement, but the evaluation follow-up was unknown.  Dr. Gulick stated that D.S. would be sent for sexually transmitted disease (STD) and HIV testing.

469.    In a note dated July 9, 2015, ACS Worker Kassim reported that D.S. was allegedly engaged in weekly individual psychotherapy at the HSVS out-patient mental health clinic with therapist Josh Levitt.

470.    Upon information and belief, Josh Levitt is a "mental health counselor" who got his Master's in mental health counseling in 2010.

471.    However, Defendants have not turned over these records and upon information and belief, it is not clear the extent to which this counseling was provided.

472.    On September 14, 2015, ophthalmologist Dr. Storm diagnosed D.S. with visually significant myopia and decreased stereopsis and prescribed D.S. glasses for full-time use.

473.    During a September 24, 2015, home visit, C.P. informed HSVS Case Planner Walker that D.S. recently had an outburst in which he began cursing and flipping chairs after not getting his way.

474.    In a note dated September 26, 2015, SVS Supervisor Bishop directed the case planner to make monthly visits to C.P.'s home to make sure D.S. was safe and ensure that his special behavioral needs were being fully met.  SVS Supervisor Bishop further directed the case planner to make diligent efforts to ensure there were at least twice per month sibling visits between D.S. and his separated siblings at HSVS and New York Foundling starting in October.

475.    Defendants' records indicate that D.S. participated in some sibling visits between October 2015 and November 2016, but even during this time period did not have visits consistently occurring twice per month.

476.    On October 1, 2015, C.P. informed HSVS Case Planner Walker that, according to D.S.'s school, D.S. would become out of control when upset, and he threw an object at the teacher and almost hit her.

477.    An October 2015 FASP reported that D.S. was diagnosed with ADHD, depression, anxiety, and aggression.  The FASP stated that D.S. received individual outpatient therapy at the HSVS mental health clinic and was taking Zoloft, Concerta, Benadryl, and Thorazin, with medication management from Dr. Shah.

478.    On November 9, 2015, HSVS Case Planner Walker spoke with the guidance counselor at D.S.'s school, who reported that D.S. exhibited frequent misbehavior, and his actions were extreme.  Several days later, HSVS Case Planner Walker reported providing the school with D.S.'s most recent psychiatric evaluation for review.

479.    On November 23, 2015, C.P. informed SVS Case Planner Walker that she was being called several times a week to come get D.S. at school.

480.    On December 1, 2015, C.P. showed HSVS Case Planner Walker a letter from D.S.'s school stating that he could not return until he was seen by his therapist.

481.    The DOE's files contain a December 2015 letter from the principal of P.S. 81 to Dr. Shah at HSVS.  The letter described bizarre and troubling behavior by D.S., including extreme physical tantrums, sexually inappropriate behavior, spitting, licking the bottom of his shoes, screaming "I want Jesus," singing "lewd" song lyrics, and writing on a paper or telling staff, "I do not love you."

482.    SVS Case Planner Walker reported that D.S.'s saw his therapist on December 1, 2015, and the therapist gave C.P. a letter so D.S. could return to school.

483.    On December 14, 2015, C.P. informed SVS Case Planner Walker that D.S. was suspended from school for getting into a fight and becoming aggressive with the staff.

484.    On January 12, 2016, D.S. was removed from school and taken to Woodhull Hospital.  Police and an ambulance were initially called because D.S. threatened to kill one of the school staff members. D.S. was calm when they arrived, so they did not transport him, but the principal did not feel safe with D.S. in the building, so D.S. was escorted to Woodhull Hospital.

485.    An HSVS clinic note dated January 20, 2016, reported that D.S. was diagnosed with Disruptive Disorder and Oppositional Defiant Disorder ("ODD").

486.    A January 2016 assessment conducted by the DOE outlined a range of extremely troubling and maladaptive behaviors, including that D.S. was threatening to kill other children, spitting, hitting, and engaging in sexually inappropriate behavior.  The assessment included assertions that D.S. was "targeting" his teacher by taking off his shoes and putting his foot in her face, making sexually inappropriate remarks, and destroying her work.  D.S. was also refusing to perform schoolwork and destroying his own work.

487.    In January 2016, the DOE completed a social history with HSVS Case Planner Walker.  The social history notes:

> In school, [D.S.] displays a lot of sexual and aggressive behaviors. He does not follow directions and is often combative when he is corrected or given instructions. [D.S.'s] behaviors are often very unpredictable. He can be very cooperative and participate in activities one minutes and the next he is angry, aggressive, and non-compliant. When he is in these moods he often targets his peers and teacher. He has destroyed his peer's and teacher's work, put his foot in the teacher's face, hit peers, throw objects around the room, destroy his own work, ripped his clothing and run out of the classroom. [D.S.] often threaten others or dare (sic) them to hit or do things to him. He often seems to have no fear of authority in the building as he is often combative towards them. During counseling, he agrees his behaviors are

inappropriate and he would apologize, but within the same moments he will display one of the above behaviors.

488.    In January 2016, the DOE's IEP team met and changed D.S.'s classification to "Emotional Disturbance," stating that, based on the representations of either he foster parents or the HSVS Defendants that D.S. was allegedly receiving "weekly therapy" to address his behaviors, and was on psychotropic medication, and recommending placement in a District 75 school.

489.    Yet, Defendants have produced no evidence that D.S. was receiving "weekly therapy."

490.    On February 17, 2016, D.S. continued to misbehave in school and on the bus.

491.    In a note dated March 9, 2016, HSVS Assistant Director King directed the case planner to assist the foster parent in enrolling D.S. in extracurricular activities such as Boy Scouts and Little League.

492.    Upon information and belief, while placed with L.M. and O.M., D.S. had been enrolled in few if any formal extracurricular activities, and limitations on his participation in community activities was noted to be tied to his behavior.

493.    In March 2016, Dr. Jean Jacques, M.D., who worked for Defendant Foster Care Agencies' clinic, conducted a psychiatric evaluation of D.S ("March 2016 report").  At the time, D.S. had just turned nine years old.

494.    The March 2016 report stated that D.S. was receiving ongoing treatment at the HSVS clinic.  Upon information and belief, D.S. was not receiving adequate treatment at HSVS, the treatment was not sufficiently intensive and/or evidence-based and was evidently not working. Yet, Foster Care Agency Defendants and the Foster Care Agency Employees and ACS and DOE Defendants did not devise an alternative plan for D.S.

495.    The March 2016 report stated that the prior week D.S. had to be seen at the emergency room due to a public "meltdown."

496.    The March 2016 report noted that D.S. had a history of "trauma, neglect, abuse, sexual abuse and a history of sexualized behavior."  It listed the "chief complaint" to be night terrors, irritable mood, poor attention, concentration, aggression, temper loss, temper tantrums.

497.    The March 2016 report stated that D.S. was "suspected of having an intellectual disability."  D.S. does not have an intellectual disability, and there was not an adequate basis to suspect that he did.

498.    The March 2016 report diagnosed D.S. with "DMDD, Unspecified Disruptive Impulse Control and Conduct Disorder, PTSD, ADHD" and "Borderline Intellectual Functioning."

499.    Although D.S. was born with a brain injury, and various medical testing had been recommended but not conducted, Dr. Jacques did not review the prior file and/or was not in possession of the accurate information about D.S.'s history, earlier cognitive abilities, and the need for further testing.

500.    Further, upon information and belief, Dr. Jacques was not trained on and/or informed about the special education service system and what D.S. would require for a FAPE.

501.    Dr. Jacques prescribed D.S. "Risperdal/ Tenex/Concerta/Atrax" allegedly to address ADHD and anxiety.

502.    A March 17, 2016, HSVS medication consent form indicated that D.S. was taking Atarax, Concerta, Risperdal, and Tenex.

503.    An April 2016 FASP reported that in or around the time D.S. was removed from the home of L.M. and O.M., L.M. tested positive for marijuana, and O.M. tested positive for opiates.

504.    An April 20, 2016, HSVS Mental Health Clinic report stated that D.S. was diagnosed with PTSD, ADHD, and Unspecified Conduct/Impulse Control.

505.    On July 5, 2016, C.P. informed HSVS Case Planner Walker that she received a call from Special Victims Unit Detective Morales, who reported receiving notification that a child named R. stated in therapy that he had done sexually inappropriate things to his once foster brother D.S.

506.    In July 2016, following this disclosure, D.S. was seen at the Safe Horizon CAC, and, upon information and belief, D.S. disclosed sexual abuse by R. during the CAC interview.

507.    A Safe Horizon report stated that the case was a law enforcement referral with an allegation of sexual abuse by a 12-year-old, who stated that he penetrated D.S.'s anus.  The report stated that R. was placed with D.S. in the home of C.P. from July 10, 2015, to October 9, 2015.

508.    The forensic interview ended in a conclusion that there would be an arrest and D.S. would be referred for a medical assessment.  Defendants' records indicate that D.S. appeared to have a huge weight lifted off his shoulders by telling the truth.

509.    Defendants have not produced any records to establish that they took steps to provide appropriate treatment, counseling and/or services following this incident.

510.    On September 20, 2016, C.P. informed HSVS Case Planner Walker that she received a call from D.S.'s school stating that he had been taken to the emergency room at Kings County Hospital because he was throwing chairs and out of control.  C.P. reported that D.S. was released from the hospital later that evening.  C.P. reported that according to the paraprofessional, D.S.'s behaviors were escalating.

511.    On September 22, 2016, C.P. reported to HSVS Case Planner Walker an additional incident in which D.S became upset with the bus matron and grabbed her breast and buttocks.

512.    In a note dated September 26, 2016, HSVS Assistant Director King stated that the agency would refer D.S. for therapeutic foster care. In a note dated September 27, 2016, HSVS Case Planner Walker reported that therapist Josh Levitt would write a recommendation for D.S. to be placed in a day treatment program.

513.    A conference was held for D.S. on or around October 4, 2016.  The attendees at the conference were listed to include C.P., HSVS Case Planner Walker, HSVS Assistant Director King, HSVS Assistant Director Forde, and therapist Josh Levitt.  The agency staff agreed that D.S. would benefit from a day treatment program and a therapeutic foster care placement.

514.    On October 27, 2016, C.P. informed HSVS Case Planner Walker that D.S. had another incident on the bus in which he spit on the bus matron, pushed her, and kicked her, following which he was suspended from the bus for three days.  C.P. stated that she did not know how much longer she could care for D.S. because his outbursts were very hard to deal with and she was unsure how to help him.

515.    In a November 15, 2016, order, Hon. Emily Ruben of the Queens Family Court, found that it was in the best interest of D.S. to excuse the failed condition of Ms. S.'s surrender and allow him to continue to be placed with the Commissioner for adoption.

516.    Despite the recent recommendation for a day treatment program and therapeutic foster home, Defendants made no changes to D.S.'s placement, leaving D.S. to languish in an inappropriate foster home and educational setting for months.

517.    In April 2017, the Office of Mental Health ("OMH") conducted an intake for D.S. at the "Brooklyn day Treatment" ("NYCCC 2017 intake").

518.    "Brooklyn day Treatment" was a program run by OMH, with a partnership from District 75 which was supposed to provide educational services and mental health treatment.

"Brooklyn day Treatment" is also known as the New York City Children's Center ("NYCCC") and is a restrictive "locked" facility.

519.    Upon information and belief, NYCCC is racially segregated.

520.    NYCCC was a wholly inadequate placement for D.S., inappropriately staffed, and, at the time, exposed D.S., who was ten years old at the time, to older students who had predatory sexualized behaviors.

521.    The NYCCC 2017 intake reads, in relevant part: "[c]ustody of [D.S.] and his brothers were given to 'aunts and uncles' who were really friends of the biological mother." D.S. was removed from their care in 2014 because they tested positive for drugs, and D.S. "later disclosed that they had been sexually abusing him." D.S. was temporarily placed with one of his brothers and a foster parent, however, D.S. "had daily outbursts and was exhibiting extreme sexualized behaviors, exposing his private parts to others and spitting on them."

522.    In April 2017 D.S. was accepted by the NYCCC day treatment program, and he was scheduled to begin attending that program on April 19, 2017. The FASP stated that D.S. had been attending weekly individual therapy at HSVS, but the HSVS therapy and all HSVS mental health services would be suspended for D.S. once he was placed in the day treatment program.

523.    On May 22, 2017, C.P. informed HSVS Case Planner Tanisha Tabb ("HSVS Case Planner Tabb") that D.S. performed sexual actions at her home a few nights before. C.P. reported that D.S. pulled down his pants and told C.P. to suck his personal parts and stick her fingers in his backside while screaming "rape me." C.P. reported that D.S. said he was bullied at NYCCC, and the staff did not do anything about it, and she thought D.S. was having difficulty dealing with the school. C.P. reported that she took D.S. off Risperidone at the school's recommendation.

