UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

K.S. on Behalf of Herself and Her Minor
Child, D.S.,

                *Plaintiffs,*

     *-against-*

THE CITY OF NEW YORK, ST.
VINCENT'S SERVICES, INC.,
HEARTSHARE HUMAN SERVICES OF
NEW YORK, HEARTSHARE ST.
VINCENT'S SERVICES, THE
ADMINISTRATION FOR CHILDREN'S
SERVICES, COMMISSIONER, DAVID
HANSELL, In His Official Capacity, ACS J.
DOE 1, ACS J. DOE 2, JOHN OLUFEMI,
ST. VINCENT'S J DOE 1, ROSALYN
CHERNOFSKY, LYDIA KING, DARN
SAFFAYEH, NEW YORK CITY
DEPARTMENT OF EDUCATION; NEW
YORK CITY BOARD OF EDUCATION;
CHANCELLOR MEISHA PORTER, In Her
Official Capacity,

                *Defendants.*

-------------------------------------------------------------X

21-CV-04649 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiff K.S. is the adoptive mother of D.S. (collectively, "Plaintiffs"). D.S. lived in foster

care homes operated by Defendants St. Vincent's Services, Inc. ("SVS"), Heartshare Human

Services of New York ("HHS"), and Heartshare St. Vincent's Services ("HSVS") (collectively,

"Foster Care Defendants"), from the time that he entered foster care in April 2009 at the age of

two until his adoption by K.S. in May 2018. Plaintiffs allege that D.S. experienced a never-ending

stream of troubles. More specifically, they allege that over the course of nine years, D.S. suffered

sexual abuse, neglect, inappropriate placements, and a complete lack of necessary medical care, among other things. Now a young man, D.S.'s childhood trauma has metastasized into severe psychiatric and behavior disorders, requiring extensive treatment and support, which Plaintiffs allege that Defendants have all failed to provide.

K.S. sues Foster Care Defendants and individual employees of these entities (John Olufemi, Rosalyn Chernofsky, Lydia King, and Dawn Saffayeh) on behalf of herself and D.S., alleging, in sum, that Foster Care Defendants failed to protect D.S. from harm, discriminated against him for his disabilities, and failed to provide appropriate foster care and education in violation of state and federal law.

Plaintiffs also sue the City of New York for the harm D.S. suffered while in foster care based on the same underlying factual allegations. In addition, Plaintiffs sue the Administration for Children's Services ("ACS"), which is the New York City agency authorized by the State of New York to provide care to foster children. Plaintiffs allege that the City of New York, ACS, ACS Commissioner David Hansell, and ACS employees, Paul Frankel and Tyanda Smith, also failed to protect D.S. from harm and failed to ensure that he received appropriate foster care placements and medical support in violation of state and federal law.

In addition to these Defendants, Plaintiffs sue the New York City Department of Education ("DOE"), the Chancellor of the New York City School District, and the Board of Education ("BOE"), alleging that these entities and individuals violated state and federal law requiring that D.S. receive an adequate and appropriate education. DOE, BOE, and the Chancellor are referred to herein as "DOE Defendants." Similarly, DOE Defendants, the City of New York, and ACS are referred to herein as "City Defendants."

Foster Care Defendants now move, pursuant to Federal Rule of Civil Procedure 12(b)(6),

to dismiss claims brought under 42 U.S.C. § 1983[1]; the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA") (Counts II, VIII); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count IX); New York law, including violation of the New York Constitution, New York Education Law §§ 3202, 3203, 4401, 4404, and 4410, and Regulations of the New York Commissioner of Education, 8 N.Y.C.R.R. § 200, *et seq.* (Count X); and New York common law claims for fraudulent inducement (Count VI) and breach of contract (Count VII).[2] For the reasons stated below, Foster Care Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** Foster Care Defendants' motion to dismiss the IDEA claims (Counts II, VIII) and the portion of Count X that pertains to the New York Education Law and Regulations. The Court **DENIES** the motion to dismiss claims brought pursuant to § 1983 (Counts I, III, IV, XI) and § 504 (Count IX), and claims brought under New York law for fraudulent inducement (Count VI), breach of contract (Count VII), and the New York Constitution (Count X).

City Defendants also move to dismiss claims pursuant to Rule 12(b)(6). Specifically, ACS employees Smith and Frankel move to dismiss all § 1983 claims against them. City Defendants move to dismiss the New York common law claims for fraudulent inducement (Count VI) and breach of contract (Count VII); the New York claims for violation of the New York Constitution, New York Education Law §§ 3202, 3203, 4401, 4404, and 4410, and Regulations of the New York

---

[1] The § 1983 claims are brought under the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1 (Counts I, IV), failure to train (Count III), and the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. §§ 620–28, 670–79a (Count XI).

[2] Foster Care Defendants did not move to dismiss the claims for Denial of Records (Count V), New York Social Services Law, 18 NCRR § 430 (Count XII), and Negligent Supervision (Count XIII).

Commissioner of Education, 8 N.Y.C.R.R. § 200, *et seq.* (Count X); and the § 504 claim (Count IX).[3]  For the reasons that follow, City Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.  The Court **GRANTS** City Defendants' motion to dismiss the claims for fraudulent inducement, breach of contract, and New York Constitution and statutory law (Counts VI, VII, X).  The Court **GRANTS** Frankel and Smith's motion to dismiss the claims against them. The Court **DENIES** City Defendants' motion to dismiss the § 504 claim (Count IX).

## BACKGROUND

The following factual allegations are taken from Plaintiff's Second Amended Complaint ("SAC"), ECF No. 64, and are assumed to be true for the purpose of resolving the Rule 12(b)(6) motions to dismiss. *See, e.g., Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  The SAC is 146 pages with nearly 1,000 allegations.  Therefore, the following does not describe all conduct alleged in the SAC but instead provides the allegations necessary to evaluate the motions to dismiss.

I.   **Parties**

  **A. Plaintiffs**

Plaintiff D.S. is a teenage boy who was in foster care from April 2009 to May 2018. SAC ¶¶ 1, 175, 701.  Plaintiff K.S. is an education professional who previously adopted a child who is now an adult.  *Id.* ¶ 598.  With the desire to adopt another child, K.S. became certified to be a foster parent in 2017.  *Id.* ¶ 599.  K.S. adopted D.S. on May 22, 2018.  *Id.* ¶ 701.

---

[3] City Defendants did not move to dismiss the claims asserted against them pursuant to § 1983 (Counts I–IV), Denial of Records (Count V), Negligent Supervision (Count XIII), IDEA (Count VIII), and New York Social Services Law, 18 NCRR § 430 (Count XII).

### B.  Foster Care Defendants & Their Employees

Defendants SVS and HHS are not-for-profit corporations organized under the laws of the State of New York; both were designated as an "authorized agency" as defined in New York Social Services Law § 371 during the relevant time period.  *Id.* ¶¶ 57–58.  In 2014, SVS and HHS entered into an affiliation and became known as HSVS.[4]  *Id.* ¶¶ 59–60.  Foster Care Defendants have entered into a contract with the City and ACS, which authorizes them to provide day-to-day foster care services to children in foster care.  *Id.* ¶¶ 55–56.

Defendants John Olufemi, Rosalyn Chernofsky, Lydia King, and Sawn Saffayeh were employed by Foster Care Defendants for part of D.S.'s time in foster care and worked on or oversaw his case.  *Id.* ¶¶ 70–75, 79.

### C.  City Defendants & Their Employees

Children who are placed in foster care are in the custody of the City of New York.  *Id.* ¶ 63.  The City retains ultimate authority over decisions regarding placement and welfare of such children.  *Id.* ¶¶ 123–25.  Although the City authorizes foster care agencies to provide day-to-day care, there is a "comprehensive" regulatory framework that governs and the City remains involved by, for example, providing some training to foster care agency employees, requiring that foster care agencies maintain certain documents, and attending regular meetings about each foster child.  *Id.* ¶¶ 129, 133–35, 146.  When the City chooses a foster care agency to provide care for a foster child, neither the foster care agency nor the child can reject the pairing, as long as that agency has a foster home available to care for the child.  *Id.* ¶¶ 116–17.

---

[4] Although the SAC spans a time before and after this affiliation, the Court refers to these entities using their combined affiliated name "HSVS" (or "Foster Care Defendants").

ACS is an agency of the City of New York that is authorized by New York State law to care for children in foster care. *Id.* ¶ 48. ACS is tasked with "protecting children from child abuse, maltreatment, and neglect." *Id.* ¶ 49. Children in foster care are under the legal custody of the Commissioner of ACS. *Id.* ¶ 50. Defendants Tyanda Smith and Paul Frankel were employed as ACS case managers on D.S.'s case during part of D.S.'s time in foster care, "a supervisory and/or managerial role." *Id.* ¶ 68.

The DOE "claims to be and appears to have been delegated the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities." *Id.* ¶ 86. The Chancellor of the New York City School District "is entrusted with the specific powers and duties set forth in N.Y. Educ. L. § 2590-h." *Id.* ¶ 84. The BOE, a recipient of federal financial assistance, "was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York." *Id.* ¶ 85.

## II.   D.S.'s Placement in the M. Home

At the time of D.S.'s birth, he had six older siblings, five lived together with his biological mother, L.S. *Id.* ¶ 177. In June 2007, someone made a report to ACS concerning L.S.'s drug use and inadequate care. *Id.* ¶ 189. Due to concerns regarding L.S.'s ability to care for the children, ACS implemented preventative services for the family. *Id.* ¶¶ 178, 194–96.

