# DEPOSITION TOPICS[1]

I. **Policies, Foster Care Quality Assurance Standards Contracts with SVS/HSVS that Applied to D.S. During his Time in Foster Care**

1. The contracts between the City and Voluntary Agencies, inlcuding St. Vincent's Services, Inc. and Heartshare St. Vincent's for the provision of foster care services generally and to D.S. while he was in care.

2. The 2009 Foster Care Quality Assurance Standards, the January 2011 Foster Care Quality Assurance Standards, and the April 2011 Foster Care Quality Assurance Standards, including when they were in place and the rationale and basis for some of the standards, such as:

    a. Part V.A. of the 2011 Standards, including the basis for the following sentences in the 2011 Standards: (a) Educational deficits form barriers to child(ren)/youth served by the child welfare system from developing to their fullest potential; (b) Children placed into foster care need to maintain educational continuity; (c) existing educational deficits should be identified and remediated.

    b. Part V. B of the 2011 Standards including (a) the basis for the following sentence "Early diagnosis and treatment of developmental delays offers an opportunity for children/youth to achieve their maximum potential"; and (b) Part V.B.1; and (c) V. B.2

    c. The standards concerning: (a) facilitated visitation with siblings; (b) accurate case notes; (c) accurate and thorough FASPs or Case Plans; (d) case worker visits with children and foster parents; (e)mental health services; (f) medical care and documentation; (g) trauma-informed practices.

3. Other than what is included in the 2009 and 2011 Foster Care Quality Assurance Standards, the general role of ACS and Voluntary Agencies in providing foster care to children in New York City while D.S. was in foster care under Improved Outcomes for Children (IOC), including SVS and HSVS.

---

[1] Please note that these topics are being drafted without the benefit of having documents produced by the Defendants that were requested, such as the policies, procedures, protocols, guidelines, administrative directives, contracts (and attachments), organizational documents and similar documents that were requested. Further, documents concerning D.S. have not yet been fully produced. If documents are subsequently produced, some of these Topic may be narrowed or eliminated.

4. <u>Policies, procedures, practices, directives, and rules that applied to the roles, responsibilities and duties of (i) ACS and the SCO Family Agency with respect to the provision of preventive services (February 27, 2007 and the date on which D.S. was placed in foster care in 2009) and (ii) ACS and the HSV Defendants during the time period between the date on which D.S. was placed in foster care in 2009 and May 22, 2018 (unless otherwise noted) generally, which includes the following</u> unless otherwise duplicative of another topic[2]:

   a. *Licensing and recertification requirements for foster parents;*
   b. *Criminal Convictions: As of 2008 NY law changed in response to federal law. Felonies were non-waivable for new foster approvals and adoptive homes. ACS policy re approval for new children in foster homes and adoptive parents with individuals who have a criminal conviction that was nonwaivable.*
   c. *ACS role or policy/procedure when OCFS directs an agency to close a home (as occurred in this case).*
   d. *Adoption, including what information is to be provided to adoptive parents.*
   e. *Mental Health Services for Children in Foster Care*
   f. *Children who qualify for Therapeutic Foster Home*
   g. *Concurrent Planning;*
   h. *Permanency planning;*
   i. *Educational Stability;*
   j. *Foster parents moving out of state with the foster child/Interstate Compact;*
   k. *Children with special needs in foster care;*
   l. <u>Kinship Foster Care;</u>
   m. <u>Family Team Conferences;</u>
   n. <u>Caseloads;</u>
   o. <u>Case Conferencing;</u>
   p. <u>Moving foster Care agencies'</u>
   q. <u>Case Notes and Child Contact recording and recordkeeping, including the frequency with which How often Voluntary Agency caseworkers were supposed to record case notes;</u>
   r. *Sibling Visitation;*
   s. <u>The individual responsible for serving as a "Parent" in the Special Education process, including Surrogate Parents;</u>
   t. *Children engaging in sexualized acting out behavior; and*
   u. <u>Training caseworkers to identify signs of abuse, neglect and maltreatment.</u>

---

[2] As documents that Plaintiffs have requested in discovery have not been produced, it is impossible for Plaintiffs' counsel to determine whether these topics are duplicative. However, if they are, a witness need not be produced to address duplicative topics.

II. **D.S.'s Foster Care Records & Standards that Applied to Him**

1. A general description of the types of documents Bates Stamped by NYC 001-131 with the file name, "Warehouse Records" and the source of those documents (i.e. whether they were in CONNECTIONS or a different location) and the individuals who had access to those documents while D.S. was in foster care.

2. The document Bates Stamped SVS HHS 452-454, including whether ACS was advised of this notification, what, if any, policies, procedures and practices applied, what, if any next steps were required to be followed by ACS or the HSV Defendants.

3. Under applicable policies, procedures, protocols and standards, the roles, duties and responsibilities of individual ACS staff members with respect to D.S. while he was in foster care.

4. Policies, procedures, practices, directives and guidance describing how ACS and the Voluntary Agencies were supposed to use CONNECTIONS with respect to their role in provision of preventive services and foster care services to children, including D.S., and the meaning of the fillable fields in CONNECTIONS in relation to entries.

