## DEPOSITION TOPICS

In accordance with Rule 30(b)(6) and the foregoing definitions and instructions, the City Defendants are advised of their duty to designate one or more of its employees, agents, or other persons most qualified to testify on their behalf with respect to the following:

### I.  Implementation of Orders for Records

1. The steps that the DOE Defendants took to implement (a) the Queens Family Court decision referred to in paragraph 673 of the SAC, including the location of documents that have not been produced; (b) the decision in Case No. 172271, including the location of the responsive documents that have not been produced, including but not limited to D.S.'s preschool special education files.

2. The steps that the DOE Defendants took to implement the interim, pendency and final decisions in Case Nos. 210063, 197100, and 173308.

3. The DOE and City Defendants' policies, procedures, protocols and guidelines ("Policies") concerning implementation of impartial hearing orders, including but not limited to (a) whether the DOE or the City may pay tuition for a private school or for private services until the DOE receives proof of the child's attendance; and (b) documents marked as NYC Bates Nos. 12909-12961.

4. The DOE Defendants' Policies concerning implementation of 20 U.S.C. §1415(j).

### II.  D.S.'s Special Education Services

5. A general explanation of the categories and types of entries and fields on Bates Nos. NYC 5325-5406 ("SESIS Events Log"), including why D.S.'s SESIS Events log does not contain any information prior to 2012.

6. The events recorded on documents Bates Nos. NYC 5393-5401, including but not limited to (a) entries by Robin Greenfield; (b) efforts to reach L.M., (c) the reference on Bates No. 5404: "As per supervisor of school psychologists, surrogate parent should be sought. School

psychologist attempted to call Ms. Moore on three separate occasions to complete a social history update, discuss being a surrogate parent, and obtain consent. 11/15/13, Ms. Moore stated she will call back. 11/18/13, school psychologist called and left a message to schedule a meeting for sometime this week. 11/20/13, school psychologist left a message for Ms. Moore; (d) the reference on NYC 5398: "School psychologist and Assistant Principal met with Ms. Moore. Ms. Moore stated that she is not comfortable with becoming a serrogate (sic) parent and suggested we contact the agency. School psychologist is still waiting for paperwork from the agency that states that Ms. Moore is Darius' pre-adoptive parent."

7. The signatories and information contained on documents marked as Bates Nos. KS-10746, 10760, 10761, 10762-10765, 10766-10769, 10793, 10794, 10919.

8. The DOE's implementation of Prior Written Notice forms on or after 2013 as part of the SESIS implementation.

9. The IEPs that the DOE created for D.S. between 2010 and 2023.

10. The finding in the New York City Compliance Assurance Plan issued by New York State Education Department dated May 2019 ("2019 CAP") that "NYCDOE fails to consistently provide parents PWN on the form prescribed by the Commissioner of Education as required by 8 NYCRR 200.5(a) and a reasonable time before the school district proposes or refuses to initiate or change the identification, evaluation, or educational placement of the student or the provision of FAPE to the student in accordance with 20 U.S.C. §§1412(a)(6) and 1415(b)(3); 34 CFR §300.503; 8 NYCRR 200.5(a) and 200.16(h)(1)" as well as the findings on pages 21-22 of the 2019 CAP.

11. A general explanation of the types of entries and fields on the document entitled, in part, "Service Records for Student: D. S.,[redacted]" marked as Bates Nos. NYC 11597-11608 ("Encounter Attendance"), including how to interpret and the meaning of that document and the fields entitled: student, staff, service date time, service, duration minutes, and completed.

12. How to interpret and the meaning of the information about D.S. on the ATS documents produced by City and/or DOE (or that will be produced by the City and/or DOE), including attendance information, the ATS admission and discharge information and the ATS 407 Reports that have been requested but not yet provided.

