STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
K.S. on Behalf of Herself and Her Minor Child, D.S.,

                Plaintiffs,

vs.

THE CITY OF NEW YORK, *et al.,*

                Defendants.

------------------------------------------------------------- x

DECLARATION OF K.S.

Civ. No. 21-cv-4649 (JSR)

K.S., individually and on behalf of her minor child D.S.,

                Plaintiff

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION, , *et al.,*

                Defendants.

------------------------------------------------------------- x

Civ. No. 24-cv-03390 (JSR)

K█████ S█████████ declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct based on her personal knowledge and as to those statements made upon information and belief, she believes each such statement to be true:

    1.    I am D.S.'s adoptive mother.

2. I was advised that as of the last conference before the Court on November 1, 2024, the City has confirmed that they are insisting that D.S. must be deposed in person in New York City.

3. On October 15, 2024, the City had advised my lawyers that they also want D.S. to be available for a deposition for two full days – one day for the Heartshare St. Vincents Defendants and one full day for the City.

4. I submit this declaration in support of my request that the Court impose specific accommodations and restrictions on the upcoming deposition of my son, D.S., due among other thing, to his long-standing, episodic history of severe psychiatric and psychological conditions, cognitive challenges, and fragile emotional state, along with his recent successful residential placement at the Judge Rotenberg Center (JRC), whereat his physical, behavioral, and emotional well-being have been maintained without his suffering a significant disruption in his stability.

5. My son has a long and documented history of significant emotional trauma and cognitive impairments that make it difficult for him to discuss sensitive topics, particularly regarding the abuse and neglect he endured as a child.

6. He has been diagnosed with Post Traumatic Stress Disorder (PTSD), Attention Deficit/Hyperactive Disorder (ADHD), learning disabilities, and a long list of other conditions both while he was in foster care and since I became his foster and then adoptive parent in 2018.

7. Within the past four and a half years, *i.e.,* between May of 2020 and the present time, D.S. was in six different residential programs, juvenile detention, and was hospitalized for varying periods at least six times.

8. Since July 2023, D.S. has attended the Judge Rotenberg Center ("JRC") in Massachusetts through an Individual Education Program (IEP) from Defendant, the New York City Department of Education (DOE).

9. Despite the DOE having recommended a residential placement in his IEP as of August 2020, and despite my significant efforts, the DOE could not find a program that would accept D.S. for almost three years until the DOE located JRC.

10. I had to retain two consultants and file multiple administrative hearings and bring two applications with this Court to try to keep D.S. in a residential setting and to get him out of juvenile detention, where he had been involuntarily incarcerated for significant disruptive behaviors targeted at a caregiver in one of the residential schools.

11. During those three years, he engaged in extremely dangerous and unusual behaviors, including serious threats of harm to himself and others, throwing, eating, and smearing his feces, and property destruction.

12. Further during that time, my husband and I had to call 911 each time D.S. returned home – even for a short stay - to take him to the hospital because his behaviors were very dangerous – both to himself and to others.

13. I have already presented information about D.S.'s behaviors to the Court in two previous declarations, which I incorporate herein by reference, when my lawyer had to file for emergency orders from the Court (ECF Nos. 71-77, 95-105). While I assume the Court is aware of his history, I briefly provide additional background information for the Court's consideration of this application.

14. First, we obtained an order for funding to transfer D.S. from juvenile detention in Massachusetts to the J. Flowers Health Institute. ECF No. 77.

15. After D.S. was expelled from Flowers, following his engaging in repeated disruptive behaviors resulting in his hospitalization in Texas, we applied again to court and won for another order for the DOE to fund him at a program that claimed to be able to help him in Florida. ECF No. 105. That program only lasted one week, after which he was taken back to the psychiatric facility in Bellevue Hospital.

16. I am very relieved and cautiously optimistic that since his placement at JRC, D.S.'s behavior has improved compared to the three prior years (as well as some of D.S.'s earlier years as per his records); however, from his history and my experience with him, we are quite aware that his behaviors have been episodic and for this reason unpredictable.

17. Before the Pandemic, we had one- and one-half years in which he was able to live with me and attend school programs; while he continued to have certain behaviors, it was not at the extreme level that it rose to during the three years prior to his time at JRC.

18. Given his fragile condition during the early part of this lawsuit, my focus was on keeping him safe and ensuring he had a program to attend – which has been virtually a full-time job.