524.    On June 2, 2017, C.P. stated to HSVS that she wanted D.S. removed from her home because she could no longer deal with his unsafe behaviors in school, in the home, and in the community.

525.    On June 15, 2017, D.S. was brought to Brookdale Hospital Medical Center (Brookdale) at the request of his therapist at NYCCC because he was acting out, threatening and destroying property, and unable to be verbally directed. D.S. was admitted to Brookdale Hospital for five days.

526.    Brookdale assigned D.S. discharge diagnoses of ADHD, Combined Type; Disruptive Mood Dysregulation Disorder, and history of encephalopathy, asthma.

527.    According to the Brookdale Hospital report, D.S.'s foster mother (C.P.) reported that he lied, stole, was violent, had no remorse, and was unable to take responsibility for his actions. He had recently had his medication discontinued, but no alternative medication to control aggression had been prescribed. The Brookdale report recommended "in-patient hospitalization, medication management, supportive psychotherapy and trauma-based CBT." The report recommended a rule/out of an anxiety disorder, depression, and ADHD.

528.    The Brookdale Hospital report contains numerous inaccuracies. Foster Care Agency Defendants and the Foster Care Agency Employees did not make sure that Brookdale had a complete history of D.S.'s diagnoses, treatment and educational program to ensure that they could make an accurate set of recommendations.

**Defendants' Educational Neglect and Systemic Failures Relating to D.S.'s Education from 2009 Until K.S. Became his Foster Parent**

529.    Throughout the time D.S. was in preventive services and in foster care before he was placed with K.S., the DOE violated virtually every provision of the federal and state law relating to special education.

530.    ACS and the DOE failed to adopt appropriate policies, procedures and protocols and to ensure that foster care agency staff were adequately trained and knowledgeable about special education rights and rules to ensure that D.S.'s special education rights were protected.

531.    Further, Defendants failed to ensure that there was a qualified, legal decision-maker for D.S., who was given access to the information needed to properly advocate for his rights and plan for his special education needs, which were interrelated to his medical, psychiatric, psychological and behavior needs both in and outside of school, as his behavior and psychiatric state interfered with his ability to progress in school.

532.    Further, ACS and Foster Care Defendants and the DOE Defendants failed to ensure that medical evaluations were conducted, and the DOE failed to follow up on with medical information that was relevant to his special education planning needs.

533.    In June 2008, when he was almost two years old, D.S. was referred for Early Intervention evaluations to address concerns that he was not walking or speaking at an age-appropriate level.  The evaluations were conducted by On Our Way Learning Center in December 2008 and recommended speech and physical therapy.

534.    D.S.'s December 2008 Speech and Language Evaluation showed delays in receptive and expressive language skills, and his total language skills tested more than two standard deviations below the mean.  The evaluator noted concerns regarding D.S.'s oral motor skills and judged his feeding skills to be delayed.  The evaluator recommended that D.S. receive speech-language therapy.

535.    During the December 2008 D.S. Physical Therapy Evaluation, D.S. fell over common obstacles in his path and demonstrated poor safety awareness.  His balance reactions and

protective responses appeared slow in all directions.   The evaluator recommended physical therapy.

536.    D.S. did not receive Early Intervention services following these evaluations, so HSVS re-referred him in May 2009. D.S. underwent a second round of evaluations at On Our Way Learning Center in July 2009.

537.    In April 2009, D.S. entered foster care.

538.    Upon information and belief, DOE Defendants, Foster Care Defendants and HSVS failed to ensure that there was a properly trained and knowledgeable surrogate parent available to act on D.S.'s behalf relative to his special education program as required by 34 C.F.R. ¬ß 300.519 (d)(2), (g).

539.    Upon information and belief, Foster Care Defendants failed to ensure that there was a properly trained and knowledgeable surrogate parent available to act on D.S.'s behalf relative to his special education program.

540.    A July 6, 2009, Developmental Evaluation showed concerns in all developmental domains.  On the Developmental Assessment of Young Children (DAYC), D.S. tested in the poor range in cognitive functioning, the very poor range in communication, the very poor range in social/emotional functioning, the poor range in adaptive functioning, and the below average range in physical functioning.   The evaluator recommended that D.S. receive special instructional services to encourage appropriate play and generalization of skills.

541.    A 2009 Speech and Language Evaluation showed significant delays in receptive and expressive language development.  On the Preschool Language Scale, Fourth Edition (PLS-4), D.S. scored more than two standard deviations below the mean in auditory comprehension,

expressive communication, and total language.  The evaluator strongly recommended speech-language therapy.

542.    In September 2009 D.S. attended On Our Way Learning Center to receive Early Intervention services.

543.    In November and December 2009, D.S. underwent evaluations again at On Our Way Learning Center in connection with his upcoming transition to the Committee on Preschool Special Education ("CPSE").

544.    The November 2009 Psychological Evaluation reported that D.S. tested in the low average range cognitively.  The evaluator reported that a Vineland assessment of adaptive functioning was not completed because L.M. did not return contact after numerous attempts.

545.    The December 2009 Physical Therapy Evaluation reported that D.S. continued to exhibit delays in the achievement of age-appropriate gross motor skills.  The evaluator described D.S. as a habitual toe walker who runs high on his toes.  The evaluator recommended that D.S. continue receiving physical therapy.

546.    The December 2009 Speech and Language Update reported that D.S. continued to present with limited attending skills and reduced receptive and expressive language skills and recommended the continued provision of speech-language therapy.

547.    The December 2009 Educational Evaluation and Summary reported that D.S. exhibited poor knowledge of general concepts, generally would not use language upon request, and exhibited difficulties with frustration tolerance while playing with other children.  The evaluator recommended continued placement in D.S.'s center-based special education classroom for the remainder of the school year.

548.    On February 16, 2010, a CPSE Individualized Education Program ("IEP") meeting was held for D.S.   The CPSE recommended D.S. for placement in a special class in an integrated setting five hours per day at On Our Way Learning Center, speech-language therapy, and physical therapy, with a service initiation date of September 1, 2010.

549.    During Dr. Apeatu's August 2010 neurological evaluation, he observed that behaviorally, D.S. was very active and he "exhibits disruptive behavioral problems such as severe temper tantrums when upset."  Dr. Apeatu diagnosed D.S. with Developmental Delays, Possible Static Encephalopathy, History of Prematurity, and Rule Out Pervasive Developmental Disorder ("PDD").  Dr. Apeatu concluded:

550.    D.S. is a 40-month-old male child who is presenting with a static encephalopathy manifesting with communication delays, socialization deficits consistent with the diagnosis of a possible Pervasive Developmental Disorder.  He is at risk for further behavioral and academic difficulties without appropriate intervention. His examination does not reveal evidence of a progressive neurological entity, or a recognizable genetic or metabolic disorder.

551.    In April 2011 D.S.'s school expressed concerns to Defendants that his behavior had changed drastically in the past few months.  At this time, On Our Way Learning Center reported to Defendants that D.S. had pulled down the pants of another preschooler and put his mouth on the other boy's penis. D.S. was supposed to be referred for therapy to address his school behavioral needs.

552.    On Our Way Learning Center prepared Quarterly Provider Progress Reports for D.S. covering the time period April 2011 to June 2011.  D.S.'s special instruction report stated that D.S. had difficulty attending and was easily distracted; exhibited severe gaps in social skills requiring constant adult intervention throughout the day; had frequent outbursts and meltdowns

that involved screaming, kicking, and hitting; and required the aid of a paraprofessional due to safety concerns.  D.S.'s occupational therapy report stated that D.S. under-registered sensory information; appeared in constant motion and was unable to sit still for an activity; exhibited poor safety awareness and bumped into surrounding objects; was easily distracted; was impulsive and self directed; and threw objects, used inappropriate language, and spit when things did not go the way he wanted.  D.S.'s counseling report stated that D.S. was impulsive and distractible; had frequent outbursts and tantrums in class; and had "acted out sexually in class."  The counselor reported that D.S. was seen twice following initiation of counseling services.

553.    In August 2011, in response to the school incident, D.S underwent a psychiatric evaluation, which recommended that D.S. receive 1:1 therapy including play therapy, continuous psychiatric evaluation to further evaluate for ADHD, a repeat neurological evaluation as needed, and collateral parent counseling with the foster parents.  The evaluator stated that D.S. should resume treatment for developmental delays "ASAP" as L.M. had not been sending D.S. to On Our Way Learning Center since the incident in April.

554.    On September 6, 2011, the DOE prepared an IEP for D.S.  The IEP stated that D.S.'s placement would be changed from On Our Way Learning Center to P.S. 104, where D.S. was to be placed in a full day integrated program 8:1:1 with speech-language therapy, counseling, occupational therapy, and physical therapy.

555.    In November 2011, D.S.'s school reported to Defendants that his behavior was out of control.  Defendants failed to follow-up with D.S.'s school and/or offer any additional services to address his continued behavioral issues.

556.    In March 2012, the DOE evaluated D.S. and created an IEP for his transition from the CPSE to the Committee on Special Education ("CSE").  The IEP denied a FAPE to D.S.

557.    A 2012 teacher's report indicated that D.S. had severe behaviors in this program - spitting, hitting, unable to follow classroom rules, unpredictable meltdowns, throwing chairs. The teacher noted that he needed much repetition, redirection, and re-teaching. The teacher recommended that D.S. should be placed in a small special education class.

558.    In contrast, the 2012 psychoeducational evaluation noted that D.S. was a "sweet" and "engaging" child but could engage in temper tantrums and was very distracted.  This 2012 report found D.S.'s cognitive abilities ranged from average to low-average.

559.    An April 2012 FASP reported that D.S. had behavioral problems at school, including physical altercations with the teacher and bus matron.  The FASP reported that D.S. completed mental health evaluations at HSVS and was referred for individual counseling.

560.    During a November 20, 2012, visit at the Pennsylvania home, Defendants learned that D.S. got in trouble at school that day because another child said D.S. touched his private parts.

561.    In April 2013, D.S. was not receiving any mental health services. Additionally, D.S. was in regular education in Pennsylvania, with no special services.  Although it was a year since L.M. moved the children to Pennsylvania, L.M. reported to Defendants that she was still trying to obtain D.S.'s IEP and have him evaluated for special education services in Pennsylvania.

562.    D.S. was in kindergarten at the time.  L.M. stated that she was looking for a new school for D.S. for September 2013 for first grade.

563.    In a September 2013 psychological evaluation by Dr. Plotnick, it was reported that D.S. had serious behavior problems at home and at school; at school, he threw chairs and computers at teachers and assaulted other students; and recently put an eraser in his own ear which reportedly remained stuck there.

564.     Dr. Plotnick stated that his evaluation should be used to determine an appropriate special education placement for D.S. and that D.S. might need a more restrictive supervised setting, such as a residential treatment program, if his behavioral problems worsened.  Defendants failed to take any action, following through on Dr. Plotnick's recommendations.

565.     On September 30, 2013, HSVS Supervisor Olufmi met with L.M. and D.S. at the agency.  HSVS Supervisor Olufmi reported that although D.S. should be in a special class setting, he was currently placed in a regular education class at P.S. 123 while the school awaited D.S.'s IEP from Pennsylvania.  D.S. reported that he experienced comprehension difficulties at school.

566.     In December 2013, D.S. still did not have an IEP in place and was not receiving any special education services.  L.M. reported to HSVS Case Planner Nichole Edwards ("HSVS Case Planner Edwards") that D.S. continued to have significant problems in school and had been evaluated, but the school would not convene an IEP meeting or place D.S. in a special education class because no surrogate parent had been appointed, and the school could not reach anyone HSVS.  D.S. reported that he often did not understand what the teacher was saying and found it difficult to stay focused.

567.     On March 12, 2014, L.M. reported that D.S.'s IEP was finally completed, and he was moved into a 12:1:1 class.

568.     The DOE created another IEP for D.S. dated May 9, 2014, recommending placement in a 12:1:1 special class with counseling and speech-language therapy.

569.     The May 9, 2014, IEP reported the results of recent psychoeducational testing of D.S.  On the Kaufman Brief Intelligence Test - II (KBIT-II), D.S. achieved a verbal IQ score of 96, a nonverbal IQ score of 93, and a composite IQ score of 94.  Academic testing with the Woodcock-Johnson III (WJ-III) revealed that D.S.'s reading skills were at the 1st percentile (very

low), his math skills were at the 19th percentile (low average), and his writing skills were at the 6th percentile (low). On the Reading 3D assessment, D.S. tested at the level of print concepts - far below proficient. Further, the psychoeducational evaluation indicated that D.S. needed intensive, targeted instructional support to ensure that he made adequate progress and achieved subsequent reading benchmarks.