On April 21, 2009, ACS received a report of sexual abuse that occurred on April 19, 2009. *Id.* ¶ 198. An uncle of D.S.—who previously had inappropriate sexual contact with his sisters— sexually abused D.S.'s brothers D. and A. *Id.* After the incident, L.S. sought to place her children in kinship foster care so she could "get herself together." *Id.* ¶ 205. On April 24, 2009, a Family Court judge issued an order directing D.S.'s temporary removal and placement in the custody of

the Commissioner of ACS on the grounds that L.S. put D.S. at risk due to her misuse of drugs and lack of engagement with a drug treatment program and mental health services. *Id.* ¶ 211.

On April 24, 2009, Foster Care Defendants and City Defendants placed two-year-old D.S. and three of his brothers into the foster home of L.M. and O.M. ("the M. Home"). *Id.* ¶ 215. The placement was classified as a "kinship" placement, which occurs when children are placed with a relative. *See id.* ¶ 7. Although ACS was initially led to believe that L.M. was the aunt of D.S. and his siblings, L.M. later admitted to having no legal relation to either D.S. or his mother. *Id.* ¶¶ 225, 234–35.

Prior to D.S.'s placement in the M. Home, the Office of Children and Family Services ("OCFS") informed Foster Care Defendants that O.M. had a criminal history including a conviction for robbery and drug sales, and multiple arrests. *Id.* ¶ 217. Likewise, OCFS informed Foster Care Defendants that L.M. had an arrest for aggravated harassment. *Id.* By May 2009, OCFS informed Foster Care Defendants that O.M. was convicted for driving while impaired by alcohol, which occurred four days after D.S.'s placement. *Id.* ¶¶ 217–19. After learning of O.M.'s robbery conviction, OCFS wrote a letter to Foster Care Defendants, dated May 14, 2009, stating that O.M.'s application to be a foster parent "MUST BE DENIED" because that type of violent conviction is disqualifying. *See id.* ¶ 223. The letter further stated that Foster Care Defendants were required to conduct a safety assessment and take all appropriate steps to protect the children in the home, including removing them and closing the foster home. *Id.* Despite these notices from OCFS, D.S's placement in the M. Home was reauthorized for the next six years. *Id.* ¶ 216.

### III.   D.S.'s Access to Appropriate Therapy, Treatment, Education, and Home Environment

D.S. was in poor health at the time of his birth; his health has not improved. D.S. may have been exposed *in utero* to drugs or alcohol, and there is "possible evidence" of a genetic

abnormality. *Id.* ¶ 165. Over his lifetime, D.S. has been diagnosed with a number of physical, behavioral, and mental health conditions that require treatment. In addition, multiple health professionals have suggested that "D.S. was abused and/or inappropriately exposed to sexual abuse," which has resulted in his "significant sexual acting out behavior, inappropriate urination and defecation, and violent, aggressive, and maladaptive behaviors." *Id.*

An Early Intervention Individualized Family Service Plan ("IFSP") was created for D.S. in August of 2009 to provide him with necessary support. *Id.* ¶ 245. The IFSP recommended "center-based special instruction, speech-language therapy, physical therapy, and family training." *Id.* In August of 2011, after two years following the IFSP, L.M. withdrew D.S. from his specialized instruction following an incident where D.S. took down another student's pants and put his mouth on the student's penis. *Id.* ¶¶ 289–90. When this incident was brought to Foster Care Defendants' attention, they conducted an unplanned visit to the M. Home, where L.M. expressed that she thought "the school was making a big deal out of nothing." *Id.* ¶¶ 282–85. L.M. removed D.S. from that school after the incident. *Id.* ¶ 290.

L.M. repeatedly moved D.S. and his brothers around after an incident or when someone expressed concern. *Id.* In one significant example, on April 26, 2012, L.M. and O.M. moved D.S. and his brothers to Pennsylvania without proper approval.[5] *Id.* ¶ 324. Despite L.M.'s awareness that she was not supposed to move them until she received approval, Defendants did not prevent the move to Pennsylvania. *Id.* ¶¶ 334–35. D.S. lived there until August 2013. *Id.* ¶ 353. As a

---

[5] New York law states that a foster child may not be sent to live in a new state "until the appropriate public authorities in that state notified the sending agency in writing that the proposed placement did not appear contrary to the interests of the child." SAC ¶ 326. The application to move, made pursuant to the "Interstate Compact on the Placement of Children," was never approved but eventually cancelled when D.S. and his siblings returned to New York. *Id.* ¶¶ 325, 327.

result, D.S. failed to receive specialized education and recommended mental health treatments during that time. *Eg., id.* ¶¶ 321, 345. D.S.'s lack of medical treatment was nothing new. Throughout D.S.'s time in the M. Home, L.M. failed to ensure that he received necessary medical and mental health care. L.M. would frequently miss D.S.'s scheduled appointments, which caused D.S.'s treatment to be delayed or missed entirely. *E.g., id.* ¶¶ 257, 261–62, 266. Foster Care Defendants were aware of L.M.'s habit of missing appointments because they sent her notice of them. *Id.* ¶ 379.

After the incident that occurred at D.S.'s school in August 2011, many behavioral issues arose. During the time that D.S. lived in the M. Home, he physically fought with teachers, school staff, and other students, "became violent," touched other children's genitals, and would smear feces on walls and urinate in various places around his home. *Id.* ¶¶ 320, 330, 336, 348, 376, 396.

## IV.   **General Concerns Regarding the M. Home**

During the entirety of D.S.'s placement in the M. Home, Foster Care Defendants and ACS were repeatedly made aware, through third-party letters or their own home visits, of serious deficiencies in the adequacy of care and concerns of physical abuse. *E.g., id.* ¶ 274. For example, on February 2, 2011, HSVS Case Planner Melody Centeno received letters from D.S.'s school, which raised concerns regarding the "physical appearance" of D.S. and his brothers, including that they were not "dressed appropriately for school." *Id.* ¶ 273. Additionally, throughout D.S.'s placement in the M. Home, many individuals—such as school administrators and staff, D.S.'s biological mother, OCFS, and other parties—documented and reported their concerns to Foster Care Defendants and ACS that D.S. and his brothers received an inadequate amount of food, wore "filthy" and soiled clothing, had poor hygiene, were physically abused, and that L.M. and O.M.

failed to supervise D.S. and his siblings, sometimes leaving them to be cared for by an older sibling. *Id.* ¶¶ 291, 304, 308, 313, 317–18, 340, 365, 369, 373, 380, 399–401.

Despite these serious warnings, Defendants investigated only some of these reports, and they continued to recommend D.S.'s placement in the M. Home, stating in 2014, for example, that "the foster boarding home of L.M. continued to meet agency standards for safety" and that "D.S.'s educational, emotional, and medical needs were being met." *Id.* ¶¶ 275, 305, 309, 341, 375, 389.

## V.    The Closure of the M. Home and Removal of D.S.

In 2014, D.S. was still living in the M. Home. *Id.* ¶ 353. On December 5, 2014, an ACS caseworker interviewed D.S. and his brother Z. at their school and spoke to school staff. *Id.* ¶ 399. The ACS employee observed that the children were wearing "filthy" shirts "inappropriate for school or anywhere else." *Id.* The guidance counselor told the caseworker that the children had "appeared filthy since their first day of school and had ongoing body odor." *Id.* ¶ 400. D.S. and Z. also disclosed that they were staying overnight with S.B., L.M.'s mother. *Id.* ¶¶ 399, 214. Notably, D.S.'s mother originally sought to place the children with S.B., but that request was denied because ACS previously investigated S.B. for inadequate guardianship and drug and alcohol misuse, and ACS ultimately closed S.B.'s home as a result of the investigation. *Id.* ¶¶ 207–09. On August 28, 2014, Foster Care Defendants informed L.M. that S.B. was not an "appropriate resource for the children." *Id.* ¶ 388. Around that time, ACS was informed that L.M. had "beaten" D.S. "over the head and back with a notebook to the point that the notebook was destroyed" as "punishment" for D.S.'s behavioral issues in school. *Id.* ¶ 391. When D.S. returned to school, he "attacked his gym teachers," but "there were concerns for his safety if L.M. was notified of this." *Id.*

After an investigation into these reports, on December 19, 2014, ACS found that allegations of inadequate food, clothing, shelter, and guardianship were "substantiated." *Id.* ¶ 405. However, ACS concluded that the allegation of "excessive corporal punishment" was "unsubstantiated." *Id.* ACS determined that the corrective action for these findings would include the involuntary closure of the M. Home "as soon as the foster children currently in the home achieved permanency." *Id.* ACS then sent a letter to Foster Care Defendants, documenting the report of "suspected child abuse and maltreatment" and the corrective action plan, including re-training L.M., "conducting unannounced home visits, and involuntarily closing" the M. Home once D.S. and his brothers "achieved permanency." *Id.* ¶ 406.

On February 5, 2015, a placement conference was held with Foster Care Defendants, ACS, and L.M. and O.M. to address concerns regarding the children's placement in the M. Home, including several missed medical appointments and complaints regarding the hygiene of the children. *Id.* ¶¶ 409–10. An ACS facilitator recorded in the conference notes that "[t]he children are safe at this time. Agency will keep the children in the home of their maternal aunt and uncle. Agency will make unannounced visits to the foster home," and that "[t]here is no immediate danger of serious harm." *Id.* ¶ 413. But on February 23 and 24 of 2015, HSVS Assistant Director Lydia King made a note in D.S.'s record that ACS and HSVS had "concerns regarding [the M. Home] in terms of safety of children in the foster home," and directed the case planner to "closely supervise the home, make announced and unannounced home visits, and explore whether D.S. was in the right school placement." *Id.* ¶¶ 415–16. The SAC does not allege what changed between February 5 and February 23 to justify the discrepancy in the ACS facilitator's notes and HSVS Assistant Director King's notes.