5. The actions, if any, taken by ACS to move D.S. to a different Voluntary Agency in 2015 or afterward.

6. The steps and/or actions taken by ACS to comply with the Family Court order referenced in the SAC, ¶ 673, and why ACS did not comply with that Family Court Order.

7. The steps and/or actions taken by ACS with respect to the recommendations and/or plans in the following documents (a) 2010 Neurology report (SVS HHS 1162-1164); (b) 2011 evaluation (HVS HHS 1166); (c) 2013 (SVS HHS 660-669); (d) NYC 3636-3637; (e) NYC 000005-00006; (f) NYC 003293; (g) NYC 003322

8. The reason(s) why D.S. was not referred to and/or provided a therapeutic setting, therapeutic foster home and/or recommended for a residential therapeutic setting.

9. What, if any, actions did ACS take to ensure that (a) D.S. was provided special education and a Free Appropriate Public Education ("FAPE") under the IDEA (20 U.S.C. 1400 *et. seq.)* while he was in foster care; (b) D.S. was provided recommended mental health services in foster care; (c) D.S. was provided sibling visitation; (d) D.S. was placed in a therapeutic setting; (e) D.S. was placed in a

    residential setting; (f) D.S.'s foster parents were trained and aware of their obligations and rights under the IDEA.

10. The training, professional development and/or workshops provided to any ACS employee prior to or during the time they had a role, duty or responsibility concerning D.S., including any training in special education policies, procedures and/or laws.

11. Any description of allegation of and/or finding of abuse and/or neglect against any foster parent or individual with whom D.S. spent time while he was in foster care, regardless of the manner or means by which ACS became aware of the allegation, and the result of any investigation and its findings.

12. Why ACS Defendants permitted Foster Care Defendants to place D.S. in a foster home with another child in 2015.

13. The roles, responsibilities and duties of the Third-Party Reviewers, Felice Henderson referenced on NYC 3391 and Howard Bishop referenced on NYC 3415 and NYC 3384.

14. Whether the Foster Care Defendants' documentation of D.S.'s foster care services in the FASPs, CONNECTION records, and HSV files were consistent with the applicable policies and standards that applied to the Foster Care Defendants.

15. Whether the foster care services, provided by Foster Care Defendants to D.S. as were consistent with the applicable standards and policies.

### III.  ACS Structure and Document Policies and Retention

1. The location of any of the documents referencing the topics set forth in this notice.

2. ACS policies and procedures concerning document retention with respect to documents concerning individual children, including emails.

3. ACS policies and procedures concerning document retention with respect to policies, procedures, practices, guidance documents, OCFS policies, monitoring and supervision and similar types of documents, as well as emails.

4. The ACS organizational chart (including titles and individual names) for the offices of the Commissioner, Deputy Commissioner and Assistant Commissioners, and each unit and/or division for which each is responsible, as well as subdivisions and group directories and statements of roles and responsibilities, for the years 2007-May 24, 2018.

IV. **ACS Oversight, Auditing, Quality Assurance and Monitoring of the Voluntary Agencies, Including SVS/HSV, and specifically:**

1. *Any auditing, monitoring and/or heightened monitoring or warning of heightened monitoring by the Agency Program Assistance (APA) unit of HSV during the time D.S. was in foster care.*

2. *Any auditing, monitoring and/or heightened monitoring or warning of heightened monitoring by the Agency Program Assistance (APA) unit of Voluntary Agencies during the time D.S. was in foster care.*

3. The "Quality Assurance Plan" at the SVS as discussed in Part X, Section B of the 2011 Standards.

V. **ACS Generally: IOC, the Audits, Workforce Institute and prior entity,**

1. Improved Outcomes for Children (IOC) process;

2. The audit by the New York State Comptroller (KS – 14612-1469), the communication between the Comptroller and ACS regarding the audit (*see* https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2020-19f23.pdf and https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2018-16n2-response.pdf). the steps that ACS took in response to the audit, as well as the rationale and reasons for taking those steps.

4. The statements made in the 2018 letter from Jennifer Fiellman published at https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2018-16n2-response.pdf ("Fiellman Letter"): (a) "ACS conducts monthly safety checks with each provider to review and verify all required case contacts, to review safety and risk alerts, critical incidents and staffing concerns, and to ensure agencies meet the Federal benchmark status . ."; (b) whether "customized reports that support supervision of case management practice" status referenced in the Fiellman Letter were available to agencies before the ACS Safe Measures Dashboard was implemented; and (c) whether frontline staff and supervisors, could "easily track case contact requirements and schedules" (as described in the Fiellman Letter) prior to the implementation of the ACS Safe Measures Dashboard.

5. The ACS Workforce Institute announced by ACS on January 5, 2016 (https://www.nyc.gov/site/acs/about/PressReleases/2016/acsworkforce.page ) and the training entity and process that ACS used to train the Voluntary Agencies prior to the

      development of the Workforce Institute, including STARS, including topics for training.

6. The expansion of training and services referenced in the article, "New York City Children's Services to add Training After Fatalities," by Winnie Hu. N.Y. Times, February 8, 2015, and specifically the statements attributed to Andrew White that foster care workers "need to understand the impact of trauma on children and their parents, and how to find the latest treatment" and "need to understand the science of child development," as well as the "innovative training and professional development opportunities" and additional mental health services for children that have "suffered trauma" and families.