13. The counseling services that D.S. was recommended for on his IEPs in 2011, 2012, 2014, 2015, 2016 and 2017.

14. Whether the DOE ever provided any mental health services, play therapy or counseling to D.S. relating to his trauma, adoption, abuse, or sexualized behavior, and if so, the location of the records regarding these services, including any progress and/or session notes.

15. The location of the IEP progress reports for D.S.

16. The Hospital Instruction D.S. received (a) in 2015 in Bellevue and Four Winds; (b) in the fall of 2021; and (b) in the spring of 2023 and the location of records concerning the instruction.

17. What steps, if any, the DOE took to implement the services on HHS SVS 1163-1166 and/or K.S. 116-125 for D.S.

18. The DOE's awareness of whether and what steps, if any, ACS took to implement the services on HHS SVS 1163-1166 and/or K.S. 116-125 for D.S.

19. The reason(s) D.S. did not receive special education services in 2013-2014.

20. The reason(s) the DOE did not permit K.S. to participate in D.S.'s special education process until after the Queens Family Court appointed her as the surrogate parent as referenced in paragraph 673 of the SAC.

**III. Services available for children with psychological or psychiatric conditions.**

21. Services available to be placed on the IEPs of children with behavioral, psychological and/or psychiatric conditions.

22. The Home Instruction Program Schools ("HIPS"), including the application process and the special education and related services offered through HIPS for children recommended for and waiting to be placed in a state-approved non-public school.

23. The types of counseling that can be recommended on IEPs, including but limited to (a) how counseling is recommended on an IEP; (b) whether the IEP team is permitted to specify the type of counseling or professional who delivers the counseling (such a guidance counselor, a social worker, a psychologist or a licensed mental health provider) or the type of counseling (such as play therapy, trauma counseling, DBT, CBT, etc.); and (c) how a mandate for "counseling" is to be implemented by the DOE when the type of counselor or counseling is not specified.

24. Services available from the DOE for children who engage in sexualized behavior.

25. The DOE's policies, procedures, practices and resources, concerning IDEA services and educational programs available to children with a serious mental illness, including availability of services on the New York City Continuum of Special Education Services, as well as protocols and guidance for coordination with other agencies.

26. Whether the DOE offers any services to children at home, other than the services offered through Home Instruction Schools and if so, the types of services provided, and the methods and means of such provision.

27. Whether the DOE offers Home Instruction Schools services after school to children with behavioral, psychological and/or psychiatric conditions, and if so, the types of services provided, and the manner and means of such provision.

28. The DOE Defendants' policies, procedures and practices including but not limited to the referral and placement process, concerning residential schools, as well as during the Relevant Time Period II, the process for referral and placement of children who are receiving foster care services in the custody of the Commissioner of the Administration for Children's Services.

29. As of September 2018 through the date of the deposition, the City Defendants' policies, procedures and practices, including the application process concerning home instruction and DOE's Home Instruction Schools and services provided by Home Instruction Schools.

30. The DOE's policies, procedures and practices concerning IEP development that applied to IEP teams preparing IEPs for D.S.

IV. **Central Based Support Team ("CBST")**

31. Policies, procedures, practices, roles and responsibility of the DOE'S Central Based Support team ("CBST") with respect to residential placements, including but not limited to (a) the procedures on documents Bate Stamped Nos. NYC 12962-13021; and (b) when the CBST may consider residential programs outside of New York State.

32. Policies, procedures, practices, roles and responsibility of the Central Based Support team with respect to day treatment, including but not limited to (a) KS-10888 and KS -11028.

V. **Education & Foster Care**

33. The DOE's Surrogate Parent policies, procedures and practices.

34. Any interagency agreements between the DOE and ACS (or any other agency), if any, concerning students with IEPs in foster care.

35. Any office, department, or individual that existed in the DOE dedicated to foster care children prior to 2022, when the DOE created the office referenced at the April 20, 2022 City Council hearing.