19. I expected that we would be able to bring in experts who would be able to examine him and then testify based on their observations and information; however, given the initial schedule that the Court ordered, it was not clear that this would be possible. With the revisions to the schedule, and his relative stability, he may more likely be able to be examined by experts. I understand though given the requirements of litigation and the lawsuit that D.S. will have to try to participate in a more direct way.

20. Therefore, I respectfully request that the Court order certain protections for my son should he be required to be deposed by Defendants.

21.  Given D.S.'s history, my concerns include that if he were to become dysregulated, he could re-engage the dysregulated and severely maladaptive behavior that could either result in a re-arrest in Massachusetts or in his expulsion from his program, which would be catastrophic for my son and our family. There are also safety issues to consider.

22.  In past attempts to discuss his traumatic experiences, including the loss of his family and separation from his siblings who were placed in foster care, the abuse and neglect as well as sexual abuse he experienced during that time, my son has consistently shut down emotionally and has attempted to leave or has left the room, the house, or wherever he had been at the time.

23.  Attempts to address these topics have triggered overwhelming emotional responses, and when pressed, at time, he has become distressed and acted out in ways that are extremely unsafe for him and those around him.

24.  In years of family and individual therapy, we have encouraged D.S. to open up about the traumatic experiences that have led him to be diagnosed with PTSD. Therapists have suggested implementing Trauma-Focused Cognitive Behavioral Therapy (TF-CBT) as a means of helping him process his trauma. Part of this therapy involves the creation of a trauma narrative, which would require him to develop a written or artistic story about his traumatic experiences.

25.  My son has been unable to engage in this process due to what I have been told is due to the severity of his trauma. Each time these efforts are initiated, he becomes emotionally withdrawn, and/or outraged to the point of cursing and/or throwing and breaking things and unable to continue. His inability to articulate or confront these painful memories further underscores the need for significant accommodations and conditions to any deposition process.

26. JRC is not a therapeutic program that uses that kind of therapy; further, I recently discovered that the staff who work with him there on a day-to-day basis did not know his history. There is also no family therapy component to that program so there is a limited ability for the staff to learn of his past experienced and behaviors.

27. In addition, while he has a regular counselor, that counselor is on maternity leave until December, and I have not been able to reach her since the questions of deposing D.S. has arisen. There is a covering therapist, but the program has advised that she is only available on a part-time basis, and it is not clear to me what level of services she is providing to D.S.

28. In addition to his emotional vulnerabilities and traumatic past, the DOE recently provided to us a copy of an IQ test that suggests that D.S.'s IQ has significantly decreased over the past year. This test showed that it continues to be difficult for him to process and retain information - his processing speed is in the extremely low range - which may hinder his ability to participate effectively in a deposition, particularly if he is under stress.

29. In the most recent production, moreover, the DOE provided us with a psychiatric evaluation as of spring of 2024.

30. On October 15, 2024, for the first time, D.S. was able to talk to one of the experts we retained about some of his past experiences, but after about an hour, he broke down in tears and had to discontinue the session.

31. D.S. shared that since having that conversation with the expert, Dr. Drob, he started to have nightmares again, which had abated.

32. Given that we know that his condition is episodic and given the three-year period of severe behavior that he engaged in prior to starting at JRC in the summer of 2023, I am

understandably fearful and extremely concerned about taking any steps that would trigger those behaviors to resurface.

33. In general, he has been extremely reluctant to speak about his past trauma with a therapist or with me or my husband.

34. He has told me that his goal is trying to forget these traumatic events from the past.

35. Given all these factors, I am deeply worried and concerned that discussing these topics in a legal setting for an extended period of time will cause him significant emotional harm - and potentially physical harm, without proper safeguards.

36. Moreover, D.S. cannot stay at home right now if the deposition is held in New York City. We do not believe it is safe for him or our family, particularly if the day (or days) will be spent re-hashing traumatic events in a highly stressful deposition situation, without any of the familiar supports or staff that have been helpful to him at JRC.

37. While JRC staff can bring D.S. to New York for a short amount of time, the staff cannot stay over in New York City and would have to return the same day. The drive can take up to 4-5 hours each way.

38. When the question of transporting D.S. for depositions and the trial arose, I contracted the transport service for children who have behavioral disorders called "Assisted Interventions." We have used the service to pick D.S. up and drop him off at residentials and hospitals.

39. While I do not agree that it makes sense to place D.S. in an unfamiliar setting with unfamiliar people unless it is necessary to do so, I advise the Court that Assisted Interventions has a service called "SafeHouse." Pursuant to this service, Assisted Interventions can arrange for two staff members to pick D.S. up at JRC, bring him to New York City for one day, stay overnight

in a hotel, and bring him back. The cost of that service, in terms of the quote we received (as it changes over time depending on who is available) is at least $6,468.80 with an extra $2,871 per overnight stay.