570.    The May 9, 2014, IEP also reported on the results of D.S.'s recent speech-language evaluation, in which he achieved a Clinical Evaluation of Language Fundamentals 4 (CELF-4) Core Language Score of 72, at the 3rd percentile and in low range. The speech-language evaluator identified significant weaknesses in all assessed areas.

571.    The May 9, 2014, IEP reported that according to D.S.'s teacher, he exhibited difficulties comprehending tasks and completing classwork; was below grade level in reading, with difficulties in phonological awareness, decoding, sight vocabulary, reading fluency, and comprehension; and was significantly below grade level in math, with difficulties recognizing numbers and symbols, number discrimination, basic operations, multi-step tasks, and word problems.

572.    The May 9, 2014, IEP stated that L.M. was the "parent" in participation.

573.    The May 9, 2014, IEP contained no information about the significant behavioral, psychological, and emotional issues that D.S. was experiencing. Further, the IEP indicated that D.S. did not have behaviors that required a Behavior Intervention Plan.

574.    In October 2014, L.M. reported to Defendants that D.S. continued to exhibit behavioral issues in school.

575.    In December 2014, D.S.'s school reported to Defendants that D.S. and his sibling appeared to be neglected and that D.S. had difficulties - behavioral and academic - at school. In

March 2015, D.S.'s school again reported to Defendants continued concerns of abuse and neglect, including a significant number of school absences, and D.S.'s behavior.

576.    The DOE Defendants conceded that D.S. was not provided a FAPE for the 2014-2015 school year.

577.    During the summer of 2105, D.S. was removed from the M. home due to abuse and neglect and twice hospitalized due to his serious and concerning behaviors.

578.    In September 2015, D.S. began attending P.S. 81, a DOE community school in a 12:1:1 special education class.  This community school 12:1:1 special class placement was grossly inappropriate.

579.    In October and November 2015, D.S. continued to exhibit concerning behaviors at school, which was reported to Defendants.  In December 2015, D.S. did not attend school most of the month due to suspensions because of his aggressive behaviors, which are a result of his disabilities, including the PTSD.  Defendants were again aware of D.S.'s school issues but did nothing.

580.    On January 12, 2016, D.S. was removed from school and taken to Woodhull Hospital.  Police and an ambulance were called because D.S. threatened to kill one of the school staff members. The principal did not feel safe with D.S. in the building, so D.S. was escorted to Woodhull Hospital.

581.    In January 2016, DOE Defendants conducted some assessments of D.S., which noted that D.S. "displays a lot of sexual and aggressive behaviors."  A new IEP was created, changing his classification to "Emotional Disturbance" and recommending placement in a District 75 school.

582.    The January 2016 IEP stated that D.S.'s cognitive abilities fell at the borderline level (6th percentile). This report of D.S.'s cognitive abilities was erroneous and premised on an incorrect score obtained by the DOE's psychologist, who had a difficult relationship with D.S. and tested him while he was in crisis.

583.    Despite all Defendants being aware that D.S. was a child in severe crisis, there was no one at the meeting to speak for D.S.

584.    The DOE failed to consider or recommend an intensive therapeutic setting for D.S., despite his long history of abuse and neglect, multiple diagnoses, history of hospitalization (not even referenced in the IEP) and extremely disturbing, sexualized, and maladaptive behaviors.

585.    Further, ACS, HSVS, and the DOE did not ensure that there was a surrogate parent who was knowledgeable about D. S's history and special education to participate in the process.

586.    The DOE conceded that the January 2016 IEP was inappropriate, conceding that it denied D.S. a FAPE.

587.    D.S. was moved into a wholly inappropriate setting pursuant to an IEP that failed to contain an appropriate set of supports and services given the severity of D.S.'s needs.

588.    In September and October 2016, D.S.'s foster parent reported to Defendants several severe behavioral incidents at school and on the bus.

589.    In November 2016, the DOE Defendants conducted yet another psychoeducational evaluation of D.S ("2016 psychoeducational evaluation").  This report notes, inter alia:

590.    [D.S.] is a 9-year-8-month-old currently attending a monolingual 4th grade self-contained class in a specialized D. 75 program. [D.S.]  has a classification of Emotional Disturbance. The present re-evaluation has been requested by [D.S.'s] therapist at HeartShare St. Vincent's Services in conjunction with foster care agency Heart Share. Therapist and agency feel

that due to [D.S.'s] severe aggressive outburst in school he would benefit from Day treatment where he could receive more comprehensive care. D.S.'s behaviors can escalate from ripping classwork to more severe displays such as throwing chairs and tables paired with vulgar, offensive and aggressive language.

591.    The 2016 psychoeducational evaluation report stated that D.S. was "reported to have a history of Bipolar Disorder," which was not true.

592.    Another November 2016 DOE evaluation noted significant aggressive behaviors in school, such as throwing furniture and using "vulgar" language.

593.    In December 2016, DOE Defendants created an IEP for D.S. "deferring" D.S.'s placement to the Central Based Support Team ("CBST"), which means that DOE Defendants were recommending a non-public school for D.S.

594.    The DOE prepared an IEP for D.S. dated March 7, 2017, that classified him as a student with an Emotional Disturbance and recommended placement in a 12:1:1 District 75 program with speech-language therapy, a crisis management paraprofessional, and a transportation paraprofessional.

595.    The March 7, 2017, IEP reported: "Small, seemingly unrelated slights in school appear to trigger past traumas that [D.S.] has great difficulty coping with.  At such times, [D.S.] will act out in a violent and/or self injurious manner (striking or attempting to strike other students or staff, claiming he wants to die, etc."

596.    The March 7, 2017, IEP further reported that D.S. "exhibited sexually inappropriate behaviors towards school staff, as well as made sexual gestures and used inappropriate language with a sexual undertone."

597.    As set forth below, in June of 2017, D.S. was placed with K.S. as a foster child.

**D.S.'s Placement with K.S.**

598.    K.S. is an education professional who had previously adopted one older child, who is now an adult.

599.    K.S. decided that she wanted to adopt another child, and she participated in a foster parent training program and was certified as a foster parent as of 2017.

600.    K.S. was a single parent and communicated during the foster care certification process that she was not able to foster and/or adopt a child who had either a history of sexual abuse and/or significant physical or psychological disabilities and psychiatric needs.

601.    The ACS foster care application that K.S. submitted in April 2007 checked off "No" in the portion of the application inquiring if the applicant was interested in the placement of a special needs child.

602.    In or about May 2017, K.S. communicated with HSVS about her availability as a pre-adoptive foster parent.

603.    HSVS was actively looking for an adoptive placement for D.S. at that time, as his placement goal had been adoption for many years, and foster parent C.P. had expressed that she could not be an adoptive resource for D.S.

604.    HSVS Assistant Director King identified D.S. as a potential foster child for K.S. In their initial conversation, HSVS Assistant Director King told K.S. that the three things she knew about D.S. were that he had a big smile, liked bow ties, and played drums in the church band.

605.    K.S. thereafter communicated with, *inter alia*, HSVS Assistant Director King, HSVS Assistant Director Forde, HSVS Vice President Shanna Gonzalez ("HSVS V.P. Gonzalez"), HSVS Senior Director – Home Finding & Intake Helen Pundurs Bua ("HSVS Director Bua"), HSVS Supervisor Kendra Mulzac ("HSVS Supervisor Mulzac"), HSVS Supervisor Olufmi, and

HSVS Case Planner Tabb about the placement of D.S. in her home.   K.S. also met with representatives of ACS.

606.   As clear from all of the allegations (and more) described above, Foster Care Agency Defendants were aware of D.S.'s severe history of abuse and neglect and aggressive and sexual behaviors.

607.   Foster Care Defendants, intentionally and deliberately mislead and intentionally omitted material information from K.S. with respect to D.S.'s history of sex abuse and severe psychiatric, behavioral and mental health needs and the amount of care he would require in the event that K.S. were to adopt D.S.

608.   Having only the information HSVS Assistant Director King provided to her during their first phone call, K.S. agreed to meet with D.S.  K.S. met with D.S. on two dates in June 2017 and found him to be a wonderful kid who was full of personality.

609.   K.S. visited D.S. while he was at Brookdale to try to build trust and a relationship.

610.   On June 20, 2017, D.S. was discharged from Brookdale to the home of K.S. for a "respite stay."

611.   After the respite stay, D.S. very briefly returned to the home of C.P., but then was placed with K.S. as a pre-adoptive foster parent on June 30, 2017.

612.   At the time K.S. agreed to be D.S.'s foster parent, she did not know D.S. had a history of sex abuse, extreme behaviors, and psychiatric hospitalizations.

613.   K.S. was not provided with any information about his medical, psychiatric, psychological, or educational history.

614.   Initially, there was a difficult adjustment period; D.S. tried to return to his prior foster home and struggled with being in a new placement.

615.    On July 6, 2017, K.S. attended a planning conference for D.S. with, *inter alia*, HSVS Assistant Director King, HSVS Supervisor Mulzac, HSVS Case Planner Tanisha Tabb, case manager Janel Clarke, and ACS Facilitator Monette Been, and C.P.

616.    The safety concerns identified in the July 6, 2017, conference report do not include any reference to D.S.'s history of sexual acting out or reported sexual abuse.

617.    During the July 6, 2017, conference, both K.S. and C.P. reported that D.S.'s current day treatment program was not meeting his needs.  The HSVS staff agreed to assess whether an educational placement change was needed.

618.    The consensus decision at the July 6, 2017, conference was that D.S. would remain in the pre-adoptive home of K.S.

619.    A July 25, 2017, psychiatric evaluation conducted by Nurse Practitioner Linda J. Hennegan, PMHNP-BC at the NYCC diagnosed D.S. with Disruptive Mood Dysregulation Disorder; PTSD; ADHD, Combined Presentation; Borderline Intellectual Functioning; Unspecified strabismus; and Unspecified asthma, uncomplicated.

620.    As set forth above, the Borderline Intellectual Functioning diagnosis was unwarranted.

621.    Nurse Practitioner Hennegan reported that D.S.'s current medications were methylphenidate and guanfacine and that D.S. previously had psychiatric medication trials with Seroquel, Ritalin, Sertraline, Abilify, Prozac, Risperidone, and Hydroxyzine.

622.    Nurse Practitioner Hennegan also reported that D.S.'s psychiatric history included behavioral disturbance, anger management, daily outbursts at home, extremely sexualized behaviors, and erratic and unpredictable behaviors.  Nurse Practitioner Hennegan stated that D.S.'s behaviors "may be precipitated and perpetuated by multiple foster care placements."

623.    Nurse Practitioner Hennegan recommended D.S.'s continued placement in the day treatment program with his current medications, weekly counseling, and the addition of "DBT" training.

624.    Upon information and belief, "DBT" refers to dialectical behavior therapy.

625.    K.S. did not have access to the information in the July 2017 evaluation and did not have any of D.S.'s records.

626.    On August 29, 2017, K.S. sent an e-mail to HSVS Assistant Director King, HSVS Supervisor Mulzac, and HSVS Case Planner Tabb stating that she was submitting another request (following prior requests) for a meeting at the agency with D.S.'s files present.  K.S. specified that she was requesting the right to review D.S.'s school records, former and current psychiatric evaluations, notes/contact information on D.S.'s siblings, and contact information for D.S.'s former doctor and former social worker.  D.S. noted HSVS's position that it was best to wait until formalizing the adoption but stated that she wanted to be able to advocate for and understand D.S. in the meantime.

627.    In September 2017, K.S. made repeated requests to HSVS Case Planner Tabb to learn more about D.S., his history and needs to learn how to best support him.

628.    The description of D.S.'s physical and mental health in the September 29, 2017, Permanency Hearing Report did not include any reference to D.S.'s history of sexualized behaviors or his reports of sexual abuse.

629.    In October 2017, K.S. wanted to adopt D.S. and D.S. wanted K.S. to adopt him.

630.    At that time, Defendants records do not indicate there was any discussion of, or include any reference to, D.S.'s history of sexualized behaviors or his reports of sexual abuse.

631.    In October 2017, DOE and OMH at the NYCCC conducted a psychiatric evaluation, which was completed in November 2017, and provided to the DOE Defendants.   At the time, he was in fifth grade and still attending NYCCC.

632.    The 2017 psychiatric report describes D.S.'s difficulties leaving his prior foster home and engaging with K.S. It also notes that D.S. "has expressed a desire to meet his bio mother and other family members. He expresses sadness when he discusses his family and reports that this causes him distress and difficulty sleeping sometimes."

633.    When D.S. came to live with K.S. she tried to engage with NYCCC but was rebuffed and refused admission to the program. She was not given any records, IEPs, or reports. She was told by the DOE that she was not permitted access to records or decision-making because she was the foster parent.  Yet, the DOE had not designated a surrogate parent for D.S.