11

On March 30, 2015, an HSVS case planner visited the M. Home to provide L.M. and O.M. with a 10-day notice that the agency planned to remove D.S. and Z. from the home. *Id.* ¶ 424. The home was closed on April 9, 2015. *Id.* ¶ 426. A form listed the reason for closure as "Health and Safety," noting that the home was "an unsafe environment to keep and place foster children in" and that the home should "not be considered to re-open." *Id.* ¶ 426. At eight-years-old, D.S. was removed from the M. Home on April 10, 2015. *Id.* ¶ 427.

## VI.   D.S.'s Placements After the M. Home but Before Placement with K.S.

On April 10, 2015, D.S. and his brother Z. were placed with foster parent J.A. *Id.* On April 24, 2015, two weeks after the new placement, D.S. went to the emergency room at Jamaica Hospital "because he was cursing, exhibiting sexual behavior, [and] physically abusing Z." *Id.* ¶ 428. He was transferred to Bellevue Hospital before being discharged and sent back to J.A.'s home on June 5, 2015. *Id.* ¶¶ 429, 440. Employees of Foster Care Defendants "suspected that [D.S.] and his sibling were traumatized in [the M.] home," and noted that D.S. said that he "did not want L.M. to find him."[6] *Id.* ¶¶ 430–31.

D.S. went to the hospital twice more while living with J.A. because he exhibited erratic behaviors, "including cursing, throwing things out the window of the car, spitting, breaking things, and stripping naked." *Id.* ¶¶ 441, 444. J.A. informed Foster Care Defendants that "she no longer felt safe for D.S. to be in her home or around other children." *Id.* ¶ 442. One of the hospital reports noted that D.S. had "a severe history of sexual abuse by aunt, for 5 years." *Id.* ¶ 446. ACS noted in a report, dated July 6, 2015, that Foster Care Defendants must ensure that D.S. be placed in an

---

[6] J.A. shared with Foster Care Defendants that D.S. told J.A. "many disturbing things that occurred while he lived with L.M.," such as going to school "one day with a patch on his eye because he had a black eye" and threatening him not to tell anyone "or he would get a beating." SAC ¶ 432.

"appropriate setting once discharged," recommending "that he be placed in a therapeutic foster home with no other children due to D.S.'s behavior." *Id.* ¶ 456.

On July 10, 2015, when D.S. was discharged from the hospital, D.S. was placed with C.P., another foster parent. *Id.* ¶ 458. Against ACS's recommendation, C.P.'s home was not a therapeutic foster home and another foster child, twelve-year-old R., was placed with C.P. *Id.* ¶¶ 458–61. Throughout D.S.'s placement with C.P., his behavioral problems continued. *Id.* ¶¶ 478, 481, 486–87. In July 2016, R. stated in therapy that he had "done sexually inappropriate things to his once foster brother D.S.," including that "he penetrated D.S.'s anus," which was reported to a Special Victim's Unit detective. *Id.* ¶¶ 505–07. That report prompted D.S. to attend therapy at Safe Horizon Child Advocacy Center where he disclosed that he had been sexually abused by R. while living in C.P.'s home. *Id.* ¶ 506.

On May 22, 2017, C.P. told HSVS Case Planner Tanisha Tabb "that D.S. performed sexual actions at her home a few nights before," explaining that "D.S. pulled down his pants and told C.P. to suck his personal parts and stick her fingers in his backside while screaming 'rape me.'" *Id.* ¶ 523. On June 2, 2017, C.P. told Foster Care Defendants that she wanted D.S. removed from her home because she could "no longer deal with his unsafe behaviors." *Id.* ¶ 524. On June 15, 2017, C.P. brought D.S. to Brookdale Hospital Medical Center because D.S. "was acting out, threatening and destroying property, and unable to be verbally directed." *Id.* ¶ 525. D.S. spent five days hospitalized at Brookdale before being released. *Id.* ¶¶ 525, 610. D.S. lived with C.P. again briefly until June 30, 2017. *Id.* ¶ 611.

## VII.   D.S.'s Placement and Adoption with K.S.

Around May 2017, K.S. communicated with Foster Care Defendants about her availability to be a pre-adoptive foster parent. *Id.* ¶ 602. When K.S. applied to become a foster parent in April

2017, she checked off "No" on the ACS foster care application in response to the question inquiring whether she was "interested in the placement of a special needs child." *Id.* ¶ 601. K.S. also communicated "during the foster care certification process" that she could not "foster and/or adopt a child who had either a history of sexual abuse and/or significant physical or psychological disabilities and psychiatric needs." *Id.* ¶ 600. HSVS Assistant Director King identified D.S. as a potential foster child. Assistant Director King told K.S. "that the three things she knew about D.S. were that he had a big smile, liked bow ties, and played drums in the church band." *Id.* ¶ 604. Based on the information provided by HSVS Assistant Director King, K.S. met with D.S. on two occasions in June 2017, visiting D.S. at Brookdale Hospital. *Id.* ¶¶ 608–09. K.S. "found him to be a wonderful kid who was full of personality." *Id.* ¶ 608.

On June 20, 2017, D.S. moved into K.S.'s home for a "respite stay," and was "very briefly" returned to C.P.'s home before being placed with K.S. as a pre-adoptive foster parent on June 30, 2017. *Id.* ¶¶ 610–11. D.S. was K.S.'s foster child from June 30, 2017, until May 22, 2018, when D.S.'s adoption was finalized. *Id.* ¶¶ 611, 701. While D.S. lived with K.S. before the adoption was finalized, K.S. made several requests to Defendants for records relating to D.S.'s medical, educational, behavioral, and psychological history. *Id.* ¶¶ 613, 625–27, 633–34. K.S. was not provided these records or told of D.S.'s documented history of sexualized behaviors or reports of the sexual abuse he experienced. *Id.* ¶¶ 628, 630.

Although Defendants did not provide K.S. the records she requested, she observed D.S.'s behavior and health. As an education professional, K.S. performed academic assessments. *Id.* ¶ 635. K.S. also became aware that D.S. attended the New York City Children's Center ("NYCCC"), a program run by the Office of Mental Health to provide "educational services and mental health treatment" in a "locked" facility. *Id.* ¶¶ 517–18. In December 2017, D.S. had a

14

"significant incident involving property destruction," and K.S. took him to the ER for a psychiatric assessment. *Id.* ¶ 657. On January 23, 2018, K.S. brought D.S. to Interfaith Medical Center after he physically acted out, and he was discharged later that day with diagnoses of ADHD and PTSD. *Id.* ¶¶ 664–65.

During the 2017-18 school year, K.S. enrolled D.S. in an after-school debate club, a theatre program run by an agency located in a Montessori School in Manhattan, and a basketball league. *Id.* ¶¶ 688–690. K.S. found that D.S. "had no behavioral issues" in those environments, which "starkly contrasted" his behavior at NYCCC. *Id.* ¶ 691. In the spring of 2018, D.S.'s behavior at home also started to improve. *Id.* ¶ 694. K.S. noted in an April 2018 FASP that she was "eager to learn more about [D.S.] and how to best support his needs." *Id.* ¶ 699. D.S.'s adoption was finalized a month later on May 22, 2018. *Id.* ¶ 701.

## VIII.   D.S.'s Behavioral and Health Decline After Adoption by K.S.

For several months after the adoption was finalized, D.S. lived with K.S. without incident. K.S. placed D.S. in a local private school for the 2018-19 school year, where he showed "perfect behavior" until an incident in spring 2019. *Id.* ¶¶ 708, 710. For the 2019-20 school year, K.S. enrolled D.S. in a private school program that provides 1:1 instruction and D.S. continued with specialized 1:1 tutoring after school for math and reading. *Id.* ¶¶ 713–14. In the second half of that school year, D.S. had an incident where he threatened to hurt himself, at which point the tutoring program discontinued services. *Id.* ¶ 715. In March of 2020, when his school transitioned to remote learning due to the COVID-19 pandemic, D.S. experienced a significant behavioral regression. *Id.* ¶ 716. He began actively refusing schoolwork, and his grades dropped dramatically. *Id.* ¶¶ 716–18. At that point, D.S. started engaging in "inappropriate online activity" on "sexually inappropriate sites and online chat rooms," which led to "tense exchanges" with K.S.

and "meltdowns" where D.S. would "throw and break things," "threaten[] to commit suicide," threaten violence, and engage in "inappropriate acts of urination and defecation." *Id.* ¶¶ 719–31.

In response to D.S.'s growing behavioral issues, D.S. had a "series of hospitalizations" and K.S. reduced her work hours to spend more time with D.S. *Id.* ¶¶ 723–25. D.S. also tried "a few" different therapy and psychiatric programs, "but nothing helped." *Id.* ¶ 728. As D.S.'s behaviors became more extreme, K.S. sought to place D.S. in a residential treatment center ("RTC"), and eventually found a seat for him at an RTC in Pennsylvania in July of 2020. *Id.* ¶¶ 732–34. D.S. regressed and began exhibiting his pre-adoption behaviors including "defecating and urinating on the floor, making sexually inappropriate comments, and acting in sexually inappropriate ways, such as exposing himself to other children or taking off his clothes and running around naked." *Id.* ¶ 749. The Pennsylvania RTC was "ill-equipped" to handle D.S.'s behaviors and staff threatened to call the police. *Id.* ¶ 752.