36. The dates of each of the initiatives discussed in the testimony of "John Hammer, Chief Executive Director Special Education Office" given to the New York City Counsel on April 20, 2022: (a) "best practices guide for IEP teams works with families during the transition to kindergarten, includes taking into account environmental and other stressors in initial eligibility determination as well"; (b) "training opportunities available to support IEP teams in considering the possible impact" of

trauma on an individual student; (c) "This asynchronous training is available to all staff members who are part of the IEP team including but not limited to special education teachers, general education teachers, related service providers, administrators, school psychologists, and social workers"; and (d) "we've conducted trainings on the topic of surrogate parents as a joint initiative with Advocates for Children and Legal Aid. The last training in June 2021 was attended by over 2,700 staff members."

37. The guidance and training that was referred to by John Hammer, Chief Executive Director Special Education Office" in this testimony to the New York City Counsel on April 20, 2022: "Back in November 2021, we issued guidance and training on considering trauma in special education evaluations and IEP development. The guidance is aimed at providing a trauma-informed framework of best practices regarding how a student's experience with trauma should be considered during the special education evaluation and IEP development process," including but limited to (a) whether NYC 14835-43 is the guidance referred to by John Hammer; and (b) whether the DOE had issued any guidance on trauma and the IEP and/or evaluation process prior to the documents marked. NYC 14835-43.

38. Any data tracking, analysis or monitoring of children in foster care with IEPs conducted concerning the prior of time that D.S. was in foster care.

39. Any policies or manuals concerning foster care and special education that were in place when D.S. was in foster care.

40. Any training or workshops provided to the SVS and/or HSVS agency staff who was responsible for D.S. concerning special education rights, including the dates of the trainings and the topics, and attendees.

VI. Document Retention and Data Collection

41. The DOE's document retention policy and whether (a) it was different than schedule ED-1 with respect to D.S.'s records from 2010-2020; and (b) whether Chancellor's Regulation A-820

entitled Confidentiality And Release Of Student Records; Records Retention dated 6/29/2009, was superseded, and if so, the date on which it was superseded and the name, number, identification, title of office or department responsible for, and location of the new regulation and its implementation.

42.     The Memorandum Of Understanding Between The New York City Department Of Education And The New York City Administration For Children's Services To Provide Access To DOE Computer Information To Foster Care Agencies Entitled "Project School Success" and executed by former Chancellor Joel Klein and former Commissioner of ACS John Mattingly in 2008; whether this memorandum was updated and/or ACS or foster care agencies given any expanded access or required DOE to obtain access to evaluations conducted by foster care agencies.

43.     The accuracy of the following factual findings in the Court's decision in *Matter of Board of Educ. of the City Sch. Dist. of the City of N.Y. v United Fedn. of Teachers,* 2014 NY Slip Op 31588(U) June 19, 2014, Sup Ct, New York County, Docket Number: 451028/2013:

   a. "In the spring of 2010, petitioner began implementing the Special Education Student Information System ("SESIS"), a computerized system capable of recording important data regarding services provided to special education students."

   b. "SESIS was introduced after a 2005 study commissioned by the petitioner recommended that a computer system which tracked factors such as referral information, date and nature of evaluation, and program placement would enable petitioner to better manage these students, who often needed to be seen by several providers, including, inter alia, teachers, speech and other therapists, and psychologists."

   c. "Whereas a student's individualized education plan ("IEP") had previously been maintained in hard copy form, SESIS was designed to serve as a central repository for all information related to a student's IEP. Each teacher, therapist, or other individual involved in a student's

      IEP became responsible for entering his or her own data into SESIS and each student's IEP could thus be reviewed or modified by anyone with access to the system."

d. By June of 2011, SESIS had been introduced in all of the DOE's schools.

e. When the 2011-2012 school year began, petitioner implemented the "encounter attendance" function of SESIS and required each of its employees providing special education services to enter into the system information regarding attendance and details regarding a particular special education session.