40. Admittedly there is a tension between engaging in this lawsuit to try to obtain funds for D.S.'s lifetime care, and having him participate in the case, while he is being forced to re-live and speak about his rape, traumatic childhood and background - which historically have been triggers for his dysregulations - in front of strangers. However, there is no reason not to try to minimize the risk of the situation to D.S.

41. In fact, since the City remains responsible for D.S.'s residential care until at least the end of the school year in which he turns twenty-one, it is both Plaintiffs' interest and Defendants' interest to try to ensure D.S. does not become destabilized. It is also the morally correct way to proceed.

42. Because the City Defendants are unwilling to agree to any protective measures for D.S., I request that the Court approve the following accommodations and restrictions for my son's deposition:

43. **Conduct the Deposition by Video:** Depositions are stressful for anyone, let alone a child with my son's background, experiences, conditions and past episodic behaviors. I request that we do not place D.S. in a highly stressful situation for a deposition, where he would be housed with strangers in an unknown and potentially unsafe environment, if it is not necessary to do so. I also request that he should not be taken out of his residential program where he has supports and familiarity (and has been stable for several months) while he is engaging in this extremely stressful event.

44. Despite my request, I understand that the Court may not be willing to order a video deposition. If the Court is unwilling to order a video deposition, I request that the Court direct that the deposition be conducted at JRC and not require D.S. to have his deposition taken in New York City. JRC has advised that they have meeting rooms and with advance notice can accommodate a deposition there.

45. If this case proceeds to trial, then we will have no choice but for D.S. to come to New York City and stay in the SafeHouse (assuming it is not yet safe for him to come home). However, given D.S.'s experiences, there is a powerful interest in trying to minimize the risk that D.S. will be placed in a dangerous situation or will become dysregulated without the structure, familiarity and protections of the residential setting that has been positive for him so far.

46. **Limit the Deposition to One Day with Multiple Breaks:** My son has lived a life filled with trauma and has significant mental health issues. The City and Heartshare generated and possess thousands upon thousands of pages of records concerning my son while he was in foster care (with the City) and receiving special education services (with the City). It was the City itself that determined he needed residential care. Given the sensitivity of the topics (loss of family, sexual abuse, physical abuse, mental illness, educational disruptions and failures), I request that the deposition be limited in time to no more than one five-hour day, or even a shorter period of time if he appears unable to continue, with multiple breaks around sensitive subjects as further described below.

47. **Presence of a licensed therapist or his Case Manager from JRC:** As noted, unfortunately, his regular therapist at JRC is on maternity leave, but I believe he has a temporary therapist and has a caseworker. At least one support staff person from JRC should be permitted to be present during the deposition to monitor my son's emotional and cognitive state, provide

9

support, and intervene if and as necessary. D.S. may nominate a staff member that he feels comfortable with or alternatively, JRC may have requirements for such a staff member to be present.

48.   **Monitoring:** The case manager or therapist should assess my son's ability to continue with the deposition, particularly if he becomes too emotionally distressed or overwhelmed, and the case manager or therapist must be allowed to pause the deposition, if need be, either for a break or to reschedule the deposition if D.S. becomes very upset or dsyregulated.

49.   **Frequent breaks:** My son should be allowed to take breaks whenever needed to manage his emotional and behavioral stability and should not be expected to withstand questioning for over more than forty-five minutes without a five- or ten-minute break.

50.   **Simplified questioning:** Given his cognitive impairments and limitations, it is important that questions are phrased clearly and simply, allowing sufficient time for him to process the information. Complex or multi-part questions must be avoided since they may be especially difficult for him.

51.   **Compassionate questioning:** Given his severe disabilities, his prior reactions as a teenager to engage discussion about his past, his tendency to disassociate, and his cognitive limitations, it is important that the tone and volume or the questions are not threatening, aggressive, loud, hostile, or rapidly delivered. Instead, questioning should be steady, straightforward, and mild mannered in delivery.

52.   These accommodations are essential to protect my son's mental health and emotional well-being while ensuring that the deposition can proceed in a fair and manageable way.

53. I that the Court for its consideration and trust that the Court will recognize the seriousness of these concerns and grant the requested accommodations to ensure his safety and his continued well-being, while maintaining the integrity of the process.

Executed in New York, New York on November 4, 2024



K█████ S█████