634.    Similarly, OMH told K.S. she had no right to access his OMH records or make decisions regarding his care.

635.     When  D.S.  came  to  live  with  K.S.,  she  herself  conducted  basic  academic assessments.  D.S. did not know vowel sounds or consonant blends and had poor sight word recognition. She noticed that after she read him a book, he could memorize the book and read it to her from memory.   She started to take him to the library, and they would check out a mountain of books to generate his interests.  In addition, he could not write at all – he was unable to spell and had very poor handwriting. Writing was one of the behavioral triggers at school.

636.     K.S. also observed that D.S.'s math skills were nonexistent when he came to live with her; D.S. did not know the days of the week or months of the year, and he could not perform basic addition or subtraction.

637.    K.S. tried to use a behavior sheet where D.S. could earn points, but it just caused frustration as he could not do math.

638.    K.S. found that D.S. also had significant gaps in knowledge and content areas, as well as vocabulary, based on his lack of exposure.

639.    To try to address these significant deficits, K.S. hired a tutor, worked with him herself and tried to develop motivational systems.

640.    In addition, D.S.'s medical needs had been neglected prior to the time he moved in with K.S.

641.    Among other things, as noted by Defendants but never adequately addressed, D.S. had a very serious strabismus, which was eventually corrected by glasses that K.S. obtained.

642.    Over the summer of 2017, the DOE Defendants did not implement D.S.'s paraprofessional and, as a result, DOE transportation would not allow him to be transported on a school bus. As a result, K.S. had to transport D.S. to and from school.

643.    During the summer of 2017, moreover, D.S. displayed very challenging behaviors in school and at home, including cursing and property destruction.  The NYCCC would place D.S. in a padded room and call K.S. to retrieve him from school.

644.    K.S. attempted to get help from NYCCC concerning the behaviors, but none was forthcoming.

645.    D.S. barely received homework in NYCCC over the summer of 2017.  In addition, when minimal homework did come back with D.S., it contained inaccurate information and was far below grade level.

646.    When K.S. raised this with NYCCC, she was told that NYCCC was not permitted to use books in the school because they could be used as weapons. D.S. also spent time watching

movies in school, several of which were inappropriate. He was also exposed to inadequate supervision and provided access to pornographic comics when staff failed to review donated materials.

647.    D.S. had to return to NYCCC in September 2017, as Foster Care Defendants, DOE and OMH agents told K.S. that she did not have the right to make decisions or placement changes as she was a foster parent.

648.    In fall of 2017, DOE Defendants again did not implement D.S.'s paraprofessional.

649.    D.S. was placed in a mixed grade class with children of varying ages, including a pregnant student who told D.S. that her boyfriend was 30 years old.  D.S. was very upset about this, due to his history of sexual abuse.  This student made sexually inappropriate statements to D.S., which D.S. would often then yell at K.S. when he got upset.

650.    D.S. reported that the other children also bullied D.S. for various reasons, including the fact that D.S. and K.S. were not the same race, and for being "ignorant" and "dumb" when he struggled in class.

651.    D.S. also had several physical altercations in school or on the bus, where he would come home injured.

652.    When K.S. complained to NYCCC, Defendants' staff member told K.S. that she should not be concerned because hitting each other and bullying each other was "just the way these kids show affection."   K.S. advised that when she was a school principal, there were other ways for kids to interact and she would be happy to send someone from her office who specialized in training to support the school's efforts, which was not well-received.

653.    In addition, K.S.'s efforts to work with the NYCCC teachers in the fall of 2017 fell flat. D.S.'s English teacher told K.S. that he did not have special education training and his math teacher asked her for behavioral advice as he did not get along with D.S.

654.    In addition, in fall of 2017, K.S. attempted to seek help from NYCCC to address D.S.'s behaviors but the school's advice was for her to call 911, which she told the school she did not want to do.

655.    On November 6, 2017, K.S. spoke to HSVS Assistant Director King, HSVS V.P. Gonzalez and HSVS Supervisor Mulzac about her desire to obtain an outside evaluation for K.S. K.S. expressed concern about the report that D.S. had borderline intellectual functioning and expressed doubt about the accuracy of that diagnosis.  The HSVS staff members told K.S. that D.S. could have a consultation with the mental health department at the agency.  K.S. expressed disagreement with the result.

656.    On November 7, 2017, K.S. signed an Adoptive Placement Agreement for D.S. Pursuant to the agreement, K.S. took D.S. with the intention of adoption, but legal custody of D.S. remained with ACS.

657.    In December 2017, D.S. had a significant incident involving property destruction, and K.S. had to take him to the ER for a psychiatric assessment.

658.    Upon his discharge and return to NYCCC, there was a meeting with K.S. and D.S.'s therapist from NYCCC.  In front of K.S. his therapist told D.S. that K.S. might not love him anymore and would change her mind about adopting him unless his behavior improved.

659.    K.S. complained to the supervisor concerning that statement.

660.    On January 16, 2018, D.S. was seen by Alex Okun, M.D. at the New Alternatives for Children Diagnostic and Treatment Center Mobile Medical Unit.

661.    Dr. Okun's report stated: "The current [foster mother] has lived with [D.S.] for 6 months and knew little past medical, surgical or psychiatric history."

662.    Dr. Okun stated that he was limited in the information he could share with K.S. because she was not yet D.S.'s adoptive parent.

663.    Dr. Okun noted a possible history of sexual abuse but stated that details were not found in D.S.'s medical record.

664.    On January 23, 2018, K.S. brought D.S. to Interfaith Medical Center after he physically acted out.    K.S. reported to the hospital staff that she would like to have neuropsychological testing done and additional consultations but was having difficulty getting the services through the foster care system.

665.    D.S. was discharged from Interfaith Medical Center that day with diagnoses of ADHD, Unspecified Type; and PTSD, Unspecified.

666.    Although K.S. desperately wanted to obtain additional therapy for D.S., the DOE Defendants' staff told her she could not do so, due to the fact that that there was a limit on the Medicaid service caps, which the DOE Defendants were using to bill back Medicaid and fund the program.    K.S. told Foster Care Agency Defendants, DOE Defendants and OMH that she would just privately pay for therapy, but she was told she could not obtain treatment for D.S. because she was only a foster parent.

667.    The staff at NYCCC did not engage K.S. about D.S.'s academic delays.    In fall of 2017, K.S. did not see any accountability, progress monitoring and/or homework.    When K.S. brought in work that D.S. was doing at home, the school staff told her that the teachers did not see the same type of work product in school.

668.    When K.S. asked the Defendants' staff why D.S. was not being held to the standards, they told her that D.S. was "cognitively impaired" and did not have the capacity to learn.

669.    In fact, the DOE Defendants had erroneously obtained an IQ score of 66 when they tested D.S. while he was in the midst of a crisis.  DOE Defendants and OMH should have realized that this IQ score was incorrect given his prior average scores, but they failed to review and consider DOE's historical records.

670.    K.S. did not have access to D.S.'s educational records at that time, but she could tell he was not cognitively impaired.

671.    On January 30, 2018, through counsel, K.S. filed the first of three impartial hearings.  DOE Defendants designated this case as IH Case No. 172271.  This initial hearing alleged that DOE Defendants were violating the various federal and state special education laws by failing to afford K.S. access to D.S.'s special education records and allowing her to act on D.S.'s behalf and/or appointing a surrogate parent.

672.    The undersigned counsel also contacted D.S.'s law guardian from The Legal Aid Society ("LAS") to question why (a) no surrogate parent had been appointed for D.S. and (b) to request that they facilitate K.S.'s efforts to both obtain private assessments for D.S. and gain access to critical records necessary for his appropriate treatment and care.

673.    LAS filed a motion in Queens Family Court before the Hon. Emily Ruben.  On February 16, 2018, Judge Ruben issued an order:

> IT IS ORDERED that the attorney for the child's motion (#2 on AS docket and #3 on B docket) is granted in its entirety over the weak oral objection of ACS that they do not feel another evaluation is needed as the child had a short evaluation completed by the agency in February. The foster care agency is to permit the child, [D.S.], to be evaluated at the NYU Children Study Center and the Child Mind Institute pursuant to Family Court Act Sec. 255. The child's pre-adoptive foster mother, [K.S.] is to serve as the surrogate parent for purposes of special and general educational decision making. And [K.S.] shall have access to the special and

general education records and foster care records of the child including but not limited to psychological, psychiatric, therapy or other mental health records.

674.    DOE Defendants did not afford K.S. rights as a surrogate parent after Judge Ruben's order.

675.    Further, none of the Defendants turned over a complete set of records to K.S. despite her repeated request.

676.    LAS never filed a contempt motion.

677.    In February 2018, K.S. met with the staff to ascertain the path for D.S. to transition out of NYCCC, and she was told that the key to his exit would be his behavior.

678.    K.S. questioned how it was being measured as there were no goals for behavior on the IEP that had been provided to her.  OMH and DOE Defendants told her that D.S. had to meet treatment plan objectives on a plan that NYCCC could not provide to her.

679.    Upon information and belief, the impartial hearing was brought to the attention of the staff at NYCCC, and on February 9, 2018, HSVS Assistant Director King provided a copy of D.S.'s OMH Treatment Plan.

680.    According to the plan, the goals were developed in May 2017.

681.    This plan had never been provided to K.S. before.

682.    It was clear from the plan that D.S. was not making progress and had not developed a relationship of trust with his therapist, Lorna Moses.

683.    The OMH treatment plan indicated that D.S. was diagnosed with disruptive mood dysregulation, PTSD, ADHD, borderline intellectual functioning, unspecified strabismus, and unspecified asthma.

684.    This plan indicates that D.S.'s "guardian" will meet all of his medical, financial needs, as well as his social support and rehabilitation.   Ironically, the plan notes "[D.S.] and his

guardian will be involved in the decision-making process relating to school placement that meets students' needs at discharge (sic)."

685.    Further, the treatment plan should have included K.S. during the entire year.

686.    Problem No. 1 on the treatment plan: "When I get angry I tear up my home, curse at my foster mom, hit her and throw stuff around."  The goals were for D.S. to "use his calming skills" and to share with Moses, "his therapist", "1 thing" that stops him from calming down.  The plan notes minimal progress.

687.    Problem No. 2 was framed as "I sometimes tell stories that are not true."  His goal was to be truthful. The plan notes he made some progress, but that aggression toward K.S. was increasing.  An objective relating to this goal was for D.S. to "speak to his therapist" but the plan notes minimal progress.

688.    In addition, K.S. had advocated for D.S. to join the after-school debate club.  To address his in-school behaviors, a staff member at NYCCC told K.S. that D.S. should be removed from the after-school debate club (where he was performing successfully) because D.S. was getting too confident, and he needed to "learn his place."   K.S. refused to agree to remove D.S. from the debate club, and when she expressed her opinion as to why, the therapist hung up on her.

689.    During this year. K.S. had also enrolled D.S. is a theatre program run by an agency located in a Montessori School in Manhattan. He did very well at the program, which was only for general education students.  D.S. had never had any behavioral incident.  Further, given D.S.'s love for the program, he was highly motivated to read, and learn the script.

690.    K.S. also enrolled D.S. is a PALS basketball league, which was also a general education setting.

691. His behavior in those settings starkly contrasted to his behavior at NYCCC. He had no behavioral issues and was able to engage with and form friendships with typical peers.

692. Eventually, between his success in the theatre program and in the debate club and school plays, D.S. began to feel that NYCCC was not the proper setting for him.

693. He started to refer to himself as "mental" because NYCCC was a "mental health" facility.

694. During the spring of 2018, D.S.'s behavior at home started to improve. K.S. set motivational targets for a reward if D.S. could go two months without major incident, which he had almost done by the spring.

695. K.S. requested an IEP meeting in the spring of 2018.

696. DOE Defendants scheduled a meeting, but only one staff member, Ms. Lynch, showed up. The teachers only stopped by for five minutes each because they had no coverage.

697. K.S. brought up that it was clear to her that the DOE's IQ score of 66 was inaccurate. Ms. Lynch advised K.S. that D.S. could not be tested again due to the fact that it was "too soon." K.S. also challenged the goals that had been drafted prior to the meeting and told Ms. Lynch that she did not accept the IEP.

698. However, DOE Defendants did not consider K.S. to be able to act on D.S.'s behalf, as she was still his foster parent.

699. An April 2018 FASP reported that K.S. wanted to adopt D.S. and noted that she remained "eager to learn more about him and how to best support his needs." The FASP did not report a discussion of, or include any reference to, D.S.'s history of sexualized behaviors or his reports of sexual abuse.