K.S. contacted different residential programs, but none would accept D.S. due to the "sexualized component of his outwardly aggressive behaviors." *Id.* ¶ 754. Even when accepted at a facility, D.S. had difficulty remaining there and he was removed from multiple residential programs. *Id.* ¶¶ 759–60, 767, 774–75. For example, D.S. was accepted into an RTC in Massachusetts in December 2021 that was aware of his behavioral issues, including his inappropriate defecation, aggression, and sexual acting out. *Id.* ¶¶ 767–68. But a staff member "filed a police complaint against D.S. for throwing feces at her." *Id.* ¶ 774. D.S. "was arrested and warned to stay away from the staff person and returned to the program. Soon thereafter, after he was unable to control or manage his behavior, he was remanded to juvenile pretrial detention in a family court in Massachusetts." *Id.* ¶ 775. The family court tried to send D.S. back to the

RTC, but his behavior was "unable to be maintained" so he returned to juvenile placement. *Id.* ¶ 777.

K.S. learned of the J. Flowers Health Institute ("Flowers") in Texas, which is "an intensive residential setting," and wanted to place D.S. there. *Id.* ¶¶ 786–87. Flowers accepted D.S. but required "up-front payments." *Id.* ¶ 788. On December 20, 2022, an Impartial Hearing Officer granted the funding request for D.S.'s placement. *Id.* ¶ 789. On January 26, 2023, this Court granted Plaintiffs' request for a preliminary injunction to mandate that the DOE fund D.S.'s residential placement at Flowers. Order, ECF No. 77. D.S. enrolled at Flowers on February 2, 2023. *See* Decl. Katherine Sobel Stewart Supp. Mot. Prelim. Inj. ¶ 90, ECF No. 96-9. He remained at Flowers until he was removed in April 2023 following "violent and destructive episodes." *Id.* ¶ 93. K.S. again moved for a preliminary injunction mandating that DOE fund D.S.'s placement at Family First Adolescent Services, a short-term residential program in Florida, which this Court granted on May 17, 2023. *See* Order, ECF Nos. 105, 106.

On May 24, 2021, Plaintiffs filed the instant action seeking damages and injunctive relief for violations of state and federal law committed by Defendants while D.S. was in foster care. Compl., ECF No. 1. Plaintiffs amended their complaint on October 7, 2022, First Am. Compl., ECF No. 55, and again on January 10, 2023, SAC. Defendants move to dismiss portions of the SAC under Federal Rule of Civil Procedure 12(b)(6) for its failure to state a claim.

## DISCUSSION

### I.   Motion to Dismiss Standard

To defeat a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.   While the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*   Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   For now, the task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).

## II.    Section 1983 Claims

Foster Care Defendants and ACS employees Frankel and Smith move to dismiss claims against them brought pursuant to § 1983.

Section 1983 imposes civil liability on any party who, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.   Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).   To assert a cognizable Section 1983 claim, the plaintiff must allege "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### A. Foster Care Defendants' Motion to Dismiss All Claims Brought Pursuant to § 1983

Plaintiffs allege, pursuant to § 1983, that Foster Care Defendants violated D.S.'s substantive due process rights under the Fourteenth Amendment of the U.S. Constitution and federal rights conferred by the AACWA. Foster Care Defendants move to dismiss these claims on two bases: (1) they argue that, as private entities, Foster Care Defendants are not state actors; and (2) that there is no federal right conferred under the provisions of the AACWA relied upon by Plaintiffs, so those claims are not redressable under § 1983.

#### i. *Foster Care Defendants are State Actors*

Foster Care Defendants move to dismiss all § 1983 claims on the ground that they are not state actors. A private defendant is considered a state actor in this context when the "defendant's alleged infringement of the plaintiff's federal rights is 'fairly attributable to the State.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Although undisturbed Second Circuit precedent concludes that foster care agencies are state actors, *see Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974), Foster Care Defendants assert that this Court should re-evaluate that holding in light of subsequent Supreme Court precedent.

In *Perez*, the Second Circuit concluded that foster care agencies exercising custodial power over foster children were state actors for purposes of § 1983 because the private conduct was so "entwined with governmental policies" and "so impregnated with a governmental character." *Id.* at 764, 766. The court's decision rested on the State's and agencies' responsibilities under New York law. *Id.* at 765. Essentially, "it is the State which in effect is providing the care through the private institutions" because the State merely authorizes the agency to act in order to fulfill the State's responsibilities. *Id.* That "exercise of the administrative placing prerogative does not affect

in any way the State's *ultimate responsibility* for the well-being of the children, and, consequently, the public nature of the function being performed." *Id.* (emphasis added).

This Court is bound to follow Second Circuit precedent "unless and until" the Second Circuit sitting *en banc* or the Supreme Court overrules it. *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 100–01 (2d Cir. 2021). "[T]here is an exception to this general rule when an 'intervening Supreme Court decision . . . casts doubt on [the Second Circuit's] controlling precedent.'" *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 (2d Cir. 2015) (quoting *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007)). The exception applies when there is "conflict, incompatibility, or 'inconsistency'" between the Second Circuit's precedent and the intervening Supreme Court decision. *Id.* (brackets omitted) (quoting *Wojchowski*, 498 F.3d at 109).

Foster Care Defendants assert that the Second Circuit's reasoning in *Perez* has been "undermined" and been rendered "unreliable" by Supreme Court precedent. Foster Care Defs.' Mem. 8–10, ECF No. 82. Specifically, they argue that *Perez* does not fit into one of the Supreme Court's "tests" for determining whether a private entity qualifies as a state actor, all of which post-date *Perez*:

> (i) when the private entity performs a traditional, exclusive public function, *see, e.g.*, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352–354 (1974); (ii) when the government compels the private entity to take a particular action, *see, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982); or (iii) when the government acts jointly with the private entity, *see, e.g.*, *Lugar*, 457 U.S. at 941–942.

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

First, Foster Care Defendants' argument cannot be squared with Second Circuit precedent that post-dates the establishment of these "tests." Three years after the Supreme Court held in *Jackson* that a private entity performing "powers traditionally exclusively reserved to the State"

qualifies it as a state actor, 419 U.S. at 352, the Second Circuit acknowledged that "intervening Supreme Court opinion," but "reaffirm[ed its] earlier finding of state action" of a private foster care agency, *Duchesne v. Sugarman*, 566 F.2d 817, 822 n.4 (2d Cir. 1977). The Second Circuit relied on *Perez* as recently as 2014 in *Grogan v. Blooming Grove Volunteer Ambulance Corps*. 768 F.3d 259, 266 (2d Cir. 2014) (finding private ambulatory services not state actors because, unlike in *Perez*, the State did not retain ultimate authority for emergency medical services). Relying on both *Jackson* and *Perez*, the Second Circuit explained that "[t]here is support for the proposition that a State, by statute, may assume a public function." *Id.* "[T]he focus is on whether the statute imposes upon the governmental entity the 'obligation,' or the 'ultimate responsibility,' to perform the activity." *Id.* (first quoting *Jackson*, 419 U.S. at 353; and then quoting *Perez*, 499 F.2d at 765). *Duchesne* and *Grogan* demonstrate that the essential holding of *Perez*—that foster agencies are state actors because the state retains the "ultimate responsibility" to provide child services—remains true today.

Moreover, this Court's conclusion is consistent with other district courts in this Circuit, which recognize *Perez*'s continued vitality. *See, e.g., S.M. by next friend King v. City of New York*, No. 20-CV-5164 (JPO), 2021 WL 3173456, at *4 (S.D.N.Y. July 26, 2021) ("[T]he Court remains bound by the Second Circuit, and several recent cases in this circuit note that the precedential weight of *Perez* remains clear, despite the shaky foundations of its underlying logic."); *Diamond Jewels v. Lewis*, No. 15-CV-5760 (KAM)(ST), 2019 WL 5896224, at *11 (E.D.N.Y. Nov. 12, 2019) ("Although some courts in this Circuit have questioned *Perez*'s continued force 'in light of more recent Supreme Court decisions emphasizing the exclusivity element of the public function test . . . [,] they have found that it remains good law unless and until the Second Circuit holds otherwise, and they have found private foster agencies to be state actors.'" (alteration in original)

(quoting *Mortimer v. City of New York*, No. 15-cv-7186, 2018 WL 1605982, at *13 (S.D.N.Y. Mar. 29, 2018)).

Whether *Perez* would have been decided differently today is not the question. The Second Circuit's recent discussion of the case, including in context of the very intervening Supreme Court precedent that Foster Care Defendants rely on to argue that this Court should not apply its holding, supports that it remains good law. The Court concludes that Foster Care Defendants are state actors for purposes of Plaintiffs' § 1983 claims.

### ii.   *The Relevant Provisions of the Adoption Assistance and Child Welfare Act Confer Federal Rights*

Plaintiffs bring claims under the AACWA, also pursuant to § 1983. The AACWA was intended to "strengthen the program of foster care assistance for needy and dependent children." *New York State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 73 (2d Cir. 2019). It "establishes a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services. The Act provides that States will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the requirements of the Act." *Suter v. Artist M.*, 503 U.S. 347, 350–51 (1992). In order to seek redress through § 1983, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Foster Care Defendants argue that the relevant provisions of the AACWA do not confer a federal right.