700.    On May 4, 2018, K.S. filed another impartial hearing request which the DOE Defendants designated as IH Case No. 173308, alleging, *inter alia*, that the DOE Defendants had denied D.S. a FAPE and violated Section 504 and Section 1983 for the 2014-2015 school year up and through the 2017-2018 school year.  On September 30, 2018, K.S. filed another impartial hearing request which the DOE Defendants designated as IH Case No. 177559, concerning the 2018-2019 school year, which was consolidated into IH Case No. 173308.    DOE Defendants conceded that the DOE had not provided D.S. a FAPE for the four school years at issue.

701.    On May 22, 2018, D.S.'s adoption was finalized in Queens County Family Court.

702.    Upon the completion of the adoption, the Family Court case was closed. Defendants never produced the records, even though they were ordered to do so by the Family Court.

703.    K.S. notified the DOE of the adoption and requested a new IEP meeting, and a deferral to the CBST.  Although K.S. wrote to the CSE chairperson and the school liaison, neither the CSE nor the school arranged for an IEP meeting.

704.    On July 12, 2018, after K.S. had already adopted D.S., the hearing officer in IH Case No. 172271 issued a decision directing DOE Defendants to provide certain records to K.S. and fund independent evaluations.  Other claims were withdrawn without prejudice and re-filed.

705.    DOE Defendants eventually turned over a subset of D.S.'s records.

706.    Even after K.S. adopted D.S., DOE Defendants did not turn over D.S.'s complete record.  In fact, to this day, it has not been provided.

707.    Foster Care Defendants have similarly never turned over complete records to K.S. concerning D.S.'s foster care placement, medical, psychiatric, psychological and mental health.

708.    For the 2018-2019 school year, K.S. unilaterally placed D.S. in a small, neighborhood private school, with mostly students who did not have IEPs.  K.S. chose the school due to its small, community-based environment and its strong emphasis on individualized learning.  She also invoked D.S.'s rights to his pendency services, so he would have services onsite at the school.

709.    On June 10, 2019, the hearing officer in IH Case No. 173308 issued a decision finding that the DOE Defendants should fund 4000 hours of 1:1 tutoring, 460 hours of speech therapy, 552 hours of counseling, assistive technology services and training, and also ordered that K.S. should be reimbursed for the tuition at the private school in which she had placed D.S., as well as certain after-school programs required for D.S. to have access to typical peers.

710.    Though D.S. was able to remain in the private school and had perfect behavior in his after-school activities, toward the of school in spring 2019, he had a behavioral incident.  As a result, D.S. was not offered a seat for the 2019-2020 school year.

711.    The DOE once again failed to offer D.S. an IEP or placement for the 2019-2020 school year.

712.    As a result, K.S. had no options for D.S. in fall of 2019.

713.    As such, K.S. enrolled him at a private school program that provides 1:1 instruction school by utilizing the compensatory hours D.S. was awarded from IH Case No. 173308.  To date, the DOE has not paid for these services.

714.    D.S. also continued with a specialized 1:1 tutoring program for math and reading after school.

715.    During the second half of the 2019-2020 school year, however, D.S. had an incident while at his tutoring program during which he became dysregulated and threatened to hurt himself. At that point, the tutoring program discontinued D.S.'s services.

716.    When his school program transitioned to remote learning due to the COVID-19 Pandemic ("Pandemic") in March of 2020, D.S. experienced a significant regression.

717.    D.S. was not able to do his schoolwork independently and lost all his motivation to persist and work. He had been making progress in reading and math with the individual, in-person support he was receiving in school, but once all of his schoolwork became virtual and it was his responsibility to work independently, he stopped trying.

718.    D.S. began actively refusing to do his schoolwork and would sign off in the middle of the class if he felt like it was becoming too challenging. Though he had been receiving As and Bs in his classes prior to the Pandemic, his grades dropped dramatically once remote learning began.

719.    Further, K.S. testified that D.S. became very oppositional because he wanted to use his technology in ways that were not appropriate.

720.    D.S. initially wanted to play video games instead of doing his schoolwork, but then he discovered sexually inappropriate sites and online chat rooms and would sneak technology behind K.S.'s back.  She could not turn off the internet completely, as D.S. was required to engage in online learning.

721.    At this point, the effects of the sexual abuse and trauma he experienced as a child began surfacing in the way he was engaging in this online community.

722.    D.S.'s inappropriate online activity led to tense exchanges with K.S. and her partner and frequent meltdowns where he became dysregulated and would throw and break things.

110

723.    D.S. would lose his self-control in ways that made the home unsafe, and he began articulating suicidal thoughts and threatening to commit suicide. These volatile behaviors resulted in a series of hospitalizations for D.S., including an overnight psychiatric evaluation.

724.    K.S. first took him to Bellevue in March of 2020 for a one-to-two-night stay after he wrote a suicide note.  He was then released and diagnosed with depression.

725.    Though K.S. reduced her work hours to spend more time assisting D.S. with remote learning, he continued to "spiral" and would lock himself in his bedroom for periods of time.

726.    When K.S. locked up his technology in a closet to prevent him from accessing inappropriate sites, he got up during the night to break into the closet to access his computer.

727.    At this time, K.S. began seeking out a new therapist and psychiatrist to try to address D.S.'s escalating behaviors and decompensating psychological state.

728.    D.S. tried a few different programs, but nothing helped, and D.S. returned to the emergency room at Park Slope, Columbia Presbyterian about a month later after threatening to commit suicide again.

729.    D.S. was transferred to an adolescent psychiatric facility in White Plains, where he stayed for stabilization. D.S. demonstrated highly concerning behaviors during his stay, such as defecating in his sink, but was nonetheless discharged after just two weeks.

730.    After D.S. was sent home, he almost immediately "re-spiraled" out of control. He smashed K.S.'s computer, threw furniture, and threatened to hurt K.S. and himself with a knife.

731.    D.S. returned to the facility in White Plains for three weeks, where he continued to exhibit concerning behaviors, including inappropriate acts of urination and defecation. He also threw a chair at one of the doctors.

732.     At this point, K.S. began looking into short-term residential treatment programs for D.S. funded by insurance due to the extremity of the dysregulated behaviors he was exhibiting.

733.     After D.S. had spent three weeks in the White Plains facility, K.S. was notified that there was an open bed for him at a residential treatment center ("RTC") in Pennsylvania. This was the only program available that K.S.'s insurance would fund.

734.     K.S. was unable to find any programs located closer to home, as most residential programs in New York were closed to new admissions due to the Pandemic. As a result, K.S. brought D.S. to the Pennsylvania RTC in July of 2020.

735.     Prior to the Covid-19 shutdown and D.S.'s subsequent decline, K.S. had applied to some New York State-approved special education programs, but D.S. was not accepted at any of these programs.  She also investigated other options to try to avoid him being out of school. None of those options could have been appropriate based on his decline.

736.     When she did not hear anything from the DOE, in July 2020, K.S. sent a letter to the DOE requesting guidance on getting an IEP and placement for the 2020-2021 school year.  She explained that D.S. had a regression, and that the DOE had not offered a program or placement in 2019-2020.

737.     Without seeking to conduct any new assessments, the DOE held an IEP meeting on August 28, 2020, and an IEP was created.

738.     At the meeting, none of the DOE's staff had any updated information about D.S. – including private testing that had been conducted during the prior hearing and provided to the DOE – and only had an updated social history with K.S. and outdated information from D.S.'s last IEP while he attended NYCCC.

739.    The DOE's IEP team agreed that D.S. required a residential setting – many years too late.  As alleged above, residential placement was recommended for D.S. when he was in elementary school, but Defendants failed to act on it.

740.    Yet, despite the urgency of the situation, and the history, which K.S. shared, since no other placement was available, the DOE offered D.S. only one to two hours of remote academic instruction until a residential placement was found.

741.    K.S. explained that this would be impossible, as D.S. could not leave the RTC to come home, due to his behavior and psychological and psychiatric condition.

742.    Further, she noted that D.S. had access to that type of instruction through the compensatory bank, and he had severely deteriorated and regressed and been uncontrollable with his inappropriate internet usage.

743.    Further, despite the history, the proposed IEP noted that D.S. did not require a behavior plan and should only receive 30 minutes of counseling per week.

744.    After the IEP meeting, the DOE "deferred" the IEP to the CBST, who mailed out D.S.'s packets to various in-state programs, as per DOE's policy.

745.    Following the August 2020 IEP meeting, K.S. received phone calls from four residential programs indicating that the programs had received referral packets from the DOE and wanted to discuss enrollment. Though K.S. followed up with the representatives from these programs, none of them offered D.S. a seat.

746.    As no other placement options were offered, D.S. had remained in the Pennsylvania RTC, funded by K.S.'s insurance, for most of the year.

747.    D.S.'s behavior, psychological condition and academic functioning continued to decline in 2020-2021.

748.    He continued to engage in the behaviors that required him to enroll in the RTC in the first place, such as threating to self-harm, expressing suicidal intent, and acting outwardly aggressive.

749.    Further, D.S. started to exhibit the behaviors that he had exhibited before he entered K.S.'s home, and which were reflected in the records that the Defendants did not disclose to K.S.: defecating and urinating on the floor, making sexually inappropriate comments, and acting in sexually inappropriate ways, such as exposing himself to other children or taking off his clothes and running around naked.

750.    While in school, D.S. was engaging in attention seeking behaviors such as threatening the teacher's aide, exposing himself to her, and acting as if he was masturbating under the table.

751.    D.S.'s cognitive functioning appeared to be in decline as well.

752.    Unfortunately, the staff at the insurance funded RTC were ill-equipped to handle his behaviors. In fact, the staff had even threatened to call the police at times due to the sexualized component of D.S.'s behaviors, despite the fact that these are the behaviors his treatment plan was supposed to addressed.

753.    Upon information and belief, some of the behaviors that D.S. exhibited could have a medical component, as the earlier reports received noted that he had seizures, and may have been exposed to *in utero* substances, as well as sexual abuse.

754.    As a result of D.S.'s severely declining behaviors, K.S. reached out to multiple residential programs, including the ones suggested by the DOE Defendants, as well as insurance-funded programs, and no one would accept D.S. due to the sexualized component of his outwardly aggressive behaviors.

755.    As a last resort, K.S. found an educational consultant and paid $5000 for assistance in locating a program for D.S., a small residential setting in Utah that is specifically for children with sexual trauma.

756.    K.S. moved D.S. to the Utah program as of March 30, 2021, as her insurance company indicated that it would agree to fund the program for an initial period, after which time K.S. would be financially responsible.

757.    K.S. filed a new impartial hearing concerning the 2019-2020 and 2020-2021 school years, withdrew her claims concerning the 2019-2020 school year due to the need for a fast resolution, and received a favorable decision.

758.    That hearing was designated Case No. 197100. On May 2, 2021, the hearing officer issued a decision in K.S.'s favor, funding the Utah program, as well as compensatory education for up to 365 days for the 2020-2021 school year during which time the DOE had not offered or funded a program.

759.    Unfortunately, even though K.S. finally won funding for what appeared to be the appropriate program to address D.S.'s underlying abuse, D.S. allegedly had a sexual incident with another student in the program who was a minor.  He then had a significant behavioral outburst, which resulted in yet another hospitalization.

760.    Due to the situation, the Utah program could not keep D.S., and he remained in the hospital.

761.    K.S. advised the DOE Defendants of the situation, but the DOE Defendants could not locate any alternative residential program.

762.    Subsequently, D.S. was discharged to New York City into K.S.'s home without any supports.

763.    DOE Defendants only offered D.S. a public-school class in District 75.

764.    K.S. had no choice but to use D.S.'s compensatory bank to hire a male behavior therapist to push into her home to provide wrap around services for D.S.

765.    This situation was, however, short-lived, as D.S. soon had another significant psychological and psychiatric incident, which precipitated another emergency room visit and hospitalization in New York.

766.    Since the initial hospitalization the summer of 2020, K.S. applied to and/or followed up with over sixty residential placements, including every recommended placement sent to her by the DOE Defendants, but none of the programs would agree to accept D.S.

767.    Finally, a program in Massachusetts agreed to accept D.S. as of December 2021.

768.    The program was aware of his behaviors, including the behaviors involving feces, aggression and sexual acting out.  The program agreed to accept him.

769.    Although the program is approved in the state of Massachusetts and previously was contracted to accept residentially placed students from New York, apparently that program was no longer contracted and/or approved by New York.

770.    As a result, upon information and belief, DOE Defendants were unable to contract directly with the program despite agreeing that D.S. requires residential placement and being unable to find a seat.

771.    As a result, K.S. had to request, again, that the program be funded through the impartial hearing process.

772.    The DOE agreed to fund the program through the impartial process, although the funding had recently run out.

773.    Plaintiffs requested, and Defendants agreed that the program could continue to be funded under D.S.'s stay-put rights under the IDEA, 20 U.S.C. § 1415(j).

774.    As soon as the parties resolved that emergency issue, a staff member at the residential school filed a police complaint against D.S. for throwing feces at her, even though he was in a residential placement for that very behavior.