For Spending Clause statutes like AACWA, "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002). As a result, the statute must indicate Congress's unambiguous intent to confer an individual right. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183

(2023). "Notably, it must be determined that 'Congress intended to create a federal right' *for* the identified class, not merely that the plaintiffs fall 'within the general zone of interest that the statute is intended to protect.'" *Id.* (citation omitted). Congress's intent to confer a federal right is evinced where "the provision in question is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Id.* at 183–84 (quoting *Gonzaga*, 536 U.S. at 284, 287). "Conversely," the Supreme Court has "rejected § 1983 enforceability where the statutory provision 'contained no rights-creating language'; had 'an aggregate, not individual, focus'; and 'served primarily to direct the Federal Government's distribution of public funds.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 290). "If a statute grants a right to a plaintiff class, the right is fit for judicial enforcement, and the state is obligated to fulfill the right, then a rebuttable presumption attaches that a Section 1983 action enforcing the right is available." *Poole*, 922 F.3d at 78–79. The State may rebut that presumption by showing that Congress "specifically foreclosed a remedy under § 1983," either "expressly, through 'specific evidence from the statute itself,' or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Gonzaga*, 536 U.S. at 285 n.4 (citations omitted). "[I]t is the defendant's burden to show that a right otherwise secured by law is not § 1983 enforceable." *Talevski*, 599 U.S. at 186 n.13.

Plaintiffs assert that the following statutory provisions confer a federal right that permits them to bring claims under the AACWA pursuant to § 1983: first, that the State must "develop[]" a "case plan" as defined by 42 U.S.C. §§ 671(a)(16), 675(1); second, that the State must provide "a case review system" based on the requirements set forth in 42 U.S.C. §§ 671(a)(16), 675(5); and finally, that the State have procedures for running criminal record checks prior to placing foster

care children with foster or adoptive parents, as mandated in 42 U.S.C. § 671(a)(20).  The Court

considers each in turn and concludes that each section confers a federal right.

### 1.  *Sections 671(a)(16), 675(1): Written Case Plan Requirement*

For a State to "receive federal aid under the Act, states must submit a plan for approval to

the Secretary of Health and Human Services (the Secretary).  Section 671 details what a state plan

must provide to qualify." *Poole*, 922 F.3d at 76–77.  Here, Plaintiffs allege that D.S. did not have

a written "case plan" in violation of § 671(a)(16).  That section of the Act provides:

> In order for a State to be eligible for payments under this part, it shall
> have a plan approved by the Secretary which—
> . . .
> (16) provides for the development of a case plan (as defined in
> section 675(1) of this title and in accordance with the requirements
> of section 675a of this title) for each child receiving foster care
> maintenance payments under the State plan . . . .

Section 675(1) defines "case plan" as a "written document" that includes, for example, a "plan for

assuring that the child receives safe and proper care," and that "address[es] the needs of the child

while in foster care, including a discussion of the appropriateness of the services that have been

provided to the child under the plan."  An additional requirement is that the case plan includes the

"health and education records of the child, including the most recent information available

regarding . . . the child's known medical problems."  42 U.S.C. § 675(1)(C).

The Court concludes, consistent with other courts within this District that have reached

the issue, that the "case plan" provisions of the statute confer a federal right redressable under

§ 1983.  *See Barricelli v. City of New York*, No. 15 CV 5273-LTS-HBP, 2016 WL 4750178, at *5

(S.D.N.Y. Sept. 12, 2016); *S.M.*, 2021 WL 3173456, at *6.  First, the statutory language mandates

that "*each child* receiving foster care maintenance payments under the State plan" have a case

plan.  § 671(a)(16) (emphasis added).  Such language focuses on the benefited class—foster

children—rather than the states that are regulated by this provision. *Cf. Poole*, 922 F.3d at 81

(concluding, when interpreting a different section of the AACWA, that "[t]he Act's use of the term 'each child' indicates an individual focus").    Because this individual-centric language demonstrates a clear intent to confer a federal right, it becomes Foster Care Defendants' burden to point to evidence of Congress's intent to foreclose § 1983, and they have not done so.

Contrary to Foster Care Defendants' argument, Plaintiffs allege sufficient facts to survive the motion to dismiss.  Plaintiffs' allegations regarding D.S.'s lack of health records, for example, are sufficient to state this claim.  Plaintiffs allege that "none of the persons charged with D.S.'s care were provided a clear, historical picture of his needs and disabilities," and that Foster Care Defendants "cannot locate any of the mental health treatment records for any therapy provided to D.S. while he was in care."  SAC ¶¶ 171–72.  The Court can draw the reasonable inference that a lack of any "historical picture" of D.S.'s needs—given that many of them relate to his medical needs—and the lack of mental health treatment records, means Foster Care Defendants did not create a written document of his updated medical problems that complied with the requirements of the written case plan.[7]  Therefore, the Court denies the motion to dismiss this claim.

### 2. *Sections 671(a)(16), 675(5): Case Review System*

Similar to the requirement that the State must provide a "case plan," Plaintiffs allege that Foster Care Defendants failed to provide a "case review system" in compliance with 42 U.S.C. § 671(a)(20) and as further defined by § 675(5).  Foster Care Defendants do not contest the sufficiency of the allegations of this provision—just whether it confers a federal right.

---

[7] As Plaintiffs appear to concede, Pls.' Opp'n Foster Care Defs.' Mot. 16, ECF No. 89, the statutory language of this provision does not support that Defendants are required to *implement* the case plan. To the extent that Plaintiffs make that argument for claims arising under § 671(a)(16), that claim is dismissed. *See Barricelli*, 2016 WL 4750178, at *6.

The relevant provision states that "for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child." § 671(a)(16).  Plaintiffs bring claims based on two requirements of the "case review system": (1) that the case plan is designed to achieve certain goals as defined in § 675(5)(A); and (2) that the State maintains up-to-date records supplied to foster parents per § 675(5)(D).

First, for the case plan design claim under subsection (A), a "case review system" is defined as "a procedure for assuring that," *inter alia*, "each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." § 675(5).  As with the requirement that the State develop a case plan this provision is directed to benefit "each child" in foster care.  The content of the requirement is aimed to ensure that each child's plan is designed with the "best interest and special needs of the *child*." *Id.* (emphasis added).  Even though "the provisions speak in terms of a 'system' and 'procedures,' they require that such system and procedures 'assur[e]' that 'each child' have a case plan designed to achieve placement in a 'safe setting' that is 'least restrictive' and 'most appropriate . . . .'" *Barricelli*, 2016 WL 4750178, at *7.  That language demonstrates Congress's intent to confer a right.

Turning to the "records provision" of the case review system in subsection (D), that provision requires that "a child's health and education record" be "reviewed and updated," and that a copy of the record be "supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care." § 675(5)(D).  The Court concludes that this language similarly confers a federal right.  Namely, "the 'focus on individual

foster children,' and the language 'designating foster parents' to receive a benefit on their foster child's behalf, 'together unambiguously reflect Congress's intent' that the records provisions benefit individual foster children and parents." *Henry A. v. Willden*, 678 F.3d 991, 1009 (9th Cir. 2012) (citation omitted).

However, Foster Care Defendants argue that because § 675(5)(B) requires that the "status of each child [be] reviewed periodically but no less frequently than once every six months by either a court or by administrative review," Congress foreclosed § 1983 enforcement. But "administrative review" is "conducted by a panel of appropriate persons at least one of whom is not responsible for the case management of, or the delivery of services to, either the child or the parents who are the subject of the review." § 675(6). That review, which the State could provide as the only review mechanism, would not require review by *any* court. "[T]he Supreme Court has generally found a remedial scheme sufficiently comprehensive to supplant Section 1983 only where it 'culminate[s] in a right to judicial review' *in federal court*." *Poole*, 922 F.3d 69 (emphasis added) (alteration in original) (quoting *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 521 (1990)). Given that the language does not mandate any type of judicial review—let alone federal court review—the Court cannot say that enforcement under § 1983 is incompatible with the statute. Therefore, the Court denies the motion to dismiss this claim.

### 3. *Section 671(a)(20): Criminal Background Checks*

Plaintiffs also allege that Foster Care Defendants violated the provision of AACWA requiring that it conduct background checks and apply certain disqualifying factors based on the results of those checks. Once again, Foster Care Defendants do not argue that the SAC is insufficient. Their argument rests on whether this provision confers a federal right.

27

This section of the AACWA requires the State to have "procedures for criminal records checks, including fingerprint-based checks of national crime information databases (as defined in section 534(f)(3)(A) of Title 28), for any prospective foster or adoptive parent before the foster or adoptive parent may be finally approved *for placement of a child*." 42 U.S.C. § 671(a)(20)(A) (emphasis added). Where "a record check reveals a felony conviction for child abuse or neglect . . . for a crime involving violence, including rape, sexual assault, or homicide, but not including other physical assault or battery," and "if a State finds that a court of competent jurisdiction has determined that the felony was committed," then final approval "shall not be granted." *Id.* § 671(a)(20)(A)(i). Similarly, final approval "shall not be granted" where a check reveals "a felony conviction for physical assault, battery, or a drug-related offense, if a State finds that a court of competent jurisdiction has determined that the felony was committed within the past 5 years." *Id.* § 671(a)(20)(A)(ii).