775.    He was arrested and warned to stay away from the staff person and returned to the program. Soon thereafter, after he was unable to control or manage his behavior, he was remanded to juvenile pretrial detention in a family court in Massachusetts.

776.    The residential program advised K.S. and DOE Defendants that if the DOE defendants (or K.S.) did not agree to continue to pay the tuition while D.S. was in juvenile detention, they would be forced to give away his placement.

777.    The family court tried to send D.S. back to the residential placement, but his behavior was unable to be maintained, and he was twice returned to juvenile placement.

778.    While in juvenile placement, D.S. became suicidal statements, as well as threats, and was placed in the hospital twice.  In one case, he had to be shackled to the bed.

779.    K.S. notified the DOE of the situation, but she was not contacted by the DOE, and the DOE did not offer D.S. a placement.

780.    The family court judge indicated that the court was unwilling to send D.S. back to the residential setting due to safety reasons, and unless an alternative placement was found, the judge indicated D.S. would be sentenced to remain in juvenile detention in Massachusetts until he turned 18 years old.

781.    D.S. is decompensating in detention.

782.    Detention and/or incarceration is not the correct setting for D.S. He is in dire need of treatment.

783.    K.S. retained yet another educational consultant, and together applications were submitted to approximately 40 additional programs, all of which either rejected D.S. outright or advised that he could only be considered following a stabilization period at a placement.

784.    Moreover, despite the fact that D.S. is in dire need of psychiatric, psychological and behavioral intervention, as well as an appropriate diagnostic placement, he is apparently ineligible for in-patient psychiatric care.

785.    D.S. is and continues to be facing irreparable harm.

786.    K.S., with the help of the educational consultant, located the J. Flowers Health Institute in Texas ("Flowers").

787.    Flowers is an intensive residential setting, with wrap-around and comprehensive interventions.  It is not designed for a multi-year stay but is designed for purposes of stabilization and intensive interventions.

788.    Flowers provided a letter of acceptance for K.S., but requires payment up front for one month's stay, continuing with up-front payments for each additional month that D.S. remains placed there.

789.    On December 20, 2022, in IH Case No. 210063, undersigned counsel moved for an emergency interim order of the Impartial Hearing Officer granting funding for D.S.'s immediate placement at Flowers, as well as funding for D.S.'s transportation to Flowers or any other placement and home visits and visitation by K.S.

790.    The National Director of Clinical Outreach at Flowers testified that it is a one-on-one care facility, but due to the acuity of D.S.'s condition, he would be placed in two-on-one

care for evaluation, stabilization, and intensive trauma treatment and receive one-on-one academics with specialists who work as a team.

791.    Counsel for the DOE stated that the DOE did not object to the emergency request to place D.S. at Flowers or to an order placing D.S. there.

792.    The DOE also did not dispute, *inter alia*, the following facts: a) D.S. "requires a residential placement." b) "The DOE has recommended a residential placement but is unable to locate one." c) "Between the programs that the Parents and the DOE have applied to, D.S. has been rejected from approximately 100 residential settings." d) D.S.'s "pendency placement is a residential setting, but he is unable to return to his existing placement because, *inter alia*, the judge presiding over his juvenile case does not believe the setting is safe for the staff and the student and because the staff member has had the student arrested for the behavior that the student displayed which is caused by his underlying disability." e) D.S. "is currently in juvenile detention, at risk of incarceration until the age of 18 years old if a residential setting is not located." f) K.S. "cannot afford to pay Flowers and seek reimbursement."

793.    By dated January 5, 2023, the Impartial Hearing Officer ordered, *inter alia*, the following: a) "the DOE shall immediately fund the student's placement at Flowers as pendency, until the student is stabilized and is able to gain admission to another appropriate residential setting"; b) "the DOE shall immediately make the initial advance payment to Flowers for the first month at the daily price of the 2:1 ratio" as specified in the hearing record "in no event later than January 12, 2023"; c) "[g]oing forward, the DOE shall make advance payments to Flowers at least 15 business days prior to the last day on which the prior time period's payment will expire unless the Parents or Flowers notifies the DOE that the student is going to leave the program"; d) the "DOE shall reimburse the Parents for the cost of transportation services to

transport the student to and from Flowers and any other setting and/or institute in which he currently is placed, as well as any home visits (as required by the program)"; e) the "DOE shall reimburse the parents for up to five round-trip visits per year for the Parents and her husband to visit D.S. including reasonable costs for travel, lodging and meals"; f) if D.S. "is unable to be maintained at J. Flowers, the DOE will continue to fund the student's tuition at another residential setting, and reimburse the Parents for both transportation for the student's D.S. and visits by the parent and her husband of up to five in one year"; and g) "the DOE shall continue to fund Flowers or another appropriate private residential placement/program and above transportation costs until all issues raised in the due process complaint are resolved by final order."

794.    Upon information and belief, without a Court-order, directing the City to process this payment, the DOE and the City will not be able to comply with this order.

795.    If D.S. was well enough to attend school in New York City, or if New York City had residential settings in the community, the school would have been required to hold D.S.'s placement while he is in a juvenile facility and would have to re-enroll him.

796.    It is only due to the severity of his disability and the lack of appropriate residential settings available on the approved list that his seat is at risk due to non-payment.

797.    As DOE Defendants could not locate a placement for him and there are no settings in New York, K.S. is in the situation of having to litigate to keep the funding in place, and yet she is unable to take the financial risk of doing so, given the challenges with finding a placement for D.S. and the risk that any placement will not be restrictive and/or therapeutic enough to maintain him.

798.    Although the DOE elects to use private residential placements to address the needs of students, they should still be responsible for developing and operating their own placements in the community to address the needs of students like D.S., who have complex mental health needs.

799.    This is particularly the case for children who have spent him in foster care.

800.    All Defendants' malfeasance in refusing to turn over critical documents further injured and continued to injure D.S. and hamper his treatment.

## GENERAL ALLEGATIONS

801.    As the legal guardians of plaintiff, Defendant City and Foster Care Agency Defendants had a legal obligation to provide plaintiff with safe foster care placements, free from neglect, abuse, and inadequate medical, psychological, psychiatric treatment and placements; to maintain relationships with his siblings; and to ensure he would have a responsible adult acting on his behalf to ensure that he received a FAPE under the IDEA and state law.

802.    Plaintiff is not required to file Notice of Claim, pursuant to N.Y. C.P.L.R. § 214-g and N.Y. Gen. Mun. L. § 50-e (8).

803.    At all times, every Defendant's conduct was intentional.

804.    At all times, with respect to each of the actions and inactions alleged herein, each Defendant's actions and inactions, individually and collectively, amounted to gross negligence, willful misconduct, gross misconduct, reckless disregard and intentional conduct regarding the safety, well-being, best interest, and rights of D.S. and K.S.

805.    This lawsuit is timely because D.S. has not yet reached the age of majority, and minority tolling of all state law claims and Section 1983 claims would apply.

806.    This lawsuit is timely because the statute of limitations for K.S. to file claims on behalf of D.S. was tolled due to his minority.

807.    K.S.'s claims did not accrue and/or were tolled until on and even after the date of the adoption.

808.    K.S.'s and D.S.'s claims are timely because they allege continuing harm.

809.    Plaintiffs' claims did not accrue, did not need to be exhausted and/or are tolled or are already exhausted with respect to claims concerning D.S.'s general and special education.

810.    Among other things, due to Defendants' actions and inactions, D.S. has suffered and is suffering physical injury, psychological injury, educational injury, monetary injury, injury from segregation, deprivation of liberty, experienced pain and suffering and emotional distress.

811.    Among other things, due to Defendants' actions and inactions, Plaintiff K.S. has suffered and is suffering psychological injury, emotional distress, pain and suffering and emotional distress and monetary injury.

812.    Both K.S. and D.S. are facing irreparable harm.

CLAIMS

Count I

42 U.S.C. § 1983 – Violations of Plaintiffs' Substantive Due Process Rights under the U.S. Constitution

813.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

814.    Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

815.    Defendants assumed an affirmative duty under the Fourteenth Amendment of the United States Constitution to provide reasonable care to and to protect from harm D.S. who was taken into Defendants' custody when he was two years old.

816.    When D.S. was removed from his birth mother, Foster Care Defendants assumed an affirmative duty under the Fourteenth Amendment to protect him from harm and the risk of harm.

817.    By the foregoing actions and inactions, Foster Care Defendants have acted under color of state law and violated their duty to D.S.

818.    Defendants assumed an affirmative duty, while D.S. was in foster care, under the Fourteenth Amendment of the United States Constitution to, *inter alia*: (a) protect D.S. from physical and psychological harm; (b) provide D.S. the services necessary to ensure his physical and psychological well-being; and (c) provide D.S. treatment and care consistent with the purpose and assumptions of custody.

819.    The foregoing actions and inactions of the Defendants constitute a policy, pattern, practice, or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference, gross negligence, and/or reckless disregard to D.S.'s constitutionally protected liberty interests.  These policies, practices or customs include but are not limited to the following:

    a.    failing to assess the appropriateness of foster homes;

    b.    placing children in inappropriate foster homes (including due to foster parent's criminal history);

    c.    failing to ensure that children are placed in appropriate therapeutic homes and/or one their own if there are risks for placement with other children;

    d.    erroneous designation of foster homes as "kinship" foster homes;

    e.    failing to supervise children in foster homes;

    f.    failing to protect foster children from abuse;

g.  failing to assess and ensure treatment of foster children's medical, psychological, and educational needs;

h.  erroneously permitting a foster parent to leave the state with foster children;

i.  failing to make appropriate long-term plans for children in foster care;

j.  failing to ensure siblings in foster care maintain contact with each other;

k.  failing to ensure that staff assigned to foster care cases were aware of the full case history, that all relevant information was shared between case workers and supervisors when staffing assignments were changed, and that staffing assignments were made and maintained in a manner that allowed case workers to establish and maintain rapport with the children;

l.  failing to ensure special education rights are protected;

m.  failing to conduct appropriate investigation into special education services;

n.  failing to ensure staff are adequately trained on special education rights so that they can understand the information they are receiving during visits and monitoring; and

o.  affirmatively misrepresenting and/or omitting information about foster children to adoptive parents;

p.  maintaining a policy of deliberate indifference to the type of care that children received in foster homes;

q.  improperly instructing its employees regarding ACS's obligation to supervise children or ensure the children's safety after the children went into foster care;

r.  failing to develop or implement programs to ensure that foster care employees properly supervised the care of foster children;

s.   failing to develop or promulgate guidelines and procedures for the selection and supervision of foster parents, to eliminate or exclude those foster parents who pose a danger to children's welfare or who neglect or abuse children and to confirm identities of kinship foster parents;

t.   failing to develop and promulgate appropriate policies and procedures for coordinating with the DOE Defendants;

u.   failing to develop and promulgate appropriate policies and procedures to ensure that foster children's IDEA rights and state law rights to education were protected; and

v.   failing to develop or implement procedures or standards for protecting foster children in foster homes.

820.   D.S. had a constitutional right, violated by Defendants, to be provided adequate medical care, psychological and psychiatric care and treatment, and access to appropriate general and special education services, as well as a right to maintain contact with his siblings, while in government custody.

821.   D.S. had a constitutionally protected right, violated by Defendants, to be free of arbitrary state decisions that have a significant impact on his welfare, and that interfered with and/or caused him to lose his sibling relationships.

822.   Foster Care Defendants knew or should have known that placing D.S. in the foster home of L.M. and O.M. was unsafe, and the decision to place D.S. in the M. home in April 2009 and to continue the placement until April 2015 amounted to deliberate indifference, gross negligence, and a reckless disregard for D.S.'s safety.

823.    Foster Care Defendants recklessly, and with gross negligence and deliberate indifference, placed D.S. in a home with O.M., an individual with a criminal history of violence and driving while intoxicated.

824.    Foster Care Defendants falsely, and with gross negligence and deliberate indifference, improperly investigated and improperly designated the M. home as a "kinship" foster home for D.S. and continued to designate the home of L.M. and O.M. as a "kinship" foster home even after it was revealed that they were not related to D.S. or his siblings.

825.    Foster Care Defendants recklessly, and with gross negligence and deliberate indifferent, continued to place D.S. in the foster home of L.M. and O.M. despite clear, repeated signs that D.S. and his siblings were being abused and/or neglected in the home.

826.    Upon information and belief, City Defendants knew that the Foster Care Agency Defendants and their employees provided constitutionally inadequate supervision of children in their care and custody, such as D.S., and City Defendants failed to protect children such as D.S. from sexual and physical abuse, as well as neglect, in relation to his medical, psychological, and educational care.