Like the other provisions of the AACWA on which Plaintiffs rely, this section confers a federal right. Importantly, this provision is specific for the "placement of *a child*" and governs procedures that must be followed before a foster child is placed with a foster or adoptive parent. Despite the reference to "procedures," which may denote a "programmatic focus" that does "not create enforceable rights," *Poole*, 922 F.3d at 80, the procedures here are specifically intended to protect foster children prior to semi-permanent or permanent placement. In addition, although the language requires the State to follow these procedures, that does not divert the focus away from the foster care children. "[I]t would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights." *Cf. Talevski*, 599 U.S. at 185 (rejecting the argument that because two provisions of the statute address "who it is that must respect and honor these statutory rights" that the statute

materially shifts focus away from the intended beneficiaries of the law).  Finally, Foster Care

Defendants have made no argument that the statute precludes § 1983 enforcement of § 671(a)(20)

to overcome the presumption that this provision creates a federal right.  The Court therefore denies

the motion to dismiss this claim.

In sum, the Court concludes that Foster Care Defendants are state actors and denies their

motion to dismiss all claims brought pursuant to § 1983, including those brought under the

AACWA.

### B.  City Defendants' Motion to Dismiss ACS Employees Smith and Frankel from this Action is Granted

Plaintiffs allege that Defendants Smith and Frankel, who were "employed by Defendant

City and assigned to work as the ACS case manager on D.S.'s case, a supervisory and/or

managerial role, during a part of D.S.'s time in foster care and were responsible for tasks including

the approval of Family Assessment and Service Plans ("FASPs")," violated D.S.'s due process

rights under the Fourteenth Amendment based on their failure to protect him from harm.

SAC ¶¶ 68, 815, 826–27.

Officials "are sometimes charged with affirmative duties, the nonfeasance of which may

violate the constitution." *Richards v. City of New York*, 433 F. Supp. 2d 404, 422 (S.D.N.Y. 2006).

For cases involving a government official's failure to act, the omissions must have been a

"substantial factor" leading to the constitutional violation.  *Doe v. New York City Dep't of Soc.*

*Servs.*, 649 F.2d 134, 141 (2d Cir. 1981).  There should be an allegation of "actual knowledge of

a specific harm . . . and [that the official's] failure to perform the duty or act to ameliorate the risk

or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution."

*Richards*, 433 F. Supp. 2d at 424.

Smith and Frankel move to dismiss the § 1983 claims asserted against them. They argue that the SAC alleges insufficient personal involvement to sue them under § 1983. Because Smith and Frankel were supervisors at ACS, the allegations must focus "on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)). As a result, Plaintiffs must plead that "the supervisor had subjective knowledge of a substantial risk of serious harm." *Id.*

Here, the allegations are insufficient to support that Smith and Frankel were aware of a risk of harm but failed to act. They are mentioned specifically in only a few allegations. In particular, Plaintiffs allege that Smith and Frankel were case managers for D.S.'s case (without identifying when they actually served as case managers) and that they "failed to take adequate steps to assess D.S." SAC ¶¶ 68, 201. But information collected by other ACS caseworkers cannot be imputed to Smith and Frankel. There must be particular allegations about what information *they* reviewed to allege that *they* had an obligation to act. Indeed, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Tangreti*, 983 F.3d at 619.

In addition, for Frankel specifically, there are allegations that he "approved" three reports. *Id.* ¶¶ 364, 375, 390. However, his approval is insufficient to allege personal involvement. *See Washington v. Piper*, No. 18 CV 7783 (NSR), 2019 WL 6343516, at *3 (S.D.N.Y. Nov. 26, 2019) (collecting cases supporting "that the mere allegation of supervisory approval, without more, is insufficient to show any personal involvement"); *Delee v. Hannigan*, 729 F. App'x 25, 31 (2d Cir. 2018) (affirming the dismissal of claims against a supervisor for insufficient personal involvement

where the complaint alleged that he "forwarded correspondence" from the plaintiff "to another party"). Frankel's approval does not lead to the inference that he personally knew of a specific risk of harm given that no allegations specify the information included in those reports. Moreover, Plaintiffs allege that at least one of the reports that Frankel approved omitted material information regarding D.S.'s issues, so, on its face, that report would not have raised concern that D.S. was in substantial risk of harm. *See, e.g.*, SAC ¶ 363 ("Notwithstanding D.S.'s severe behavioral difficulties exhibited at home and at school, the October 2013 FASP stated that D.S. was 'undoubtedly thriving' in the home of L.M. and O.M."). Therefore, the motion to dismiss claims against Smith and Frankel is granted.[8]

### III.   Section 504 of the Rehabilitation Act of 1973

Foster Care Defendants and DOE Defendants next move to dismiss Plaintiffs' claims alleging that they discriminated against D.S. based on his disability in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[9]

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The Act "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' individuals with a disability." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196 (2d Cir. 2014). To allege a prima facie

---

[8] Because the Court concludes that the allegations against Smith and Frankel are insufficient, the Court does not reach whether they are entitled to qualified immunity.

[9] Plaintiffs clarified that despite the heading of this claim in the SAC, the claim is brought directly under the Rehabilitation Act. *See* Pls.' Opp'n Foster Care Defs.' Mot. 1 n.2.

violation under § 504, the plaintiff must allege "(1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Id.* at 196–97 (footnote omitted).

### A. The § 504 Claim is Sufficiently Alleged Against Foster Care Defendants

Plaintiffs' claim against Foster Care Defendants under § 504 is essentially that D.S. was denied meaningful access to the foster care system due to his disabilities. Pls.' Opp'n Foster Care Defs.' Mot. 17, ECF No. 89. Foster Care Defendants move to dismiss on the issue of causation, arguing that Plaintiffs have failed to "plead that D.S. was denied benefits solely due to his disability." Foster Care Defs.' Mem. 15–16.

Foster Care Defendants view causation too narrowly. In *Henrietta D. v. Bloomberg*, the Second Circuit explicitly rejected that the individual's disability must be the "sole" cause to support a meaningful access claim, holding that the district court "did not clearly err in concluding, in effect, that the plaintiffs' disabilities were a substantial cause of their inability to obtain services, or that that inability was not so remotely or insignificantly related to their disabilities as not to be 'by reason' of them." 331 F.3d 261, 279 (2d Cir. 2003). The Second Circuit went on to explain that to meet the "by reason of" standard, a plaintiff must demonstrate "(i) that they are facially entitled to public benefits which are also available to similarly situated persons without disabilities, and (ii) that under a state of affairs where the social services system functioned properly, their disabilities would clearly necessitate a reasonable accommodation in order for them meaningfully to access the benefits (which accommodation they are not currently receiving)." *Id.* at 280.

The SAC's allegations are clearly sufficient to allege a claim within the parameters of *Henrietta*. Foster Care Defendants do not dispute that D.S. was entitled to benefits, and the SAC

alleges that Foster Care defendants failed to provide reasonable accommodations so that he could meaningfully access the benefits of the foster care system. Plaintiffs allege many instances where Foster Care Defendants failed to ensure, for example, that D.S. promptly receive the medical and mental health care that he needed, and that they failed to place him in the type of therapeutic foster home setting that was recommended and necessary for his disabilities. SAC ¶¶ 169, 290, 363, 456, 461. These allegations are more than sufficient to allege that Foster Care Defendants failed to reasonably accommodate D.S. because of his disabilities. *See, e.g., Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 685 (S.D.N.Y. 1996), *aff'd sub nom. Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) (concluding plaintiffs adequately stated a claim under § 504 by alleging that ACS failed to "promptly" assess one plaintiff's "medical status, transferred him from one inappropriate placement to another including a group home that lacked the medical staff needed to monitor his condition, neglected to inform the placement agency of his HIV-positive status," and that ACS failed to assist another plaintiff "who remains in a group home unequipped to address his neurological problems").

**B. The § 504 Claim is Sufficiently Alleged Against DOE Defendants**

Plaintiffs allege that DOE Defendants discriminated against D.S. in violation of § 504 through "repeated, ongoing and egregious violations of IDEA," and because they placed D.S. in inappropriate and overly restrictive education settings and limited his participation in the community because of his disability. SAC ¶¶ 898–901.

The majority of DOE Defendants' arguments test whether the SAC has sufficiently alleged a violation of § 504 that occurs as a result of violations of the IDEA. The "IDEA and Section 504 are complementary, but they address different injuries and thus require different proof. Specifically, Section 504 offers relief from discrimination, whereas IDEA offers relief from

inappropriate educational placement, regardless of discrimination." *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005).  One may assert a violation of § 504 based on violations of the IDEA, but in those circumstances, the plaintiff must allege "something more than a mere violation of the IDEA." *Cianciotto on behalf of D.S. v. New York City Dep't of Educ.*, 600 F. Supp. 3d 434, 459 (S.D.N.Y. 2022).  That type of claim "requires proof of bad faith or gross misjudgment." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014).  The plaintiff does not have to show that an official intended to discriminate; "intentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a [free appropriate public education]," referred to as "FAPE," pursuant to the requirements of the IDEA.  *Gabel*, 368 F. Supp. 2d at 334. Courts have found that this showing is sufficiently alleged when, for example, the plaintiff alleges that the defendant repeatedly violated the IDEA and then failed to remedy those violations when alerted to them.  *See, e.g.*, *M.H. ex rel. K.H. v. Mt. Vernon City Sch. Dist.*, No. 13 Civ. 3596 VB, 2014 WL 901578, at *7 (S.D.N.Y. Mar. 3, 2014) (concluding that allegations of the "numerous and systemic failures to identify those students in need of special education services and timely to create and implement appropriate IEPs—together with their assertions that [defendants] were aware of but failed to remedy these failures—are sufficient to withstand a motion to dismiss"); *Scaggs v. New York Dep't of Educ.*, No. 06 CV 0799 JFB VVP, 2007 WL 1456221, at *16 (E.D.N.Y. May 16, 2007) (sufficiently alleging a § 504 claim by citing an "extensive list" of "failures and omissions with regard to disabled students," with "assertions that defendants were aware of plaintiffs' disabilities, that plaintiffs' parents requested accommodation and programs to address such disabilities and that defendants intentionally refused to take any remedial or corrective action to remedy the problems").