827.    Upon information and belief, City Defendants knew that the Foster Care Agency Defendants and their employees provided constitutionally inadequate investigations of foster parents and consequently licensed or certified as foster parents, including alleged kinship care parents, such as L.M. and O.M, child abusers and/or individuals with a criminal history, posing a safety risk to children like D.S.

828.    City Defendants knew or should have known that they had a heightened obligation to supervise and monitor foster children who were placed with Foster Care Agency Defendants.

829.    City Defendants:

a.   maintained a policy of deliberate indifference to the type of care that children received in foster homes;

b.   improperly instructed its employees regarding ACS's obligation to supervise children or ensure the children's safety after the children went into foster care;

c.   failed to develop or implement programs to ensure that foster care employees properly supervised the care of foster children;

d.   failed to develop or promulgate guidelines and procedures for the selection and supervision of foster parents, to eliminate or exclude those foster parents who pose a danger to children's welfare or who neglect or abuse children and to confirm identities of kinship foster parents;

e.   failed to develop and promulgate appropriate policies and procedures for coordinating with the DOE Defendants;

f.   failed to develop and promulgate appropriate policies and procedures to ensure that foster children's IDEA rights and state law rights to education were protected; and

failed to develop or implement procedures or standards for protecting foster children in foster homes.

830.   As a direct result of the Defendants' actions and omissions, Defendants violated the United States Constitution, and D.S. has suffered harm, including, but not limited to, physical (and sexual) abuse, post-traumatic stress disorder, seizures, extraordinary physical and mental injuries, pain and suffering, anguish, terror, confusion, helplessness and the neglect of his medical, psychological and educational needs. Said injuries are irreversible and permanent. The Defendants' violations of the United States Constitution exposed D.S. to unsafe environments

where he was repeatedly abused and neglected, including the failure to evaluate and address his severe psychological issues.

Count II

42 U.S.C. § 1983 – IDEA violations

831.    By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Foster Care Defendants and DOE Defendants have denied D.S. the educational services to which he is entitled under the IDEA and New York law, in violation of 42 U.S.C. § 1983.

832.    By failing to supervise and train their employees and agents concerning the federal and state laws and policies concerning general and special education services, Foster Care Defendants and DOE Defendants have violated 42 U.S.C. § 1983.

833.    By failing to ensure that pendency is timely implemented and secured, Foster Care Defendants and DOE Defendants violated 42 U.S.C. §1983.

834.    The Defendants violated Plaintiff's rights under 42 U.S.C. § 1983 by failing to have adequate policies, procedures, protocols, and training to ensure that the provisions of the IDEA and Section 504 referenced herein were complied with, which deprived D.S. of his right to a FAPE under federal and state law.

835.    Under color of state law, Foster Care Defendants and DOE Defendants deprived D.S. of his right to special education services afforded to him under New York State law, in violation of the Fourteenth Amendment of the U.S. Constitution.

836.    As a direct and proximate result of the Foster Care Defendants' and DOE Defendants' misconduct, D.S. has suffered and will continue to suffer educational harm, unless Defendants are enjoined from their unlawful conduct.

837.    Foster Care Defendants should not have permitted the "kinship" foster parents who were not related to D.S. take D.S. out of state to Pennsylvania and should not have permitted any out-of-state placement without an ICPC in place.

<u>Count III</u>

42 U.S.C. § 1983 – Failure to Train

838.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

839.    Foster Care Defendants had an obligation to provide training to foster care employees regarding:

      a.   the investigation and certification of prospective foster parents;

      b.   the selection of foster parents for particular foster children

      c.   the relicensing or recertification of foster parents;

      d.   the supervision of foster children in foster homes;

      e.   the protection of foster children from abuse and neglect;

      f.   the supervision of foster care agencies;

      g.   special education rights and services, including appointing surrogate parents; and

      h.   coordination with DOE Defendants.

840.    Foster Care Defendants were deliberately indifferent to their obligation to provide training to their employees on the subjects listed above.

841.    Foster Care Defendants knew or should have known that their failure to provide such training would endanger the safety of foster children.

842.    In failing to provide adequate training to their employees, Foster Care Defendants were deliberately indifferent to the welfare of foster children and to the risk of injury to those children.

843.    As a result of Defendants' failure to train, D.S. suffered sexual, physical, and emotional abuse, and his medical, psychological, psychiatric, mental health and educational needs were neglected and went without appropriate treatment.

844.    By reason of their acts and omissions, Foster Care Defendants acting under color of state law, in gross and wanton disregard of D.S.'s rights, deprived D.S. of his constitutional rights in violation of the U.S. Constitution.

845.    As a result of defendants' actions, D.S. suffered extraordinary physical and mental injuries, pain and suffering, anguish, terror, confusion, and helplessness. Said injuries are irreversible and permanent.

<u>Count IV</u>

42 U.S.C. § 1983

846.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

847.    Foster Care Defendants had a duty to supervise the care of children in foster care.

848.    Because the plaintiff was in the custody of Defendant City and under the supervision of Foster Care Agency Defendants, Foster Care Defendants had a special relationship with D.S.

849.    All Foster Care Defendants had a duty to use the highest degree of reasonable care in supervising the care of foster children, including D.S., and to protect foster children, including plaintiff, from sexual, physical, and emotional abuse, as well as neglect.

850.    Each Foster Care Defendant's duty to supervise the care of foster children and to protect foster children from abuse and neglect was a non-delegable duty.

851.    In failing to protect D.S. from abuse and neglect while in care, and in failing to provide D.S. with adequate medical care, psychological care, psychiatric care, and ensure that there was a parent or surrogate parent knowledgeable about special education and able to take appropriate steps relative to the special education process, Foster Care Defendants failed to exercise even reasonable care in supervising plaintiff and recklessly disregarded their duty to D.S.

852.    Foster Care Defendants acted recklessly, and with gross negligence and deliberate indifference, in placing D.S. in the foster home of C.P. when a) they knew it was not a therapeutic foster home, which Foster Care Defendants knew D.S. needed; b) they knew it was not a home without other children, which Foster Care Defendants knew D.S. needed; and c) upon information and belief, they knew it was a home with another foster child who had suffered a history of being sexually abused, which placed D.S. at risk of sexual abuse by that child.

853.    As a result of the failures of the aforementioned Foster Care Defendants, plaintiff was subjected to repeated abuse and neglect, and was denied adequate care, including medical, psychological, and psychiatric care, as well as appropriate educational services.

854.    As a result of defendants' actions, D.S. suffered extraordinary physical and mental injuries, pain and suffering, anguish, terror, confusion, and helplessness. Said injuries are irreversible and permanent.

<u>Count V</u>

Denial of Records

855.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

856.    The Foster Care Defendants owed and owe K.S. and D.S. a duty to provide K.S. with D.S.'s complete medical, psychological and psychiatric history under Section 373-a of the Social Services Law, and in light of the 2018 Order of the Family Court.

857.    The Foster Care Defendants owed and owe K.S. and D.S. a duty to provide K.S. with D.S.'s foster care records based on the 2018 Order of the Family Court.

858.    Foster Care Defendants also told the DOE Employees that K.S. was not permitted to gain access to D.S.'s records, forcing K.S. to have to file litigation.

859.    OMH staff refused to release records to K.S. that she was legally entitled to receive on D.S.'s behalf.

860.    DOE Defendants withheld and delayed producing records necessary for foster parents or any surrogate parents appointed to act on D.S.' behalf in relation to his IEP and the special education service process.

861.    Defendants intentionally, willfully, and negligently withheld this information, and continue to withhold it, in reckless disregard of D.S.'s health and well-being, causing injury and continuing to cause injury to D.S. as well as K.S.

862.    Defendants particularly harmed D.S. and K.S. by withholding information critically necessary to D.S.'s medical and mental health treatment, including the indicated finding of physical abuse of D.S. by L.M. and O.M. and information concerning the rape of D.S. by his foster brother while placed in the home of C.P.

863.    Even after this action was filed, and Defendants were aware of the critical need for information about D.S.'s history of abuse, they withheld the information from K.S.

864.    In fact, records recently obtained from the CAC shows that D.S. was anally raped and that both ACS and Foster Care Defendants were aware of this incident, and yet failed to alert K.S. or her counsel.

865.    Moreover, HSVS Defendants and DOE Defendants have failed to turn over alleged counseling and/or trauma counseling records that they allegedly have which allegedly reflect counseling that was provided to D.S. with a therapist named Josh Levitt.

<u>Count VI</u>

Fraud in the Inducement

866.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

867.    The Foster Care Defendants misrepresented D.S.'s background to K.S. and omitted key information about D.S.'s background before and after she accepted D.S. as a foster child, causing K.S. and D.S. damages.

868.    The Foster Care Defendants made material representations of fact concerning D.S.'s history, special needs, psychological, psychiatric and medical needs, which were false. Further, Foster Care Defendants and Defendant King in particular, intentionally remained silent and made material omissions (particularly with respect to D.S.'s history of sexual abuse and of acting out sexually) to induce her to accept D.S. as a pre-adoptive foster child.

869.    Such omissions, representations and misrepresentations by Foster Care Defendants, were intended to deceive K.S.; she believed them, justifiably relied upon them, and was induced by them to accept D.S. as a pre-adoptive foster child and then to adopt him.  As a result, K.S. sustained and will continue to sustain pecuniary loss due to D.S.'s extensive and intensive needs.

870.    In addition, such omissions, representations, and misrepresentations placed K.S. in a situation where, regardless of which course of action she took, K.S. and D.S. suffered extraordinary emotional, psychological injury and distress.

Count VII

Breach of Contract – Third Party Beneficiaries

871.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

872.    At all times applicable, Foster Care Agency Defendants were a party to contracts with defendant City, pursuant to which Foster Care Agency Defendants agreed to provide foster care to children who were placed with defendant City.

873.    Pursuant to said contracts, defendant City agreed to compensate Foster Care Agency Defendants.

874.    Pursuant to said contract, Foster Care Agency Defendants were required to provide safe, competent, and professional supervision of children in foster care and to protect children in their care from abuse and maltreatment.

875.    Upon information and belief, pursuant to said contract, Foster Care Agency Defendants were required to facilitate visitation between children in their care with the child's birth parent, as well as siblings placed apart, including by making diligent efforts to ensure that such visits took place biweekly and were consistent with the safety needs of the child.

876.    Upon information and belief, pursuant to said contract, Foster Care Agency Defendants were responsible for providing or obtaining necessary and appropriate medical services for any foster child in its care.

877.    Upon information and belief, pursuant to said contract, Foster Care Agency Defendants were required to comply with all certification and approval requirements for foster parents and adoptive parents, including background checks and training, and agreed that children would not be placed in any foster or adoptive home unless applicable requirements for certification or approval had been met.

878.    Upon information and belief, pursuant to said contract, Foster Care Agency Defendants were required to ensure compliance with the requirements of the ICPC.

879.    As a foster child in the care of Foster Care Agency Defendants, D.S. was the intended beneficiary of the contract between defendant City and Foster Care Agency Defendants.

880.    While D.S. was in foster care, Foster Care Agency Defendants breached its contract with defendant City, including but not limited to breaching the above-cited provisions of said contract.

881.    As a result of Defendants' actions, D.S. suffered extraordinary physical and mental injuries, loss of funds, pain and suffering, anguish, terror, confusion, and helplessness. Said injuries are irreversible and permanent.

<u>Count VIII</u>

IDEA and IDEA/42 U.S.C. § 1983

882.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

883.    DOE Defendants and defendant City failed to ensure that D.S. was provided a FAPE in foster care and since he was adopted by K.S.

884.    City, ACS, and DOE Defendants' application of blanket policies, practices and procedures violates the IDEA.

885.    City, ACS, and DOE Defendants' failure to ensure inter-agency coordination and coordination between foster care agencies, including the Foster Care Agency Defendants here, and the DOE Defendants' CSE and schools, violate the IDEA.

886.    City, ACS, and DOE Defendants' failure to ensure that the provisions of the IDEA that require appointment of surrogate parents for children like D.S., who are in foster care, and who require such an appointment, are implemented, violate the IDEA.

887.    City, ACS, DOE Defendants and Foster Care Agency Defendants failed to ensure training and supervision of their staff responsible for foster children whose biological parents are no longer able to participate in the special education process, to ensure that the children, like D.S., have an active parent or surrogate parent who is able to participate in the process.

888.    City, ACS, and DOE Defendants' failure to ensure that there was a legally appropriate "parent" or surrogate parent available to make decisions about D.S.'s educational services, who was trained in and sufficiently knowledgeable about special education so as to effectuate the appropriate evaluations, IEP and placements and advocate for D.S.

889.    City, ACS, DOE and Foster Care Agency Defendants allowed certain foster parents to participate in D.S.'s special education process where they were not legally allowed to do so, and they made no effort to confirm whether those individuals were allowed to participate in the process.