Thus, the central issue is "whether plaintiffs' allegations give rise to a plausible inference that defendants acted with bad faith or gross misjudgment in depriving plaintiffs of a FAPE." *M.H.*, 2014 WL 901578, at *7 (quotation marks omitted). The SAC supports that inference. DOE Defendants have conceded that DOE did not provide D.S. a FAPE for four school years (2014-15 through 2018-19). SAC ¶ 700. DOE Defendants then failed to offer D.S. a placement for the 2019-20 school year, forcing K.S. to enroll D.S. in a private school for which the DOE has never offered reimbursement. *Id.* ¶¶ 711–713. In March 2020, D.S. underwent a severe behavior regression requiring hospitalization, *id.* ¶¶ 724–31, but DOE Defendants did not recommend residential treatment until late August 2020, *id.* ¶¶ 737–40. Notably, that was many years after a doctor recommended a residential treatment program as an appropriate placement for D.S. *Id.* ¶ 361. These repeated failures to provide D.S. a FAPE in violation of the IDEA and failure to respond to reasonable accommodations are sufficient to raise a plausible inference that Defendants acted with bad faith or gross misjudgment.[10]

Defendants also probe the factual accuracy and weight of certain allegations, including whether DOE Defendants indeed acted in bad faith or whether they have made sufficient efforts to comply with the IDEA. City Defs.' Mem. 18–21, ECF No. 108; City Defs.' Reply 7, ECF No. 116. While that may be tempting given the number and detailed nature of the allegations, whether Plaintiffs can actually prove a violation of § 504 is not the question to be answered today.

DOE Defendants' motion to dismiss Count IX is denied.

---

[10] Plaintiffs make various other factual allegations that they claim independently support their § 504 claim. *See* Pls.' Opp'n City Defs.' 11–17, ECF No. 111. Having found that DOE Defendant's persistent failure to provide D.S. a FAPE is sufficient to allege the claim, the Court need not address Plaintiffs' remaining arguments.

## IV.   **Fraudulent Inducement**

Both Foster Care Defendants and City Defendants move to dismiss the fraudulent inducement claim.[11]  To state a claim for fraudulent inducement under New York law, a plaintiff must allege that (1) "the defendant made a material false representation"; (2) "the defendant intended to [deceive or] defraud the plaintiff thereby"; (3) "the plaintiff reasonably relied upon the representation"; and (4) "the plaintiff suffered damage as a result of such reliance." *Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 592–93 (S.D.N.Y. 2021). Plaintiffs' fraud claim is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that parties "state with particularity the circumstances constituting fraud or mistake."  That standard has been referred to as the obligation to allege the "who, what, where, when, and why" of the claim. *Wai Chu v. Samsung Elecs. Am., Inc.*, No. 18-CV-11742-GHW, 2020 WL 1330662, at *5 (S.D.N.Y. Mar. 23, 2020).  Specifically, the plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).  In addition, the Second Circuit "require[s] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent," which may be done "by alleging facts to show that defendants had both motive and opportunity to commit fraud" or "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

---

[11] Although the SAC does not identify that these claims were brought under New York law, the parties' briefs assume that is the case, so the Court construes the claim consistent with the parties' briefs. The Court does the same for the breach of contract claim discussed in the next section.

### A. The SAC Sufficiently Alleges Fraudulent Inducement against Foster Care Defendants

Plaintiffs allege that Foster Care Defendants fraudulently induced K.S. to adopt D.S. SAC ¶¶ 866–70.  Specifically, Plaintiffs allege that they "made material representations of fact concerning D.S.'s history, special needs, psychological, psychiatric and medical needs, which were false" and "intentionally remained silent and made material omissions (particularly with respect to D.S.'s history of sexual abuse and of acting out sexually) to induce her to accept D.S. as a pre-adoptive foster child." *Id.* ¶ 868.

First, Foster Care Defendants argue that they did not actually deceive K.S. with any material misrepresentations because she visited D.S. for the first time while he was admitted to Brookdale Hospital Medical Center and his "discharge diagnoses included ADHD, Combined Type; Disruptive Mood Dysregulation Disorder, and history of encephalopathy, asthma." Foster Care Defs.' Mem. 18.  They argue that she therefore was aware of the "extent" of his medical history and needs.  They add that K.S. would have had plenty of time to observe D.S. after he began living with her for eleven months prior to adoption. *Id.* at 19.

That argument fails. Drawing all inferences in Plaintiffs' favor, the SAC suggests that K.S. did not have a complete understanding of D.S.'s history given that K.S. was repeatedly denied access to D.S.'s records during the time that she was a pre-adoptive foster parent. *E.g.*, SAC ¶¶ 625, 633.  Further, Plaintiffs allege that the "Brookdale Hospital report contains numerous inaccuracies" because Foster Care Defendants did not provide the hospital with a "complete history of D.S.'s diagnoses, treatment and educational program." *Id.* ¶ 528.  Indeed, Plaintiffs specifically allege that "[a]t the time K.S. agreed to be D.S.'s foster parent, she did not know D.S. had a history of sex abuse, extreme behaviors, and psychiatric hospitalizations." *Id.* ¶ 612.

In addition, Plaintiffs clearly allege concrete material misrepresentations and omissions regarding D.S.'s history. For example, although K.S. said she "was not able to foster and/or adopt a child who had either a history of sexual abuse and/or significant physical or psychological disabilities and psychiatric needs," Foster Care Defendant HSVS Assistant Director King "identified D.S. as a potential foster child for K.S.," and told K.S. "that the three things she knew about D.S. were that he had a big smile, liked bow ties, and played drums in the church band." *Id.* ¶¶ 600, 604. She made that statement despite allegedly knowing about D.S.'s psychiatric disabilities, history of being sexually abused, and sexualized behaviors. *E.g.*, *id.* ¶¶ 165, 422, 430, 523. After Foster Care Defendants placed D.S. with K.S. on June 30, 2017, they held a planning conference shortly thereafter on July 6, 2017. *Id.* ¶¶ 611, 616. "HSVS Case Planner" Tanisha Tabb was in attendance at the meeting. *Id.* ¶ 615. According to the SAC, not even two months earlier, "C.P. informed HSVS Case Planner Tanisha Tabb . . . that D.S. performed sexual actions at her home a few nights before" whereby "D.S. pulled down his pants and told C.P. to suck his personal parts and stick her fingers in his backside while screaming 'rape me.'" *Id.* ¶ 523. Yet that planning conference did "not include any reference to D.S.'s history of sexual acting out or reported sexual abuse." *Id.* ¶ 616. To the extent that Foster Care Defendants further dispute how much information K.S. knew and whether that information made it unreasonable to rely on their omissions, that is not appropriate to decide now. *See, e.g.*, *President Container Grp. II, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 168 (S.D.N.Y. 2020) ("[W]hether or not a plaintiff reasonably relied upon a defendant's statements is generally a factual inquiry that cannot be resolved on a motion to dismiss.").

Second, Foster Care Defendants argue that Plaintiffs have not "proven" actual pecuniary loss. But Plaintiffs need not prove anything at this stage. *See, e.g.*, *Fierro v. Gallucci*, No. 06-

CV-5189, 2008 WL 2039545, at *12 (E.D.N.Y. May 12, 2008) (concluding whether plaintiffs actually suffered pecuniary loss was "not an issue for the Court to decide on a motion to dismiss— plaintiffs have adequately stated reliance and damages resulting from defendants' alleged misrepresentations"). Regardless, Plaintiffs have sufficiently alleged monetary damages, citing specific examples and recognizing that "K.S. will need to incur significant expenses over the course of D.S.'s life – that she cannot afford – to try to provide care for D.S." *See, e.g.*, SAC ¶¶ 713, 755, 28. Accordingly, Foster Care Defendants' motion to dismiss Count VI is denied.

### B. Fraudulent Inducement is not Sufficiently Pleaded against City Defendants

Plaintiffs argue that DOE Defendants withheld records and without knowing the information in those records, she adopted D.S. However, the SAC merely alleges that DOE Defendants withheld information after K.S. requested it. *E.g.*, SAC ¶¶ 633, 705; *see also id.* ¶ 858 ("Foster Care Defendants also told the DOE Employees that K.S. was not permitted to gain access to D.S.'s records, forcing K.S. to have to file litigation."). Those allegations fail, however, to support an inference that DOE's failure to turn over records regarding D.S.'s education was done with fraudulent intent. And even assuming DOE Defendants withheld documents based on a fraudulent motive, the SAC does not allege with particularity how the lack of that information induced K.S. to adopt D.S. As to the other City Defendants, Plaintiffs merely allege that "K.S. also met with representatives of ACS" without any indication of what was or was not said, SAC ¶ 605, which is insufficient.[12] City Defendants' motion to dismiss Count VI is granted.

---

[12] City Defendants argue that Plaintiffs have also failed to comply with the state notice-of-claim requirement to bring this claim. In general, federal courts must apply state notice-of-claim requirements for state law claims. *See Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)). Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action. *Id.* at 794. Plaintiffs concede they did not provide notice but invoke the doctrine of equitable estoppel

## V.  **Breach of Contract**

Foster Care Defendants move to dismiss the breach of contract claim.  "To state a claim for breach of contract under New York law, plaintiffs must plead '(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *Schoninger v. Green*, No. 15 CIV. 2233 (PAC), 2016 WL 817474, at *2 (S.D.N.Y. Feb. 24, 2016) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)).  "[T]o recover as a third-party beneficiary of a contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party."  *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005).  Here, Foster Care Defendants concede that D.S. is a third-party beneficiary of its contract with City Defendants.  Foster Care Defs.' Mem. 20.