890.    City, ACS, and DOE Defendants selected and chose which foster parents were allowed to participate in D.S.'s special education process and blocked K.S. from participating in the process.

891.    City, ACS and DOE Defendants failed to ensure that D.S. was provided a FAPE while he was in foster care and failed to ensure that anyone had legal authority and responsibility for D.S.'s education while he was in foster care.

892.    City and DOE Defendants failed to implement orders issued on D.S.'s behalf.

893.    DOE Defendants failed to provide K.S. access to special education records while D.S. was placed in her home in foster care and after she adopted him.

894.    K.S. is not required to exhaust any further remedies for the years that D.S. was denied a FAPE while he was in foster care as she was not his parent during those years and City, ACS, and DOE Defendants failed in their obligation to ensure an appropriate parent or surrogate parent was available.

<u>Count IX</u>

Section 504 and Section 504/42 U.S.C. § 1983

895.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

896.    D.S. is a qualified individual with a disability entitled to protection under Section 504 of the Rehabilitation Act

897.    Defendants discriminated against D.S. under Section 504 by, *inter alia*, denying him reasonable accommodations, adopting systemic policies, procedures and practices that violate D.S.'s rights under the IDEA and New York State law, and engaging in widespread and pervasive violations of the IDEA and New York State Education law.

898.    DOE Defendants discriminated against D.S. by committing repeated, ongoing and egregious violations of the IDEA with a reckless and gross disregard for his IDEA rights.

899.    DOE Defendants placed D.S. in overly restrictive educational settings, including but not limited to District 75 and the NYCCC, and Foster Care Defendants participated in securing such placements and acquiesced to the placements.  D.S.'s placement in overly restrictive educational settings such as District 75 and the NYCCC occurred after and because

DOE Defendants and Foster Care Defendants failed to ensure that D.S. received appropriate educational placements and services in the least restrictive environment, as well as necessary mental health services, earlier in his childhood.

900.     Foster Care Defendants discriminated against D.S. by failing to ensure that he was afforded adequate opportunities to participate in extracurricular and community activities during the time when he was placed with L.M. and O.M.

901.    Limitations on D.S.'s participation in community activities were noted to be a result of his behavior, which was a manifestation of his disability.

902.    Upon information and belief, Foster Care Defendants' failure to protect D.S. from abuse and/or neglect precipitated and/or contributed to his behavioral issues.

903.    Foster Care Defendants failed to ensure that D.S. received the medical, mental health, and educational supports he required to be able to be educated in the least restrictive environment, to participate in extracurricular and community activities, and to be fully integrated into the community.

904.    Defendants discriminated against D.S. under Section 504 by, *inter alia*, committing extensive, repeated, gross, knowing, and reckless violations of multiple provisions of the IDEA and New York State law.

905.    Defendants' conduct was knowing, intentional, reckless, and gross.

<u>Count X</u>

Violations of NY Constitution and State Laws

906.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

907.    Foster Care Defendants and DOE Defendants have violated Plaintiffs' rights under the New York Constitution, the New York State Education Law §§ 3202, 3203, 4401, 4404 and 4410 and the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200, *et seq.*

<u>Count XI</u>

42 U.S.C. § 1983/AACWA

908.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

909.    The Adoption Assistance and Child Welfare Act of 1980 ("AACWA") provides that in order for a state to receive federal foster care funds, it must have an approved plan which "provides for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child." 42 U.S.C. § 671(a)(16).

910.    The term "case review system" means a procedure for assuring that "each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child."  42 U.S.C § 675(5)(A).

911.    The required case plan must include the "health and education records of the child, including the most recent information available regarding -- (i) the names and addresses of the child's health and educational providers; (ii) the child's grade level performance; (iii) the child's school record; (iv) a record of the child's immunizations; (v) the child's known medical problems;

(vi) the child's medications; and (vii) any other relevant health and education information concerning the child determined to be appropriate by the State agency."

912.    There also must be a procedure for assuring that "a child's health and education record . . . is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care." 42 U.S.C. § 675(5)(D).

913.    The AACWA further requires that a state's plan provide "procedures for criminal records checks . . . for any prospective foster or adoptive parent before the foster or adoptive parent may be finally approved for placement of a child," including procedures requiring that: a) in any case where "a record check reveals a felony conviction for child abuse or neglect, for spousal abuse, for a crime against children (including child pornography), or for a crime involving violence, including rape, sexual assault, or homicide, but not including other physical assault or battery, if a State finds that a court of competent jurisdiction has determined that the felony was committed at any time, such final approval shall not be granted;" b) in any case where "a record check reveals a felony conviction for physical assault, battery, or a drug-related offense, if a State finds that a court of competent jurisdiction has determined that the felony was committed within the past 5 years, such final approval shall not be granted"; and (c) record checks are conducted for any "relative guardian" or "any relative guardian and any other adult living in the home of any relative guardian, before the relative guardian may receive kinship guardianship assistance payments on behalf of the child." 42 U.S.C.A. § 671(a)(20).

914.    An action for monetary damages under the AACWA is enforceable pursuant to 42 U.S.C. § 1983.

915.    The foregoing actions and inactions of the Defendants constitute a policy, pattern, practice, or custom in preparing and implementing a foster child's case plan and that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to D.S.'s statutory rights under the AACWA.

916.    Plaintiffs have a private right of action under the AACWA because foster children like D.S., as well as foster parents like K.S., are the clearly intended beneficiaries of the AACWA; the AACWA unambiguously imposes a binding obligation on the States to implement the provisions cited above; and the provisions are sufficiently specific to allow for judicial enforcement.

917.    D.S. was entitled to a case plan that was consistent with his best interest and special needs and was designed to achieve placement in a safe setting.

918.    D.S. was entitled to have his case plan include his health and education records, and to have each of his foster parents receive those records at the time of his placement with them.

919.    K.S. was entitled to receive those health and education records at the time she became D.S.'s foster parent.

920.    D.S. was entitled to have criminal background checks run on his foster parents and entitled not to be placed in the home of a foster parent or parents with disqualifying convictions.

921.    Foster Care Defendants' acts and omissions cited above denied D.S. and K.S. their rights under the AACWA and caused harm to D.S. and K.S.

Count XII

Violations of New York State Social Services Law, 18 NYCRR § 430

922.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

923.    The foregoing actions and inactions of the Defendants constitute a deprivation of D.S.'s rights conferred upon him by the New York State Social Services Law, 18 N.Y.C.R.R. §§ 430.11 and 430.12, and regulations adopted thereto, including, but not limited to:

a.    placement in foster care that provides a safe environment and permits D.S. to receive all services specified in his service plan, 18 N.Y.C.R.R. § 430.11(d)(1);

b.    placement in foster care that permits D.S. to maintain relationships with his biological family, including siblings, 18 N.Y.C.R.R. § 430.11(c)(1)(i);

c.    placement, including continued placement, in foster care that takes into account the appropriateness of his educational needs and existing educational setting, 18 N.Y.C.R.R. § 430.11(c)(1)(i);

d.    diligent efforts at permanency planning, 18 N.Y.C.R.R. § 430.12;

e.    placement with a foster parent that meets the "reasonable and prudent parent standard," and who provides "regular, ongoing opportunities to engage in age or developmental appropriate activities," 18 N.Y.C.R.R. § 430.12; and

f.    timely, consistent, and appropriate review of and contacts with D.S.'s foster home placement, 18 N.Y.C.R.R. § 430.12.

924.    The Defendants violated 18 N.Y.C.R.R. §§ 430.11 and 430.12 by failing to place D.S. in an appropriate foster home for over 5 years (2009-2015) and to timely free D.S. for adoption and place him in an adoptive home.

925.    The Defendants violated 18 N.Y.C.R.R. § 430.11(c)(1)(i) by failing to consider the appropriateness of D.S.'s existing educational setting and ability to maintain contact with his mother and siblings, particularly when the foster parents took D.S. and his siblings out of state.

926.    As a direct result of the Defendants' violation of 18 N.Y.C.R.R. §§ 430.11 and

430.12, D.S. has suffered harm, including, but not limited to, physical and mental abuse, post-traumatic stress disorder, and educational neglect. The Defendants' violations of 18 N.Y.C.R.R. §§ 430.11(d)(1) and 430.11(c)(1)(i) exposed D.S. to unsafe environments where he was repeatedly abused and neglected.

927.    City Defendants assumed the responsibility and risks incidental to the maintenance of the ACS and its employees. The City is therefore liable for both ACS's and its own violation of the 18 N.Y.C.R.R. §§ 430.11 and 430.12 and the damages that such violations caused to D.S.

## Count XIII

### Common Law Negligence & Supervision

928.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein, and such paragraphs are incorporated by reference.

929.    Defendants and ACS had a responsibility to provide for the safety and welfare of the children it placed in foster care, and to assure that HSVS properly cared for the children in its charge.

930.    While D.S. was in foster care, he suffered severe physical harm, including repeated sexual abuse, psychological harm, including, but not limited to post-traumatic stress disorder, which was exacerbated by Defendants' failure to assess and treat D.S.'s mental health issues over the years, and medical, psychological and educational neglect.

931.    Defendants and ACS knew or reasonably should have known about the dangerous situation and abuse at the M. home. It was reasonably foreseeable that a child would suffer physical and psychological harm in the M. home, especially when Defendants repeatedly failed to intervene or take any action, despite repeated allegations of abuse and neglect during the six years that D.S. remained in the M. home.

932.    Defendants were aware of the possible (and clearly actual) abuse and neglect while in the M. home but were unable or unwilling to prevent or address the situation and not trained adequately to respond in the appropriate manner.

933.    The City assumes the responsibility and risks incidental to the maintenance of ACS and its employment of attorneys, caseworkers, and others. The City is therefore liable for ACS's negligent placement and supervision of D.S. while in foster care and the damages that such negligence caused to D.S.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

i.    Assume jurisdiction over this action;

ii.    Issue a declaratory judgment that Defendants have violated Plaintiffs' rights as alleged herein;

iii.    Direct Defendants to adopt and implement appropriate policies, procedures, training programs, services, and supports to address illegalities alleged herein;

iv.    Issue a preliminary injunction directing Defendants to turn over all of D.S.'s records in the possession of each and every Defendant.

v.    Issue a preliminary injunction directing Defendants to assume the financial and logistical responsibility for the treatment and care of  D.S. with respect to, *inter alia*, his psychological, psychiatric and special education needs, including his residential and medical care (to the extent not funded by K.S.'s insurance) on a going forward basis without requiring K.S. to bear the financial and logistical responsibility for his care, and requiring her to engage in constant administrative litigation under the IDEA;.

vi.    Issue a preliminary injunction to set up a fund for the provision of special education, related services, transition services, psychiatric, psychological and medical diagnostic and treatment, as well as funding residential placement and ancillary expenses, and appoint a special master who can appoint and coordinate a panel of experts to direct D.S.'s care which will be funded by Defendants;

vii.    Issue a TRO and preliminary injunction directing City and DOE Defendants to (a) Immediately pay Flowers in advance and ensure that Flowers receives advance payments sufficient to maintain him there as per the terms of the program;(b) continue to fund ongoing residential placement, program, hospital or inpatient setting that D.S. is admitted to and/or requires, regardless of whether D.S. remains in juvenile detention, placement and/or incarceration; (c) create a program in or near New York City that is appropriate for D.S. so he does not have to be maintained out of state and risk incarceration for behavior that is a manifestation of his disability; (d) bring all of the resources to bear upon identifying a program for D.S. that is appropriate and developing a transition plan for him that is designed to avoid incarceration.

viii.    Award Plaintiffs full and fair monetary damages in an amount to be determined by the jury for physical and psychological injury, emotional distress, pain and suffering educational injury and economic injury;

ix.    Implement all outstanding impartial hearing orders issued on behalf of K.S. and D.S.;

x.    Award Plaintiffs full and fair punitive damages in an amount to be determined by the jury;

xi.    Award D.S. additional equitable relief under Section 504 and the IDEA, including but not limited to compensatory education and future support for services that are not currently available through Defendant DOE's continuum;

xii.    Award Plaintiffs interest;

xiii.    Award Plaintiffs reasonable attorney fees pursuant to 42 U.S.C. §1988, the IDEA and

Section 504 for the IDEA administrative action and this action; and

xiv.    Granting such other relief as this Court may deem just and proper.


Dated:        January 9, 2023
              New York, New York

                              Respectfully submitted,
                              Elisa Hyman, Esq.

                                      /s/ Elisa Hyman
                              By_____
                              Elisa Hyman, Esq.
                              The Law Office of Elisa Hyman
                              1115 Broadway, 12th Floor
                              New York, NY 10010
                              Phone: (646) 572-9064
                              Fax: 646-572-9065
                              elisahyman@gmail.com
                              *Attorneys for Plaintiffs*