However, they argue that Plaintiffs have failed to specifically allege "what provisions of the agreement were breached," *Hekmat v. U.S. Transportation Sec. Admin.*, 247 F. Supp. 3d 427, 433 (S.D.N.Y. 2017), or that Plaintiffs were entitled to a different outcome.  But Plaintiffs have done exactly that.  Plaintiffs allege that Foster Care Defendants violated specific provisions of their contract with the City that required them to provide safe care and necessary medical services, facilitate visitation with siblings, comply with certification requirements, and ensure compliance with the Interstate Compact on the Placement of Children.  SAC ¶¶ 871–78.  Plaintiffs further allege that D.S. suffered harm that would not have occurred had those provisions been followed. *See, e.g., id.* ¶¶ 368, 401, 407, 418.[13]  Foster Care Defendants' motion to dismiss the breach of contract claim (Count VII) is denied.

---

to excuse their noncompliance.  Because the SAC's allegations are insufficient, the Court declines to address whether an exception to the notice-of-claim requirement applies.

[13] Foster Care Defendants also argue that the Court should dismiss this claim because it is "repetitive" of Plaintiffs' other claims.  However, at this stage, under Federal Rule of Civil

**VI.** **Foster Care Defendants' Argument for Dismissing the New York State Constitution Claim is Unsupported**

Foster Care Defendants assert that the New York Constitution claim should be dismissed because Plaintiffs do not cite "a single provision of the New York State Constitution." Foster Care Defs.' Mem. 21–22. Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to plead a "short plain statement of the claim." However, there is less rigor required with referencing the correct cause of action in a complaint compared to making sufficient factual allegations. *See Shomo v. State of New York*, 374 F. App'x 180, 183 (2d Cir. 2010) ("[F]ailure in a complaint to state a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters." (quoting *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988)). Plaintiffs contend that they meant to cite to N.Y. Const. Art. I § 11 providing that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof." Pls.' Opp'n Foster Care Defs.' Mot. 24. In response, Foster Care Defendants merely contend that this statement is still insufficient. They do not argue, however, that the *factual allegations* in the complaint are deficient.[14] Given that the formality Foster Care Defendants seek is not a firm basis to dismiss this claim, and because they have not attacked the allegations in the SAC, the Court denies the motion to dismiss the New York Constitution claim.

---

Procedure 8, Plaintiff can present claims under different legal theories in support of Plaintiffs' claim for relief. *See* 5 Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1282 (4th ed. Apr. 2023 update).

[14] Foster Care Defendants also argue in passing that because they are not state actors for the reasons stated in moving to dismiss the § 1983 claims, this claim should be dismissed. But the Court rejected that argument in the federal context, and Defendants have not argued that claims brought under the New York Constitution would render a different result.

**VII.    City Defendants' Motion to Dismiss the New York State Constitution and Statutory Claims**

Plaintiffs allege claims under the "New York Constitution, the New York State Education Law §§ 3202, 3203, 4401, 4404 and 4410 and the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200, *et seq.*" against DOE Defendants.[15] SAC ¶ 907. DOE Defendants move to dismiss these claims because of Plaintiffs' failure to comply with the notice-of-claim requirement of N.Y. Educ. Law § 3813(1), which requires for certain claims asserted against the New York City schools and certain officials, "that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim." "Education Law § 3813(1) is a statutory condition precedent to a [plaintiff's] bringing of a proceeding against a school district or board of education, and a [plaintiff's] failure to comply is a fatal defect mandating dismissal of the action." *Johnson v. Rockland Cnty. BOCES*, No. 21-CV-3375 (KMK), 2022 WL 4538452, at *5 (S.D.N.Y. Sept. 28, 2022) (alterations in original).

Plaintiffs concede that they did not comply with the notice-of-claim requirement, but they argue that several reasons make their claim exempt. Pls.' Opp'n City Defs.' Mot. 23, ECF No. 111. First, they rely on the exemption in N.Y. Gen. Mun. L. § 50-e(8)(a), which does not require that a notice of claim be filed "against public corporations by their own infant wards." "The rationale for this exception is that '[w]here . . . the prospective defendant (the city) and its own agency [are] the only parties reasonably situated to ascertain the existence of the claim and to prosecute the claim, it would be an idle gesture to require that they file a notice of claim against

---

[15] Plaintiffs' opposition to the motion to dismiss appears to assert that these claims apply broadly to all City Defendants, but the SAC clearly alleges these claims exclusively against DOE Defendants, which is how the Court will construe them.

themselves.'" *Tylena M. v. Heartshare Children's Servs.*, 390 F. Supp. 2d 296, 316 (S.D.N.Y. 2005) (alterations in original) (quoting *Thomas v. New York City*, 814 F. Supp. 1139, 1154 (E.D.N.Y. 1993)). Plaintiffs cite *Tylena M.*, where the court applied this exception because the 90-day notice period expired *before* the children were adopted, so the children remained in the state's custody during the time when notice would have been timely. *Id.* Here, by contrast, K.S. was D.S.'s parent for years before these claims were filed against DOE Defendants, and K.S. has not argued that she would not have been able to timely file notice based on when the claims accrued and when she adopted D.S.

Second, Plaintiffs frame their claims as federal causes of action, which do not require compliance with a state notice-of-claim requirement. In particular, they argue that because the IDEA incorporates each state's education laws that exceed the minimum floor set by Congress, Plaintiffs were not required to file a notice of claim. However, whether Plaintiffs can use state law as a substantive basis to support their IDEA claims is a different question from whether they have complied with the notice-of-claim requirement for claims asserted independently under state law. None of the cases Plaintiffs cite support that New York courts would recognize this as an exception to the notice-of-claim requirement.[16]

Third, Plaintiffs point to the exemption from the requirement that applies "when a litigant seeks only equitable relief." *Sheil v. Melucci*, 941 N.Y.S.2d 265, 267–68 (N.Y. App. Div. 2d Dep't. 2012) (collecting cases). Plaintiffs assert that these state law claims in Count X raise only equitable relief. However, as DOE Defendants point out, the particular cause of action does not

---

[16] Similarly, Plaintiffs appear to reframe its claim under N.Y. Educ. Law § 3202 as one under Fourteenth Amendment Due Process Clause to avoid the notice-of-claim requirement. But the SAC very clearly alleges this as a *state law* cause of action and not one under federal law.

specify what type of relief is sought.  In addition, Plaintiffs' prayer for relief suggests that it seeks monetary damages for these claims.  *See* SAC, Prayer for Relief (viii) ("Award Plaintiffs full and fair monetary damages in an amount to be determined by the jury for . . . educational injury and economic injury.").

Finally, Plaintiffs analogize to cases where a federal complaint to the U.S. Equal Employment Opportunity Commission was held to satisfy the notice-of-claim requirement instead of strict compliance.  They argue that K.S. provided notice when "she started to litigate administrative hearings and Family Court cases to obtain records and that the five hearings that were held concerning D.S.'s special education services." Pls.' Opp'n City Defs.' Mot. 25.  Even assuming Plaintiffs could use its FAPE and family court litigation as a basis for notice—a proposition that Plaintiffs do not support with any authority—it is not clear that such litigation would have provided sufficient notice.  The complaint that substitutes the notice must provide "notice of the nature of the claim and the essential facts underlying the claim." *Johnson*, 2022 WL 4538452, at *6.  Whether the FAPE and family court litigation includes the same underlying facts and claims as Plaintiffs' state law claims in the SAC is not clearly alleged or explained.

Accordingly, the New York Constitution and statutory claims are dismissed.

## VIII.   **Agreement to Dismiss Certain Claims**

Defendants move to dismiss several claims that Plaintiffs agree that they did not intend to bring against particular Defendants.  For Foster Care Defendants, the Court grants their motion to dismiss the New York State Education Law §§ 3202, 3203, 4401, 4404 and 4410 and the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200, *et seq.* (portions of Count X) and the IDEA (Count VIII) claims.  *See* Pls.' Opp'n Foster Care Defs.' Mot.

1 n.2.  Likewise, the Court grants City Defendant's motion to dismiss the breach of contract claim (Count VII).

**CONCLUSION**

Foster Care Defendants' and City Defendants' motions to dismiss the SAC pursuant to Rule 12(b)(6) are **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the Court **GRANTS** Foster Care Defendants' motion to dismiss the IDEA claims (Counts II, VIII) and the portion of Count X that pertains to the New York Education Laws and Regulations.  The Court **DENIES** Foster Care Defendants' motion to dismiss claims brought pursuant to § 1983 (Counts I, III, IV, XI) and § 504 (Count IX), and claims brought under New York Law for fraudulent inducement (Count VI), breach of contract (Count VII), and the New York Constitution claim in Count X.  The Court **GRANTS** City Defendants' motion to dismiss claims for fraudulent inducement (Count VI), breach of contract (Count VII), and New York Constitution and statutory law (Count X).  The Court **GRANTS** Smith and Frankel's motion to dismiss the claims against them.  The Court **DENIES** City Defendants' motion to dismiss the § 504 claim (Count IX).

The Clerk of the Court is directed to close the motions at ECF Nos. 80 and 107.

Dated: New York, New York
      October 10, 2023

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge